UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                             :
TRUEEX LLC,                                                  :
                                                             :
                                      Plaintiff,             :          **COMPLAINT**
                                                             :
                        - against -                          :
                                                             :
BANK OF AMERICA CORPORATION; BANK OF                         :
AMERICA, N.A.; MERRILL LYNCH, PIERCE,                        :
FENNER & SMITH INCORPORATED; BARCLAYS                        :
BANK PLC; BARCLAYS CAPITAL INC.; BNP                         :
PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.;                :
CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP                    :
GLOBAL MARKETS INC.; CITIGROUP GLOBAL                        :
MARKETS LIMITED; CREDIT SUISSE GROUP AG;                     :
CREDIT SUISSE SECURITIES (USA) LLC; CREDIT                   :
SUISSE INTERNATIONAL; DEUTSCHE BANK AG;                      :
DEUTSCHE BANK SECURITIES INC.; THE                           :
GOLDMAN SACHS GROUP, INC.; GOLDMAN,                          :
SACHS & CO.; GOLDMAN SACHS BANK USA;                         :
GOLDMAN SACHS FINANCIAL MARKETS, L.P.;                       :
GOLDMAN SACHS INTERNATIONAL; J.P.                             :
MORGAN CHASE & CO.; J.P. MORGAN CHASE                        :
BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P.                 :
MORGAN SECURITIES PLC; MORGAN STANLEY;                       :
MORGAN STANLEY BANK, N.A.; MORGAN                            :
STANLEY & CO. LLC; MORGAN STANLEY                            :
CAPITAL SERVICES LLC; MORGAN STANLEY                         :
DERIVATIVE PRODUCTS INC.; MORGAN                             :
STANLEY & CO. INTERNATIONAL PLC; MORGAN                     :
STANLEY BANK INTERNATIONAL LIMITED; THE                     :
ROYAL BANK OF SCOTLAND GROUP PLC;                            :
ROYAL BANK OF SCOTLAND PLC; RBS                              :
SECURITIES INC.; UBS AG; and UBS SECURITIES                 :
LLC;                                                         :
                                                             :
                                      Defendants.            :
------------------------------------------------------------------ x

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

PARTIES ..........................................................................................................13

    A.    Plaintiff ..............................................................................13

    B.    Defendants .........................................................................13

JURISDICTION AND VENUE ............................................................................22

FACTUAL ALLEGATIONS ................................................................................23

I.    THE MARKET FOR INTEREST RATE SWAPS ........................................23

    A.    The Trading of Interest Rate Swaps..............................................23

    B.    The Infrastructure for Interest Rate Swaps Trading .........................30

    C.    The Dodd-Frank Act .................................................................33

II.    TRUEEX CREATES AN ALL-TO-ALL INTEREST RATE SWAPS TRADING PLATFORM .................................................................34

III.    DEFENDANTS CONSPIRED TO BOYCOTT TRUEEX AND OTHER ALL-TO-ALL TRADING PLATFORMS..................................................37

    A.    The Dealer Defendants Boycott trueEX ..........................................44

    B.    The Dealer Defendants Similarly Boycotted Other All-to-All Trading Platforms ...........................................................................63

        1.    The Dealer Defendants Boycotted Javelin................................64

        2.    The Dealer Defendants Boycotted TeraExchange .....................66

    C.    The Dealer Defendants Deter Buy-Side Customers From Trading on trueEX and Other All-to-All Trading Platforms ....................................68

        1.    The Dealer Defendants Withhold or Impede Clearing Services to Buy-Side Firms that Attempt to Trade on trueEX and Other All-All Platforms .......................................................68

        2.    The Dealer Defendants Insist on "Name Give-Up" to Deter Buy-Side Participation on All-to-All Platforms ................................70

        3.    The Dealer Defendants Place Transgressors in the "Penalty Box" ..........79

D.     The Dealer Defendants' Conduct Has Chilled Market Progress ...........................82

IV.    DEFENDANTS' OTHER EFFORTS TO BLOCK ALL-TO-ALL TRADING OF
INTEREST RATE SWAPS ............................................................................................83

    A.     The Dealer Defendants Took Control of Tradeweb to Prevent the
Development of a More Competitive Trading Platform .......................................83

          1.     The Dealer Defendants' Strategic Investment Groups Took Control
of Tradeweb's Interest Rate Swaps Business ...........................................84

          2.     The Dealer Defendants and Tradeweb Hid the True Nature of the
Dealer Defendants' Acquisition of Control ..............................................88

          3.     The Dealer Defendants Installed Themselves on Tradeweb's
Boards and Committees and Use Their Positions to Further the
Conspiracy ...............................................................................................90

    B.     The Dealer Defendants Utilize Other Forums to Collude ....................................95

    C.     The Dealer Defendants Prevented Interdealer Brokers From Opening All-
to-All Trading Platforms to the Entire Market ....................................................97

V.    ABSENT A CONSPIRACY, IRS MARKET PARTICIPANTS WOULD
PREDOMINANTLY TRADE ON TRUEEX AND OTHER ALL-TO-ALL
TRADING PLATFORMS ..........................................................................................101

    A.     Relevant Market ................................................................................................101

    B.     The Dealer Defendants Have Substantial Market Power ...................................102

    C.     Defendants' Conspiracy Robbed trueEX of Substantial Profits .........................104

    D.     Absent Collective Action, It Would Have Been Economically Rational for
Individual Defendants to Support Structural Changes ........................................105

    E.     Investigations and Litigation Concerning the Credit Default Swaps Market
and ISDAfix Show a Pattern of Collusion Among the Dealer Defendants
to Manipulate Various Aspects of the Financial System .....................................107

          1.     The Dealer Defendants' Misconduct in the Credit Default Swaps
Market .....................................................................................................108

          2.     The Dealer Defendants' Manipulation of ISDAfix ................................110

VI.    THE STATUTE OF LIMITATIONS IS EXTENDED AND RENEWED DUE
TO THE DEFENDANTS' CONTINUING VIOLATION AND ONGOING

CONSPIRACY AND, IN THE ALTERNATIVE, IS EQUITABLY TOLLED
DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY ......................111

CAUSES OF ACTION .........................................................................................................114

FIRST CAUSE OF ACTION (VIOLATION OF SECTION 1 OF THE SHERMAN
ACT) ......................................................................................................................114

SECOND CAUSE OF ACTION (VIOLATION OF THE DONNELLY ACT).........................115

THIRD CAUSE OF ACTION (UNJUST ENRICHMENT UNDER NEW YORK LAW)........116

FOURTH CAUSE OF ACTION (TORTIOUS INTERFERENCE WITH BUSINESS
RELATIONS UNDER NEW YORK LAW)...................................................................117

PRAYER FOR RELIEF ......................................................................................................118

JURY DEMAND .................................................................................................................119

Plaintiff trueEX LLC ("trueEX" or "Plaintiff"), by and through its undersigned attorneys, alleges upon knowledge as to its own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This case concerns an ongoing conspiracy among major interest rate swaps ("IRS") dealers ("Dealer Defendants" or "Defendants"), to boycott trueEX in order to undermine increased competition in the IRS market and thereby maintain the Dealer Defendants' massive profits.[1]  By boycotting and successfully thwarting trueEX's IRS trading platform and similar trading platforms, Defendants have succeeded in blocking IRS customers from enjoying the benefits of greater price transparency and competition.

2.      The Dealer Defendants coordinated their interactions with trueEX to create the illusion of interest in the platform and progress toward providing liquidity to it, only to manufacture nearly identical pretexts – issue after issue, excuse after excuse, and delay after delay – as part of a scheme to neutralize the competitive threat by putting trueEX in an impossible position and waiting for it to give up, just like other platforms.

3.      As detailed herein, the Dealer Defendants' parallel conduct is shown in their common tactics, common excuses, and common vocabulary over time.  A striking example of their coordination came in July 2017 when, *within days of each other*, four of them separately contacted trueEX to suddenly agree to sign legal documents over which there had been extended delays and unnecessary wrangling.  Following this coordinated overture of feigned interest, the common excuses and artificial roadblocks continued.  As a current employee of the Defendant-controlled IRS trading platform Tradeweb Markets LLC ("Tradeweb") recently confided to

---

[1] As more fully defined below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS.

trueEX on or about March 15, 2018: "They are all in this together and will let trueEX die on the vine."

4.      An IRS trading platform is relevant only when it includes the participation of nearly all of the major liquidity providers:  the Dealer Defendants.  A trading platform that has the participation of all these dealers has a decisive advantage over any platform that lacks the participation of most of these dealers.  The Dealer Defendants coordinated to ensure that trueEX would never become relevant in the IRS market by collectively agreeing to provide liquidity to dealer-owned Tradeweb, while withholding the same liquidity from trueEX.  For example, for seven of the major dealers in the world (*i.e.*, JP Morgan, Citi, Barclays, Bank of America, Morgan Stanley, Deutsche Bank, and Goldman Sachs), not one streams Euro or Sterling liquidity to trueEX.  Six out of those seven do not stream any US dollar liquidity to trueEX.

5.      The Dealer Defendants' conspiracy goes beyond blocking trueEX's efforts to develop an anonymous all-to-all central limit order book ("CLOB") platform.  The conspiracy also includes blocking trueEX from generating meaningful business on its disclosed dealer-to-client request for quote ("RFQ") platform despite the platform's superiority to, and lower costs than, other RFQ platforms on which the Dealer Defendants trade, such as Tradeweb.  The Dealer Defendants collectively refuse to trade on trueEX's RFQ platform to ensure that trueEX does not gather sufficient traction to develop its all-to-all trading protocols that would threaten the Dealer Defendants' privileged position in the marketplace.

6.      The Dealer Defendants carried out their agreement and ongoing group boycott of trueEX through a common playbook that evolved over time and involved common tactics, excuses, and vocabulary, including, among other things: (1) requesting repeatedly that trueEX provide proof of customer demand for its trading platform, and then steering customers away

from trueEX's trading platform or otherwise pressuring customers to trade on Tradeweb when those customers contacted the Dealer Defendants; (2) creating unreasonable delays and erecting artificial barriers to progress, including (a) endless reviews of standard form documentation, (b) stating, for extended periods of time, that they do not have the resources available to on-board trueEX's platform, while simultaneously declining or ignoring trueEX's offers to provide any required resources, and (c) creating additional pretextual obstacles and excuses once prior impediments manufactured by the Dealer Defendants have been overcome; (3) conditioning or avoiding interactions with trueEX representatives, including even close personal friends; (4) delaying or refusing to clear trades on trueEX; and (5) attempting to placate trueEX with illusions of cooperation or progress beyond immaterial business.

7.      The Dealer Defendants' common efforts, tactics, and excuses were part of a coordinated effort to marginalize and thwart trueEX.

8.      The Dealer Defendants' conspiracy is driven by their trading desks, which have gone so far in some cases to illegally direct their clearing desks to limit clearing on trueEX in violation of Commodity Futures Trading Commission ("CFTC") regulations designed to ensure "an appropriate informational partition" between a bank's trading and clearing units.[2] Employees of the clearing units of Deutsche Bank, Goldman Sachs, Morgan Stanley, and Bank of America have admitted to trueEX employees that their trading desks influenced the decisions of the clearing units with regard to trueEX.  The Dealer Defendants similarly violated regulations

---

[2] *See* 17 C.F.R. § 23.605(d)(1) ("No swap dealer or major swap participant shall directly or indirectly interfere with or attempt to influence the decision of the clearing unit of any affiliated clearing member of a derivatives clearing organization to provide clearing services and activities to a particular customer . . . ."); *id*. § 23.605(d)(2) ("Each swap dealer and major swap participant shall create and maintain an appropriate informational partition . . . between business trading units of the swap dealer or major swap participant and clearing units of any affiliated clearing member of a derivatives clearing organization to reasonably ensure compliance with the Act and the prohibitions specified in paragraph (d)(1) of this section.").

that mandate the disclosure to counterparties of any "material incentives and any material conflicts of interest" regarding the decision to trade on a particular trading platform or clear a trade through a clearing organization.[3]  The Dealer Defendants, for example, failed to disclose their material conflicts of interest in pushing trueEX customers away from trueEX and to Tradeweb.

9.     Following *extended delays* in signing a basic agreement (called a "Participation Agreement" or "PA") required to move the process forward toward on-boarding trueEX's trading platform, four of the Dealer Defendants (Bank of America, Barclays, Deutsche Bank, and Morgan Stanley) separately contacted trueEX *within days of each other* in July 2017, all advising that they now were ready to sign the Participation Agreement.  Not coincidentally, these parallel overtures from four separate Dealer Defendants came very shortly after a ruling favorable for trueEX in a litigation filed by trueEX against MarkitSERV, an IRS trade processing company historically connected to the Dealer Defendants.  Soon afterwards, trueEX's CEO, Sunil Hirani, met with a senior officer at Barclays on August 9, 2017.  During the meeting, Mr. Hirani mentioned that four dealers, including Barclays, had agreed very recently, after extended delay, to sign up to trueEX within days of each other.  The Barclays officer's response was telling: "Who was the idiot from Barclays who called trueEX?"

10.     The Dealer Defendants engaged in further delays and obfuscation including, among other things, contending that "new product" approvals now were required before the process could move forward, even *after* some Dealer Defendants had signed the PAs.

11.     After extended delays reviewing basic PAs and raising other pretextual excuses, the Dealer Defendants have not meaningfully advanced on trueEX's platform.  Defendants

---

[3] 17 C.F.R. § 23.605(e).

Barclays, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, and UBS still do not provide automated pricing for any product or currency and are effectively non-participants on trueEX.  Other Dealer Defendants block trueEX through feigned cooperation, permitting only incredibly restricted pricing for limited products in specific currencies.  Bank of America, for example, only provides pricing to one client in one currency for compression trades—which merely consolidate multiple offsetting trades into one position—on trueEX.

12.     All of these *never-ending*, pretextual reviews, processes, excuses, and approvals were jointly created merely to thwart trueEX from ever obtaining the Dealer Defendants' cooperation on the trueEX trading platform.  In stark contrast, the Dealer Defendants completed onboarding onto their jointly-owned Tradeweb platform (a platform with nearly identical legal, operational, technological, and other onboarding issues as trueEX) within *several months* of the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), and all the Dealer Defendants stream pricing to Tradeweb for substantially all product types in all major currencies that Tradeweb supports.

13.     An IRS is a type of financial derivative.  It is an agreement between two parties to trade interest-rate cash flows on a specific amount of money for a fixed period of time.  In the most common type of swap — often referred to as a "plain vanilla" swap — one counterparty pays the other a *fixed* interest rate in exchange for receiving a *floating* interest rate.  The floating rate is often tied to an industry benchmark (or "reference rate"), such as LIBOR.  The counterparty paying a fixed rate is typically referred to as the "buyer," and the counterparty making payments at the floating rate is known as the "seller."  The value of the contract to each side moves (in opposite directions) depending on changes in interest rates.

5

14.     IRS comprise one of the largest financial markets, with billions of dollars in swaps (in notional value) traded each day.  Non-dealers seeking to trade IRS ("buy-side customers") have historically been limited to an opaque and inefficient over-the-counter ("OTC") market where they must individually contact one or more of the Dealer Defendants for price quotes.

15.     Plain vanilla IRS have been viable candidates for electronic trading because of their standardized structure and high level of transaction frequency.  Specifically, they have been viable candidates for electronic trading protocols that can facilitate an "all-to-all" environment, which would allow buy-side customers to trade IRS with a larger community of market participants, including non-traditional liquidity providers and other buy-side customers.  On platforms that offer all-to-all trading protocols, a buy-side customer can trade with *any* qualified trading partner and is not artificially limited to trading with just the Dealer Defendants that have historically acted as dealers.  "All-to-all" trading yields greater price competition because it increases the number of potential counterparties with whom buy-side customers can trade.  The increase in price competition saves these buy-side customers money by lowering their transaction costs.

16.     Yet, despite the buy-side's demand for more efficient and competitive electronic trading of IRS, and despite Plaintiff's substantial investments to its all-to-all trading platform, investors today remain stuck in an inefficient and antiquated market environment that forces them to trade IRS exclusively through the Dealer Defendants.  This state of affairs is the result of a carefully planned and well-orchestrated conspiracy among the Dealer Defendants to boycott the trading platform developed by Plaintiff that sought to provide all-to-all trading protocols to the buy-side.

17.     The Dealer Defendants conspired because they "want desperately to preserve the status quo" in order to protect the tremendous information advantage they enjoy in the market, which enables them to make extraordinary profits.[4]  As noted, the Dealer Defendants have historically acted as the primary market makers in the OTC market for IRS, meaning one of them was typically on one side of every IRS trade.  In this OTC market, trading was typically conducted over the telephone by "voice."

18.     The voice-based, OTC market for IRS conferred tremendous advantages on the dealers at the expense of buy-side customers.  Voice-based, OTC trading in IRS forced the buy-side to rely exclusively on dealers for price information because there was little or no price visibility available elsewhere.  In order to obtain an actionable price quote, the buy-side customer had to contact one of the dealers and disclose its identity, the intended direction of the trade (pay fixed or receive fixed), and the desired notional amount — critically important information that the dealer could use to its own advantage.

19.     Executing an IRS trade in the voice-based, OTC market was also very restrictive.  To complete a transaction, the dealers required buy-side customers to execute trades "on the wire," meaning that executable prices were only available when the buy-side customer was directly engaged with the respective dealer over the phone.  As a result, buy-side customers were severely limited in their ability to force multiple dealers to compete directly on price.  In short, the voice-based, OTC market for IRS was an opaque form of trading that did not provide an efficient means of competitive price shopping by buy-side customers and denied those customers

---

[4] Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

access to actionable, real-time price information.  The deck was stacked in favor of the dealers

and against their customers.

20.     As a result, the voice-based OTC market allowed the Dealer Defendants to

generate tremendous profits.  For every IRS, a Dealer Defendant has a "bid" price, at which it

will purchase the IRS, and an "ask" price, at which it will sell the IRS.  When the dealer

purchases an IRS at a lower bid price, and then sells an IRS with the same terms at a higher ask

price, the dealer realizes a profit on the difference between the prices, known as the "spread."  In

the dealer-to-customer OTC market, these bid/ask spreads are grossly inflated, allowing the

dealers to earn huge profits.

21.     But financial markets develop and evolve — or at least they are supposed to.  By

the 1990s, technological advances were bringing electronic trading to a variety of financial

markets.  Electronic trading in fixed income securities was introduced in the mid-1990s and

began gathering momentum in the IRS market in the early 2000s.

22.     The evolution of the IRS market to electronic trading should have displaced the

archaic and inefficient protocols of the voice-based trading regime.  The 2008 financial crisis

stemmed, in part, from opaque, inefficient markets controlled by relatively few players who put

the entire U.S. and global financial system at risk.  Recognizing as much, Congress sought to

bring more price transparency and competition to the markets for IRS and other derivatives with

Dodd-Frank.  Dodd-Frank mandates, for example, that standard IRS move to exchanges or swap

execution facilities ("SEFs"), which were envisioned as electronic trading platforms that would

allow trading on an all-to-all limit order book.[5]  Rules issued pursuant to Dodd-Frank were

intended to make the derivatives markets – which were assailed as opaque and inefficient

---

[5] An "all-to-all limit order book" is a system in which participants submit bids and offers that are then
automatically matched in order to facilitate efficient trading.

following the financial crisis – safer, more transparent, and more competitive.  But the Dealer

Defendants, in their quest for massive profits, have colluded to maintain opacity, inefficiency,

and control, once again creating and contributing to systemic financial risks for the U.S. and

globally.

23.       In 2010, trueEX was founded by Sunil Hirani, a veteran financial technology

entrepreneur.  Mr. Hirani assembled a team of derivative trading and technology professionals to

develop an electronic IRS trading platform.  trueEX expended nearly $95 million and years of

effort to develop and market its electronic trading platform.  trueEX also developed software to

permit live credit checks and connected to third-party credit hubs to facilitate central clearing of

trades.  Central clearing simplifies all-to-all trading by eliminating the risk a swap counterparty

will default on its obligations.  Unbeknownst to trueEX, however, the Dealer Defendants had

conspired to boycott entities offering modern, electronic trading to buy-side customers.

24.       The Dealer Defendants conspired for one simple reason: to continue to enjoy an

extraordinary profit center.  By blocking the entry of trueEX and other similar independent IRS

trading platforms, the Dealer Defendants force the buy-side to trade with them in an opaque OTC

market and thereby extract billions of dollars in monopoly rents, year after year.

25.       Absent collusion, the lack of transparency and limited price competition that

pervades the IRS market would have disappeared long ago.  Because of the benefits of

transparency, competitive pricing, and immediacy, markets for financial products historically

have moved to electronic, all-to-all trading platforms soon after the products become sufficiently

standardized and liquid.  Because of its maturity, size, and high-level of standardization, the IRS

market has long been primed for such electronic trading.

26.     Faced with a variety of threats of evolution to this modern form of trading, the Dealer Defendants banded together via a horizontal conspiracy to protect the highly-profitable market structure that they dominated.

27.     In particular, the Dealer Defendants engaged in a group boycott aimed at shutting down trueEX and other independent trading platforms that could develop all-to-all IRS trading. The Dealer Defendants' efforts to thwart trueEX have taken numerous forms common to all Defendants as detailed herein.

28.     The Dealer Defendants themselves trade IRS *among each other* on efficient, electronic platforms operated by entities known as interdealer brokers ("IDBs").  These platforms allow the Dealer Defendants to access transparent and better pricing for themselves while responding to buy-side requests to trade.

29.     Under collective pressure from the Dealer Defendants, IDBs allow only *dealer-to-dealer* transactions.  If an IDB were to allow buy-side customers access to its platform, the bifurcation of the market desired by the Dealer Defendants would have collapsed long ago.  The Dealer Defendants therefore make sure that any IDB that dares to consider opening its platform to the buy-side is put in the "penalty box" and blackballed.  ICAP, the leading IDB for IRS, has agreed with the Dealer Defendants to not open its interdealer platforms to the buy-side in exchange for the dealers' promise of continued liquidity and the primary market share in the interdealer market.

30.     The Dealer Defendants police the threat posed by IDB trading platforms through a practice known as "name give-up."  Name give-up requires disclosure of the identity of each swap counterparty to the other on every trade.  The Dealer Defendants impose this practice on IDBs for the sole purpose of enabling the dealers to ensure that no buy-side customer trades IRS

on the IDBs' efficient, electronic platforms.  Any SEF that does not fully implement name give-up, such as trueEX, is boycotted by the Dealer Defendants' cartel.

31.     Thus, even as they enjoy the benefits of exchange trading among themselves, the Dealer Defendants deny those benefits to their buy-side customers.  Buy-side customers have been effectively "shut out" of this "paradise of infinite liquidity and tight pricing."[6]

32.     As a result of the Defendants' collusion, trueEX effectively facilitates no "new risk" IRS trading despite years of development and millions of dollars in investment capital. Absent the Dealer Defendants' group boycott, IRS market participants would trade on trueEX's platform.  The boycott of trueEX and other independent, electronic trading platforms fits a pattern of collusion among the Dealer Defendants and others designed to manipulate various aspects of the financial system, including the market for credit default swaps ("CDS") and interest-rate derivatives.

33.     The Defendants' collusion is responsible for the irrational persistence of antiquated trading practices that deprive the IRS market of the cost savings and transparency associated with all-to-all trading.  The only SEFs — including Tradeweb's — that today have any meaningful buy-side customer trading activity are those that only promote trading directly between participants and a Dealer Defendant through a trading method whereby the customer places a "request for quote" with one or more dealers.  This RFQ method prevents the market from experiencing the true benefits of all-to-all trading and is the functional equivalent of transacting on the voice-based OTC market.

34.     As has become evident only recently, Tradeweb functions as a primary forum for Defendants' collusion.  Defendants made sure Tradeweb would not convert its platform to an

---

[6] Joe Rennison, *Meet the new OTC market-makers*, Risk (Feb. 27, 2014), http://www.risk.net/risk-magazine/feature/2331122/meet-the-new-otc-market-makers.

anonymous order book for the trading of IRS.  They also agreed to commit liquidity to Tradeweb and to withhold support from other trading platforms that threatened their privileged position in the market.  Against its own economic self-interest, Tradeweb agreed with the Dealer Defendants to shutter the possibility of offering competitive all-to-all IRS trading, and to forego the lucrative brokerage fees that would come from facilitating such transactions.

35.     The Dealer Defendants installed themselves on Tradeweb's Board of Directors and a variety of "committees" that meet to discuss the IRS market, secretly, under the cover of a supposedly legitimate and independent enterprise.  Key strategic personnel from the Dealer Defendants have used the auspices of Tradeweb to coordinate their conduct to ensure the IRS market does not develop in ways that threaten their collective dominance.  Tradeweb's board uses the time before and after board meetings to coordinate market structure arrangements as well as activities and actions to neutralize Tradeweb competitors such as trueEX.

36.     As a result of the Dealer Defendants' collusion, the IRS market has not developed in the manner that financial markets typically do.  The Dealer Defendants have instead collectively kept it frozen in time for their own selfish purposes.

37.     Yet, because Defendants' conspiracy to maintain a bifurcated market is not expressly prohibited by Dodd-Frank, the CFTC, the Dodd Frank Act's primary regulator with respect to the swaps market, is unable to address the anticompetitive harms described herein. Defendants' conspiracy is, however, prohibited by the Sherman Act, whose crucial role in putting a stop to collusive conduct by competitors Congress carefully and expressly preserved.[7]

---

[7] *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified.").  *See also* 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (statement of Rep. John Conyers, Jr.) ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

38.     Indeed, the need for the enforcement of the antitrust laws in this case is especially strong, given that Defendants continue to take steps to shield their ongoing conspiracy.  In October 2016, Bloomberg reported that in late May 2016 a "secret society" of the "top in-house lawyers for some of the world's most powerful banks" met at a hotel near Versailles to discuss the terms on which they would settle a related interest rate swaps class action antitrust litigation and other financial antitrust litigation.[8]  Two attendees disclosed that, among other things, the banks' lawyers discussed that no bank should settle any such lawsuit until at least 60 days after the filing of a defense motion to dismiss.  Bloomberg also reported that the Chief Legal Officer of Morgan Stanley "implored his confederates to hang together and resist the temptation to settle quickly."

## PARTIES

### A.     Plaintiff

39.     Plaintiff trueEX LLC is a Delaware limited liability company with its principal place of business in New York, New York.  trueEX LLC conducts swap execution activities and has been granted permanent registration as a SEF by the CFTC.

### B.     Defendants

40.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

---

[8] Greg Farrell & Keri Geiger, *Inside the Secret Society of Wall Street's Top In-House Lawyers*, BLOOMBERG (Oct. 14, 2016), https://www.bloomberg.com/news/articles/2016-10-14/what-top-bank-lawyers-were-doing-at-secret-versailles-summit.

41.     Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. BAC was a shareholder in Tradeweb during the relevant period and was part of the conspiracy against Plaintiff. Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York. BANA is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, BANA agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. MLPFS is a wholly owned subsidiary of BAC. In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the CFTC.

42.     As used herein, the term "Bank of America" includes Defendants BAC, BANA, MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that participated in the IRS market.

43.     Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England and branch locations in New York, New York. Barclays Bank PLC was a shareholder in Tradeweb during the relevant period and was part of the conspiracy against Plaintiff. Barclays Bank PLC is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Barclays Bank PLC

agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly owned subsidiary of Barclays Bank PLC. In addition, Barclays Capital Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

44.     As used herein, the term "Barclays" includes Defendants Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that participated in the IRS market. Barclays Bank PLC maintains a New York branch.

45.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch. BNPP SA is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, BNPP SA agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

46.     As used herein, the term "BNPP" includes Defendants BNPP SA, BNPP Securities, and their subsidiaries and affiliates that participated in the IRS market. BNPP transacts business in New York, New York.

15

47. Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Citigroup was a shareholder of Tradeweb during the relevant period and was part of the conspiracy against Plaintiff. Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York. Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York. Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England. Citibank, Citigroup Global Markets Inc., and Citigroup Global Markets Limited are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Citibank, Citigroup Global Markets Inc., and Citigroup Global Markets Limited agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

48. As used herein, the term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Limited, Citigroup Global Markets Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that participated in the IRS market.

49. Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Credit Suisse Group AG was a shareholder of Tradeweb during the relevant period and was part of the conspiracy against Plaintiff. Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London,

England. Credit Suisse International is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Credit Suisse International agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

50. As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that participated in the IRS market.

51. Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Deutsche Bank AG was a shareholder of Tradeweb during the relevant period and was part of the conspiracy against Plaintiff. In addition, Deutsche Bank AG is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Deutsche Bank AG agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

52. As used herein, the term "Deutsche Bank" includes Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that participated in the IRS market. Deutsche Bank maintains a New York branch.

53.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. The Goldman Sachs Group was a shareholder in Tradeweb during the relevant period and was part of the conspiracy against Plaintiff. Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs Bank USA is a New York state-chartered bank, with its principal place of business in New York, New York. Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Goldman Sachs & Co.; Goldman Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Goldman Sachs & Co.; Goldman Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

54.     As used herein, the term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, and their subsidiaries and affiliates that participated in the IRS market.

55.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant period, J.P. Morgan Chase & Co. was a shareholder of Tradeweb and was part of the conspiracy against Plaintiff. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co. J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Plc are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; and J.P. Morgan Securities Plc agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

56.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities Plc, and their subsidiaries and affiliates that participated in the IRS market.

57.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant period, MS was a shareholder of Tradeweb and was part of the conspiracy

against Plaintiff. Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah. Defendant Morgan Stanley & Co. LLC ("MS&C") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley & Co. International plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a subsidiary of Morgan Stanley UK Group, the ultimate parent of which is MS. Defendant Morgan Stanley Bank International Limited is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Morgan Stanley International Holdings Inc., the ultimate parent of which is MS. Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited are registered as swap dealers with the CFTC, and, during the relevant period, they entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. In addition, MS&C is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

58.     As used herein, the term "Morgan Stanley" includes Defendants MS; Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; Morgan Stanley Bank International Limited, and their subsidiaries and affiliates, including Morgan Stanley Capital Group Inc. and Morgan Stanley Capital Products LLC, that participated in the IRS market.

59.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut. RBS PLC is registered as a swap dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, RBS PLC agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. During the relevant period, RBS Group PLC was a shareholder of Tradeweb and was part of the conspiracy against Plaintiff. Defendant RBS Securities Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly owned subsidiary of RBS PLC. In addition, RBS Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

60.     As used herein, the term "RBS" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that participated in the IRS market. RBS PLC maintains a New York branch.

61.     Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut. UBS AG is registered as a swap

dealer with the CFTC, and, during the relevant period, it entered into IRS contracts with the buy-side in the United States. As part of the conspiracy, UBS AG agreed with the other Defendants to, and did, boycott the Plaintiff's platform, located in New York. UBS AG was a shareholder of Tradeweb. Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

62.     As used herein, the term "UBS" includes Defendants UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that participated in the IRS market. UBS maintains a New York branch.

## JURISDICTION AND VENUE

63.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiff alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

64.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

65.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because Plaintiff resided, transacted business, was found, or had agents in this District; all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

66.     Defendants' activities were within the flow of, were intended to, and had a substantial effect on interstate commerce.

67.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many Defendants are subject to personal jurisdiction in the United States because they were formed in or have their principal places of business in the United States.  In addition, all members of the conspiracy are subject to personal jurisdiction in this District because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiff residing in, located in, or doing business throughout the United States.  For example, the Defendants directly conspired through Tradeweb, whose principal place of business is in New York, New York, and at Tradeweb Board of Directors meetings in Miami and elsewhere. Further, the Defendants conspired to boycott trueEX, which is based in New York.

68.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.  The IRS at issue in this action often included a contractual clause submitting the parties to jurisdiction in this District.  Also, the IRS at issue were regularly traded through the desks of the Dealer Defendants located in New York.  The Dealer Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries traded IRS swaps in the United States as their agents, and if these agents did not, the Dealer Defendants would have to have made those trades themselves.

**FACTUAL ALLEGATIONS**

**I.     THE MARKET FOR INTEREST RATE SWAPS**

    **A.     The Trading of Interest Rate Swaps**

69.     In the early days of IRS trading, IRS contracts were not standardized and typically had to be negotiated and documented on a trade-by-trade basis.  As a result, IRS trading involved

high transaction costs.  Nonetheless, because IRS allowed parties to manage and hedge against movements in interest rates, they became widely used by a variety of investors.  Many entities also began to use IRS to speculate on movements in interest rates.

70.    Over time, IRS trading became more standardized.  In 1987, the International Swaps and Derivatives Association ("ISDA"), created the ISDA Master Agreement, which outlines standard terms to govern OTC derivatives transactions, and became widely used.  By no later than 2000, all of the material terms of most IRS — including the tenor (*i.e.*, the maturity or term of the swap), the fixed rate, the reference index used to calculate floating payments, the payment frequency, and the timing of payments — were standardized, resulting in lower transaction costs and higher trading volumes.  As a result, counterparties can enter into an IRS by simply agreeing upon the tenor, notional amount, fixed rate, and floating rate index.

71.    Consequently, the IRS market has grown exponentially over the last three decades.  From 2006 to 2014 alone, the outstanding notional value of IRS grew from $230 trillion to $381 trillion.

### The Dealer-to-Customer Market

72.    As demand for IRS increased, the Dealer Defendants positioned themselves as the exclusive market makers or liquidity providers in the IRS market.  As market makers (also called the "sell-side"), these banks became the sellers of IRS, offering fixed and floating-rate cash flows to their customers — the so-called "buy-side."

73.    IRS trading typically works as follows: A buy-side customer asks a dealer for a quote either: (1) to pay the floating rate and receive a fixed rate, or (2) to pay the fixed rate and receive a floating rate.  The rate at which the dealer will pay the fixed rate is known as the "bid," and the rate at which it will receive the fixed rate is known as the "offer" or the "ask."  In a

simple example, a five-year IRS may be quoted by a dealer at a bid of 2.00% and an ask of 2.05%, meaning that the dealer will either pay the fixed rate at a 2.00%, or receive a fixed rate of 2.05%. The difference between the bid of 2.00% and the ask of 2.05% is referred to as the "bid/ask spread" (or "bid/offer spread" or "spread").

74. The fixed rate is the primary term that is subject to negotiation when entering into an IRS trade. A buy-side customer that seeks to pay the floating and receive the fixed rate will receive the "bid" price quoted by a dealer for the fixed rate. A buy-side customer seeking to pay the fixed rate and receive the floating rate will pay the "ask" or "offer" price quoted by a dealer for the fixed rate. The floating rate in either case is typically based on LIBOR. In some cases, the terms of trade include an upfront cash payment, in one direction or another.

75. Generally speaking, the wider the spread between the bid and ask prices, the more money the Dealer Defendant makes and the more the IRS costs for the buy-side. The mid-point of the spread is generally considered to be the mid-market price.

### *Voice Trading*

76. Trading of IRS between dealers and buy-side customers has historically occurred in a voice-based, OTC market environment. In this environment, the trading process is almost exclusively conducted on the telephone, which has several features that limit the trading capabilities of the buy-side, while also providing significant advantages to the Dealer Defendants.

77. Voice-based trading in IRS forced the buy-side, for example, to rely exclusively on the Dealer Defendants for real-time pricing information because there was very little reliable pre-trade pricing visibility. Logistically, calling all available dealers for price information was not realistic, so often buy-side customers would engage a very small community of dealers. In

addition, in order to obtain price information, buy-side customers would have to disclose to each dealer they called their identity, the direction of their trade (pay fixed or receive fixed), and notional amount.  This provided a one-way flow of information about upcoming trades to the dealer, which it could in turn use to its own trading advantage.

78.     Executing a trade in the voice-based IRS market was even more restrictive than the price discovery process.  To complete a transaction, the Dealer Defendants required buy-side customers to execute trades "on the wire," meaning that price quotes were only actionable when the customer was on the phone with the dealer.  This prevented buy-side customers from shopping around to many dealers, comparing all of the quotes, and forcing dealers to compete directly on price.  The Dealer Defendants also often required buy-side customers to announce if they were putting one dealer "in competition" with other dealers, further minimizing price competition.  Thus, buy-side customers were rarely able to avail themselves of the best prices in the market.

## *Electronic Trading*

79.     Electronic trading in fixed income securities was introduced in the mid-1990s and began gathering momentum in the IRS market in the early 2000s.  Technology had the potential to make IRS trading much more efficient, transparent, and competitive for the buy-side, as it did in other financial markets.  In the IRS market, however, the dealer-to-dealer and the dealer-to-customer markets took very different paths.  Simply put, the former developed, while the latter did not (because of Defendants' collusion).  While the IDB platforms that support dealer-to-dealer trading evolved to promote transparency, ease of access, speed of execution, and reduced trading costs, the dealer-to-customer markets adopted protocols that replicated many of the historical voice-based OTC practices.

80.     The only IRS trading platforms open to buy-side customers that have survived Defendants' conspiracy typically use an RFQ protocol whereby an investor can request quotes from several dealers, but from no one else.  This basically amounts to the investor calling dealers to obtain quotes, except using electronic messages instead of the telephone.  As with a voice-based transaction, the RFQ protocol on these platforms is not anonymous — the customer must disclose its identity at the time of the request, as well as valuable information about the customer's trading intentions, even if a trade is not agreed upon.  Accordingly, these protocols, by design, largely replicate the limitations of the voice-based, OTC market.

81.     The protocol differences between the two sides of this bifurcated market, as they exist today, are summarized in the following chart:



82.     As this chart shows, whether a buy-side investor is trading over the telephone, in a Bloomberg chat, or through a dealer-to-customer platform, the investor is stuck trading in a way that largely replicates the limitations of the OTC market.  In the RFQ protocols, buy-side

customers do not have access to the real-time price transparency or competitive pricing found in other modern financial markets that facilitate all-to-all trading.

### *The Dealer-to-Dealer Market*

83.     In marked contrast, as shown in the chart above, the Dealer Defendants trade with *each other* in a separate interdealer marketplace that developed more naturally to have far more competitive protocols.  When dealers want to lay off risk on other dealers, they trade on dealer-only competitive and transparent platforms provided by IDBs.  These platforms are very different than the inefficient trading mechanism to which the Dealer Defendants relegate their buy-side customers.

84.     When trading with each other on an IDB platform, dealers submit their bid and ask prices to the IDB, which then publicizes the best quotes (known as the "inside market") anonymously to all other dealers on the platform.  A dealer can immediately enter into an IRS contract at a quoted price without negotiation, or it can ask the IDB to attempt to negotiate (commonly referred to as "tighten up") a better price.  Because several standardized IRS products have been actively traded for years, IDBs use electronic trading platforms akin to "order books," "limit order books," or "central limit order books," which automatically match the best bids and offers.  In return for facilitating dealer-to-dealer trades, an IDB earns a commission, known as a "brokerage fee" on each.

85.     The price transparency and immediate execution available in interdealer IRS trading yields direct price competition among dealers.  As noted, the interdealer market is also pre-trade anonymous: the dealers' identities are concealed from one another until they agree to enter into a trade.  This prevents any entity on an interdealer platform from being discriminated against in terms of pricing.  It is only at the time of execution, post-trade, that counterparty

identities must be revealed — as discussed below, this requirement (known as "name give-up")

is imposed so that the Dealer Defendants can ensure that no buy-side customers are trading on

the IDB platforms.

### *The Dealer Defendants Block All-to-All Trading*

86.     While only dealers have access to limit order book trading, nothing about the IRS

market inherently requires that to be the case.  Quite the opposite: because of the standardization

of IRS, increased liquidity, and the availability of clearing, much of the IRS market should have

moved years ago to all-to-all trading platforms.  And there are a number of reasons why the buy-

side would welcome all-to-all trading.  "A centralised trading platform can bring together a large

set of traders with opposing trading interests, reducing search frictions and raising competition to

fill an order."[9]  The introduction of all-to-all trading brings pricing transparency to the

marketplace, typically resulting in a narrowing of bid/ask spreads.

87.     The buy-side remains locked in an archaic market as a result of Defendants'

conspiracy to block access to the trading tools that the Dealer Defendants have enjoyed for years.

The Dealer Defendants have restricted their buy-side customers from entering the interdealer

market and relegated them to dealer-to-customer platforms that preserved many of the dealers'

inherent advantages (and buy-sides' inherent restrictions) in the voice-based, OTC market.

88.     The Dealer Defendants have also actively blocked the buy-side's use of all-to-all

trading platforms, which would give the buy-side access to competitive marketplaces similar to

those the Dealer Defendants have enjoyed for years.  When insurgent entities, such as trueEX,

tried to bring all-to-all trading to the market or open existing IDB platforms to the buy-side, the

Dealer Defendants actively preserved the status quo by using their collective market power to

---

[9] *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 23 (2016),
http://www.bis.org/publ/mktc07.pdf.

prevent such efforts from succeeding.  The Dealer Defendants have even blocked trueEX from achieving a meaningful RFQ platform, let alone any traction toward an anonymous all-to-all CLOB.

### B.     The Infrastructure for Interest Rate Swaps Trading

89.     As IRS developed into standardized and highly liquid financial products, the technology and supporting infrastructure for all-to-all trading of IRS was readily available.  An example of this infrastructure is central clearing.  Long before Dodd-Frank mandated in 2010 that IRS and other swaps be cleared through central clearinghouses, IRS were fully capable of being centrally cleared for both the dealers and buy-side customers.

90.     A clearinghouse is an entity designed to step in the middle of a bilateral trade to reduce counterparty risk.  A clearinghouse becomes the counterparty to both buyer and seller, and turns the transaction into two separate trades: a sale from the seller to the clearinghouse, and then a sale from the clearinghouse to the buyer.  An advantage of cleared trades is that every trade participant faces the same counterparty — the clearinghouse.  As a result, market participants do not need to evaluate the creditworthiness of their counterparty before every deal.  Central clearing also eliminates the need for ISDA agreements between counterparties because they no longer face each other.  Central clearing helps lay the groundwork for all-to-all anonymous trading by bringing buyers and sellers to a centralized platform, creating the infrastructure for the processing of trades, and eliminating case-by-case creditworthiness assessments.

91.     Financial contracts have been cleared going back to the latter stages of the 19th century.  The clearing of futures and other exchange traded derivatives began in earnest in the early 20th century with commodity exchanges in New York and Chicago forming their own clearing houses.  As financial markets grow in size and liquidity, contract terms tend to become

more standardized, and eventually the vast majority of transactions take place in cleared all-to-all anonymous trading environments.  This pattern has taken place in equities as well as commodities where the vast majority of trading volume takes place on exchanges.

92.     Central clearing of buy-side IRS trades was feasible by, at the latest, the early 2000s.  Because the type, size, and maturity of buy-side trades are similar to those of interdealer IRS trades, it would have been straightforward to extend central clearing to the buy-side.  One obvious option was to use a clearing model known as the futures commission merchant or "FCM" clearing model — which is the model that was used for many asset classes by the early 2000s and is used by the IRS market today.

93.     Generally speaking, clearing works as follows: two counterparties agree upon the terms of an IRS transaction.  The first counterparty is to receive a fixed rate and pay a floating rate while the second counterparty is to receive a floating rate and pay a fixed rate.  Rather than execute an IRS transaction with each other (as in a bilateral transaction), each counterparty enters into an IRS transaction with a central clearinghouse.  The first counterparty enters into an IRS with the clearinghouse where the it receives a fixed rate and pays a floating rate while the clearinghouse receives a floating rate and pays a fixed rate; and the second counterparty enters into an IRS with the clearinghouse where the second counterparty receives a floating rate and pays a fixed rate while the clearinghouse receives a fixed rate and pays a floating rate.

94.     The clearinghouse is neutral as to these two transactions.  The financial transfers from the first transaction are completely offset by the financial transfers from the second transaction.  The counterparties, on the other hand, pay and receive the same financial transfers as if they had entered into a non-cleared bilateral IRS transaction.  The two counterparties, however, do not have a direct contractual relationship, thus effectively eliminating the risk the

other counterparty may default on its contractual obligations.  By removing this risk, buy-side investors can trade anonymously on electronic trading platforms, without being concerned whether a counterparty will fulfill its contractual obligations.

95.     While this arrangement decreases counterparty risk for the two trading parties, it does not decrease counterparty risk for the clearinghouse itself.  To solve this problem, in many asset classes, FCMs serve as intermediaries between buy-side clients and the clearinghouse.  The FCM establishes credit limits for its buy-side clients and posts collateral to the clearinghouse on behalf of the client, thereby assuring that all obligations of its clients will be met throughout the life of each transaction.

96.     This FCM model (or other similar models) could have been readily applied to IRS by the early 2000s.  The FCM clearing model has been used for decades to centrally clear a variety of complex financial instruments traded in an all-to-all environment, including futures, options, and other exchange-traded derivatives.

97.     Indeed, as discussed further below, sophisticated industry players with a proven track record of bringing clearing and trading solutions to a variety of financial markets, including the Chicago Mercantile Exchange ("CME"), sought to provide those solutions for the IRS market but were stopped from doing so by the Dealer Defendants.  No technological or infrastructure impediments prevented the opening of all-to-all IRS trading to the buy-side.

98.     By at least 2010, the buy-side was demanding all-to-all trading of IRS, IRS were fully capable of trading on modern electronic platforms with all-to-all trading protocols, and the infrastructure supporting those protocols existed.  There were, therefore, no natural or technological reasons why the IRS market did not evolve to allow the buy-side to conduct all-to-

all trading of IRS on electronic trading platforms.  The only reason the market did not develop in that way is because Defendants conspired to prevent it from occurring.

### C.   **The Dodd-Frank Act**

99.     In reaction to the fallout from the 2008 financial crisis, Congress passed Dodd-Frank on July 21, 2010.  Among the stated purposes of the legislation was to "promote the financial stability of the United States by improving accountability and transparency in the financial system" and to "protect consumers from abusive financial services practices."[10]

100.    A key goal of Dodd-Frank was "to bring greater pre-trade and post-trade transparency to the swaps market."[11]  As the CFTC noted: "The OTC swaps market is less transparent than exchange-traded futures and securities markets."[12]  The CFTC also recognized that "transparency lowers costs for investors, consumers, and businesses; lowers the risks of the swaps market to the economy; and enhances market integrity to protect market participants and the public. . . all market participants will benefit from viewing the prices of available bids and offers and from having access to transparent and competitive trading systems or platforms."[13]

101.    As part of Dodd-Frank, Congress created SEFs, a new type of CFTC-regulated entity defined as "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system."[14]

---

[10] Dodd-Frank Wall Street Reform and Consumer Protection Act Preamble, PL 111-203, Preamble, 124 Stat 1376, 1376 (2010).

[11] Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33476, 33477 (June 4, 2013) (to be codified at 17 C.F.R. pt. 37).

[12] *Id.* at 33476.

[13] *Id.* at 33477.

[14] 17 C.F.R. § 1.3.

102.     Congress also mandated that IRS move to exchanges or SEFs to be centrally cleared.  Dodd-Frank employs an FCM model of clearing, which effectively makes the Dealer Defendants' FCM divisions gatekeepers for IRS clearing.[15]

103.     While Dodd-Frank authorized the CFTC to oversee the swaps market, the Act expressly preserved the operation of the antitrust laws to address collusive conduct such as the Defendants' boycott conspiracy.[16]

## II.    TRUEEX CREATES AN ALL-TO-ALL INTEREST RATE SWAPS TRADING PLATFORM

104.     The IRS market has long been primed and ready for the introduction of all-to-all electronic trading.  By at least 2010, hundreds of trillions of IRS were traded in standard types. There was no longer any need to maintain a privileged set of dealers to provide liquidity in the market.  OTC dealers are sometimes useful sources of immediacy for infrequently traded financial instruments where it would be rare for any two buy-side firms to have reasons to trade at or around the same time.  But that does not describe the majority of the IRS market and has not for many years.

105.     The benefits that central clearing and all-to-all trading could bring to the IRS market were widely recognized by market participants, regulators, and economists—and there was tremendous demand for modern, electronic trading platforms for IRS.

---

[15] There are only approximately 20 active FCMs for IRS trading, and nearly all are owned by the Dealer Defendants.  *See* Tod Skarecky, *FCM Rankings – Q3 2016*, CLARUS FIN. TECH. (Nov. 16, 2016), https://www.clarusft.com/fcm-rankings-q3-2016/.

[16] *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified.").  *See also* 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (statement of Rep. John Conyers, Jr.) ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

106.     In 2010, trueEX was founded by Sunil Hirani, a successful financial technology entrepreneur who has focused on increasing efficiency, transparency, and competition in derivatives exchanges and OTC markets.  trueEX includes veteran financial technology entrepreneurs whose proven track record of derivatives industry innovations includes building the first electronic trading platform, first electronic processing platform, and first clearing house for credit derivatives.  trueEX sought to bring to market an IRS electronic trading platform open to both buy- and sell-side entities.

107.     trueEX assembled derivative trading and technology professionals in order to develop an electronic trading platform focused on providing exchange-traded and centrally cleared IRS trading to all market participants, including anonymous CLOB and RFQ trading. This would have been a major step forward for the buy-side, granting them access to an anonymous all-to-all trading platform similar to the IDB platforms used by the Dealer Defendants.

108.     trueEX developed next-generation technology and innovative trading solutions to provide pre-trade certainty of execution and clearing, trade anonymity, pre-trade and post-trade transparency, as well as low cost execution for the interest rate swaps market.  trueEX created a web-based graphical user interface ("GUI") that permits new customers to instantly access electronic order entry, execution and clearing, views of market activity, and historical data without prior installation or cost to the customer.  trueEX also permits customers to integrate trueEX into their own trading software by using trueEX's application programming interface ("API") as an automated entry point using standard industry protocols.  trueEX additionally permits customers to gain access to trueEX through numerous industry standard third party gateways.

109.    The development and marketing of trueEX's trading platform demanded enormous industry knowledge and technological skill, thereby requiring the employment of numerous technology, operations, and sales experts.  trueEX incurred substantial expenses, including office rental, data center fees, licenses for software and financial vendor platforms, and legal and compliance advice.  Ultimately, trueEX spent nearly $95 million in connection with the development and operation of its electronic IRS platform.

110.    trueEX focused on developing a CLOB with an all-to-all liquidity pool.  There is no post-trade name give-up on trueEX's CLOB—all execution remains completely anonymous. trueEX was also dedicated to creating electronic trading options beyond CLOB trading, including RFQ trading for both standard (*e.g.*, plain vanilla swaps) and highly customized swaps (*e.g.*, unusual currencies and custom dates).  trueEX also developed a well-received Portfolio Terminations and Compaction ("PTC") trading protocol that gives customers even more trading flexibility to execute, terminate, or novate a package of trades.  trueEX's platform is clearing agnostic, giving customers a choice of clearinghouse for their swaps business.

111.    On September 25, 2012, the CFTC designated trueEX as a Designated Contract Market ("DCM").  This designation permitted trueEX to act as a board of trade (or exchange) for IRS.  As noted by trueEX's CEO in a related press release, trueEX planned to bring "transparency for the first time to [the] opaque, multi-trillion dollar [IRS] market.  Moving the derivatives markets to an exchange-traded and centrally cleared environment will mitigate systemic risk, reduce execution and processing costs, and provide much-needed transparency."

112.    On April 26, 2012, trueEX executed a clearing agreement with CME Clearing and, in 2013, continued to develop software to permit live credit checks, and connected to credit hubs developed by other entities, such as Traiana Inc., to conduct pre-trade credit checks.

113.    On September 20, 2013, the CFTC granted trueEX temporary registration as a SEF.[17]  On October 2, 2013, trueEX began offering its innovative anonymous CLOB, with pre-trade certainty of clearing and the benefits of standardization, transparency, anonymity and the ability for market participants to submit limit orders.

114.    Not surprisingly, trueEX was well received by customers and smaller liquidity providers.  Many prominent buy-side firms, such as Buy-Side Client 1, Buy-Side Client 2, Buy-Side Client 3, Buy-Side Client 4, Buy-Side Client 5, Buy-Side Client 6, Buy-Side Client 7, Buy-Side Client 8, Buy-Side Client 9, Buy-Side Client 10, Buy-Side Client 11, Buy-Side Client 12, and Buy-Side Client 13, signed up to trueEX.  In total, 100 buy-side entities on-boarded onto trueEX.

115.    trueEX was well positioned to earn substantial brokerage fees as a leading all-to-all trading platform in the $300 trillion global IRS market.  Investors estimated trueEX's worth to be more than $225 million.  trueEX would have earned these substantial fees and maintained this considerable value but for the Defendants' conspiracy described herein.

## III.    DEFENDANTS CONSPIRED TO BOYCOTT TRUEEX AND OTHER ALL-TO-ALL TRADING PLATFORMS

116.    Industry observers noted that, following the CFTC's preliminary approval of SEFs, SEFs such as trueEX were "poised to take business from the big banks that have dominated swaps trading."[18]  Faced with this threat, the Dealer Defendants conspired to prevent electronic trading from introducing greater competition and transparency.  None of the Dealer

---

[17] The CFTC did not award full registration for any SEFs until 2016, when the CFTC granted trueEX full registration on January 22, 2016.

[18] Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

Defendants acting alone could stop such trading platforms from succeeding.  The Dealer Defendants instead worked together to ensure that trueEX and other such trading platforms would not succeed.

117.    As detailed below in Section IV, the Dealer Defendants coordinated their conspiracy through numerous forums, including their joint involvement with Tradeweb, ISDA, and the Futures Industry Association ("FIA").

118.    Personnel from the Dealer Defendants' strategic investment groups, which, as also detailed below in Section IV, are organized for the specific purpose of protecting the dealer community from the growth of all-to-all trading, organized and perpetuated the conspiracy at issue through regular meetings.  Besides meeting through the boards of Tradeweb, ISDA, and the FIA, Dealer Defendants' personnel met in informal settings to carry out an ongoing dialogue concerning their joint opposition to all-to-all trading platforms, which would result in the compression of bid/ask spreads and lower profits.  During these secret discussions, these personnel mapped out strategies for neutralizing the threat posed by anonymous all-to-all trading platforms.

119.    The heads of the Dealer Defendants' IRS trading desks also maintained an ongoing dialogue about their preferred structure of the IRS market.  Besides meeting through the boards of Tradeweb, ISDA, and the FIA, these "heads of rates" regularly communicated through email and Bloomberg messages, at lunches, dinners, industry conferences, and other events.  In these communications, they discussed their mutual desire to maintain the status quo and prevent anonymous all-to-all electronic trading.[19]

---

[19] As noted below, many of these trading desk heads were also installed on Tradeweb boards at various times during the relevant period, including the following: Luke Halestrap (Head of Emerging Markets Interest Rates at Bank of America), Nicholas Brophy (Head of Rates Trading in the Americas at Citi), Timothy Blake (Head of U.S. Interest Rate Products at Credit Suisse), Michele Faissola (Head of Global

*The Dealer Defendants Boycott All-to-All Trading Platforms*

120.    The Dealer Defendants prevented the emergence of all-to-all trading principally

by boycotting market entrants like trueEX that dared to try to open up electronic all-to-all IRS

trading platforms to the buy-side.  The Dealer Defendants are so intent on preventing

competition that they have even blocked trueEX from getting a toehold on its disclosed dealer-

to-client RFQ platform.  These efforts have "been relentless — sometimes buried in SEF

rulebooks and trading workflow minutia, and other times amounting to outright intimidation."[20]

The Dealer Defendants needed to act together to ensure that neither trueEX nor the other nascent

SEFs gathered enough liquidity from the Dealer Defendants or alternative liquidity providers to

pose a threat to the Dealer Defendants' privileged position in the marketplace.  As a result of

these collective steps, Defendants have successfully prevented meaningful change in the market.

121.    As one industry leader explained, there remains "a two-tier market today on the

S[EF]s — dealer-to-dealer and dealer-to-client" and "[i]t is not truly an all-to-all market."[21]

Similarly, Darcy Bradbury of D.E. Shaw, a buy-side institution, has commented that "we've

ended with a bifurcated market where you have a couple of customer-to-dealer SEFs where

basically that's the only place the customers can trade.  And then you have the deeper pools of

---

Rates at Deutsche Bank), Stephen Wolff (Head of Strategic Investments and Head of Fixed Income e-
Commerce at Deutsche Bank), Simon Maisey (Head of eCommerce for Global Rates at JP Morgan),
Christopher Paul Willcox (Global Head of Rates Trading and Global Rates Strategic Investments at JP
Morgan (and later a Managing Director at Tradeweb)), Kemal Askar (Head of Rates Trading in the
United States at JP Morgan), David Moore (Head of Global Rates at Morgan Stanley), Richard Volpe
(Global Head of Dollar Interest Rates at RBS), and Paolo Croce (Head of European Rates at UBS).

[20] DENNIS KELLEHER, CAITLIN KLINE, & VICTORIA DAKA, STOPPING WALL STREET'S DERIVATIVES
DEALERS CLUB 12 (Feb. 2016), https://bettermarkets.com/sites/default/files/Better%20Markets%20
Policy%20Brief%20-%20Stopping%20Wall%20Street's%20Derivatives%20Dealers%20Club.pdf.

[21] Peter Madigan, *Buy-side firms slam broker Sefs over lack of anonymity*, RISK (Oct. 24, 2014),
http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of-
anonymity.

liquidity, the central limit order books, at the interdealer broker SEF platforms."[22]  Ms. Bradbury

added that the buy-side wants to "be able to use central limit order books instead of just the RFQ

process that's available on the customer-to-dealer SEFs" because the platforms will allow end

users to obtain "better information about what pricing is," as well as "more competition" and

"deeper pools of liquidity."[23]

122.    The IRS market does not have to operate this way.  Not long ago, before the

Defendants' collusion became apparent, market participants forecasted "that 40 to 50 firms could

end up competing for swaps execution business."[24]  Today, however, only trueEX remains to

offer anything close to anonymous all-to-all trading.[25]

123.    When trueEX and other all-to-all trading platforms solicited the participation of

the Dealer Defendants, the Dealer Defendants would speak with each other to ensure collective

action with respect to the platform.  They used a variety of tools to ensure that these platforms

failed so they could keep the buy-side relegated to trading on dealer-to-customer platforms that

are nothing more than the functional equivalent of the OTC marketplace.

### *The Dealer Defendants Withhold or Impede Clearing on All-to-All Platforms*

124.    The Dealer Defendants blocked or impeded trading on trueEX and other all-to-all

trading platforms.  Because Dodd-Frank effectively requires that any trades occurring on SEFs

---

[22] Transcript of the April 2, 2015 Meeting of the U.S. Commodity Futures Trading Commission Market Risk Advisory Committee Meeting, 140:2-8, http://www.cftc.gov/idc/groups/public/@aboutcftc/ documents/file/mrac_040215_transcript.pdf.

[23] *Id.* at 140:9-19.

[24] Mike Kentz, *SEF start-ups face obstacles*, INT'L FIN. REV. (July 22, 2013), http://www.ifre.com/sef-start-ups-face-obstacles/21099200.article.

[25] *See id.* (noting that "market participants are beginning to doubt the viability of start-up platforms that were once assumed to be guaranteed a slice of the market").

be cleared, the clearing subsidiaries of the Dealer Defendants could prevent those trades from occurring simply by causing their FCMs to refuse to clear.

125.     At the behest of the Dealer Defendants, clearinghouses have insisted on requiring clearing members to contribute large amounts of capital to the clearinghouse's default (or "guaranty") fund.[26]  This practice of insisting that clearing members must satisfy extremely large capital requirements is unnecessary and is itself one way that the Dealer Defendants block entry and competition.  Since large banks like the Dealer Defendants are generally the only entities that can satisfy these large capital requirements, they function as critical waypoints (or potential roadblocks) on the path to clearing.

126.     As noted above, Dodd-Frank employed an FCM model for clearing, which effectively made the banks' FCM divisions gatekeepers for IRS clearing.  The Dealer Defendants have come to use that gatekeeping role to further their conspiracy by refusing to clear IRS trades on trading platforms that utilize all-to-all trading protocols.

127.     FCMs generate revenues by clearing trades on behalf of firms that are not clearing members of a clearinghouse.  This relationship should be mutually beneficial — the FCMs earn fees on each trade they submit for clearing, and their customers are able to gain access to clearing without having to comply with onerous capital requirements.

128.     By regulation, the Dealer Defendant FCMs must operate separately from the Dealer Defendants' trading desks, and the FCMs derive no revenues from IRS trading.[27]  Thus,

---

[26] For example, CME requires clearing members to hold $50,000,000 in capital *and* contribute at least $15,000,000 in cash to its guaranty fund in order to clear IRS.  *See* CME GROUP, *Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership and OTC Derivatives Clearing Membership* (April 2016), http://www.cmegroup.com/company/membership/files/summary-of-cme-group-clearing-membership-requirements.pdf.

[27] *See supra* n.2.

in a competitive marketplace, FCMs would be agnostic as to which trading platforms their customers use and as to their customers' counterparties.  In fact, an FCM operating in its own interest would, subject to credit limits, want to maximize the amount of trades it clears for customers, regardless of where or how the trades were executed.  This is because the only risk that FCMs face is the risk that their buy-side clearing clients default, a risk in no way connected to the platform on which a customer conducts an IRS trade.

129.    Determined to stop all-to-all SEFs, the Dealer Defendants jointly caused their FCMs to withhold clearing services from buy-side customers or second-tier dealers seeking to trade on SEFs operating all-to-all anonymous trading platforms open to the buy-side.[28]

130.    This coordinated misconduct was directly contrary to the economic self-interests of the Dealer Defendant FCMs and would not be economically rational if it did not further the interests of the Dealer Defendants' cartel.  The FCMs nonetheless capitulated to the demands of their trading desks and management, who are focused on keeping buy-side customers from trading on anonymous all-to-all platforms.

131.    FCMs must confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place, and will not allow the trade to move forward if a customer fails this "pre-trade credit check."[29]  To prevent customers from trading on an all-to-all anonymous trading platform, the Dealer Defendant FCMs frequently refuse to

---

[28] *See* KELLEHER, ET AL., *supra* n.20, at 12 (noting that dealers "deny[] their clearing customers the credit limits necessary to trade on SEFs that don't acquiesce to the dealers' demands").

[29] A pre-trade credit check can occur via either a "ping" or a "push" system.  Under a "ping" system, a SEF will "ping" an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade.  Under a "push" system, an FCM will pre-authorize a customer to clear trades up to a certain credit limit, a practice commonly referred to as "pushing limits."  As an example, Barclays might "push" a limit of $500 million to a SEF for its customer, buy-side customer X, meaning that X could trade and clear up to $500 million of IRS on that SEF without needing to re-obtain approval from Barclays before every trade.

conduct pre-trade credit checks for any prospective trade on an anonymous all-to-all SEF. When buy-side investors attempt to trade on an all-to-all anonymous SEF, the Dealer Defendant FCMs' refusal to conduct a pre-trade credit check means the trade cannot occur. FCMs therefore have the ability to act as gatekeepers by restricting the order flow of buy-side customers onto all-to-all platforms.

132. The Dealer Defendants routinely provide pre-trade credit checks and clear buy-side trades on other platforms that are not anonymous. In particular, they provide pre-trade credit checks and clear buy-side trades executed on Tradeweb's dealer-to-client RFQ or on other platforms that they do not view as threats to the bifurcated market structure. They refuse, however, to provide pre-trade credit checks or clear any trade by a buy-side entity executed on an IDB or an order book, including those operated by Bloomberg and Tradeweb, thereby making it effectively impossible for the buy-side to trade on these platforms.[30]

133. The Dealer Defendants' ability to prevent or impede clearing has blocked market entry for all-to-all anonymous trading platforms, including those offered by trueEX. Without access to clearing, buy-side firms and second-tier dealers cannot trade on such platforms and are forced to trade on dealer-friendly SEFs like Tradeweb that retain the basic, inefficient dealer-to-customer trading structure of the OTC market.[31]

---

[30] See KELLEHER, ET AL., *supra* n.20, at 12.

[31] The Dealer Defendants have used their "death-grip" on clearing to block startups offering anonymous, exchange-style trading in other markets as well, including the Treasury market. When Direct Match Holdings Inc. attempted to give more customers access to the same type of anonymous, exchange-style trading that banks have enjoyed for years in the Treasury market, it died without arranging even one trade because no bank would grant Direct Match access to clearing-and-settlement. *See* Matthew Leising & John Detrixhe, *Demise of Direct Match Shows Bank Death-Grip on Treasury Market*, BLOOMBERG (Aug. 29, 2016), http://www.bloomberg.com/news/articles/2016-08-29/demise-of-direct-match-shows-bank-death-grip-on-treasury-market.

134.    As a result of the Defendants' conspiracy, trueEX and other all-to-all trading platforms have done little or no IRS trading for new credit risk.

### A.    The Dealer Defendants Boycott trueEX

135.    As described above, trueEX expended immense resources to develop an IRS trading platform with the ultimate goal of creating an all-to-all anonymous CLOB platform. After learning of trueEX's plans for an IRS platform, the Dealer Defendants conducted secret meetings, including under the cover of Tradeweb, to discuss how to neutralize this threat.

136.    As has only become evident recently, the result of those discussions was an agreement to implement a group boycott aimed at shutting down trueEX and similar trading platforms.  The Dealer Defendants carried out their agreement in coordination with each other and through a common playbook that evolved over time and involved common tactics, excuses, and vocabulary, including, among other things: (1) requesting repeatedly that trueEX provide proof of customer demand for trueEX's trading platform, and then steering customers away from trueEX's trading platform or otherwise pressuring customers to trade on Tradeweb's platform when those customers contacted the Dealer Defendants; (2) creating unreasonable delays and erecting artificial barriers to progress, including (a) endless reviews of standard form documentation, (b) stating, for extended periods of time, that they do not have the resources available to on-board trueEX's platform, while simultaneously declining or ignoring trueEX's offers to provide any required resources, and (c) creating additional pretextual obstacles and excuses once prior impediments manufactured by the Dealer Defendants have been overcome; (3) conditioning or avoiding interactions with trueEX representatives, including close personal friends; (4) delaying or refusing to clear trades on trueEX; and (5) attempting to placate trueEX with illusions of cooperation or progress beyond immaterial business.

### *The Dealer Defendants Dissuaded and Pressured Customers*

137.    The Dealer Defendants coordinated to neutralize trueEX by working in unison to

gather information about trueEX's customers and business plans, and then share that information

with each other.  The Dealer Defendants used the similar tactic of asking trueEX to provide them

with customer lists and names of customers under the guise of discussing future business with

trueEX.  In reality, the Dealer Defendants had no interest in doing meaningful business with

trueEX, but rather were interested in delaying and thwarting trueEX's progress and acquiring

information to evaluate trueEX's competitive threat and to identify potential customers that they

could then steer away from trueEX and to the dealer-owned Tradeweb.

138.    Dealer Defendants personnel would take information that they learned about

trueEX's product offerings and share it with Tradeweb to replicate and employ in an effort to

ward off customer demand for trueEX.  Certain dealer personnel (including Rana Yared of

Goldman Sachs) expressly asked trueEX to waive or modify provisions of trueEX's standard

non-disclosure agreement so that Dealer Defendants could discuss information learned about

trueEX with other Dealer Defendants and Tradeweb.  When trueEX pushed back on the

inclusion of such a provision in October 2014, Goldman Sachs stopped moving forward with

trueEX and stated that its "tech resources have moved onto another project as a result" of

trueEX's comments.  The Dealer Defendants also supply Tradeweb with employees, such as

Rana Yared's sister, who have access to information about trueEX through connections to the

Dealer Defendants.

139.    The Dealer Defendants engaged in information gathering efforts in a similar and

coordinated way, uniformly citing a "lack of customer interest" in trueEX as an excuse for not

using the platform and thus requiring trueEX to provide customer lists or otherwise identify

customers interested in using trueEX.

140.    Unaware of the Dealer Defendants' conspiracy, trueEX readily complied and

asked their customers to contact Dealer Defendants to express their interest in trading through

trueEX.

141.    Frequently, the Dealer Defendants insisted that trueEX instruct their buy-side

customers to contact Dealer Defendants directly, ostensibly to test customer demand, but in

reality so that they would have a chance to steer the customers' business away from trueEX.  For

example, Nicola White, Head of Fixed Income at Morgan Stanley, asked that trueEX have

clients call Morgan Stanley about "client demand for MS" on trueEX in October 2015.

142.    Once the customers actually contacted the Dealer Defendants, the Dealer

Defendants attempted to force the customer to justify its interest in trueEX, to dissuade the

customer from using trueEX, or to explicitly pressure the customer to use Tradeweb instead.

143.    Not only were the Dealer Defendants' *tactics* consistent and coordinated, but their

*excuses* upon being questioned or confronted by trueEX were as well.  The Dealer Defendants

uniformly would downplay their interactions with trueEX's buy-side customers, claiming that

they were "platform agnostic" or "client-driven," that they were simply "educating" clients about

their "liquidity options," and that individual traders were merely expressing their own opinions

about trading platforms.  The Dealer Defendants also stated that if anyone were pressuring

clients to use Tradeweb, they were only uninformed or unsophisticated employees on the trading

desk.

144.    For example, when trueEX confronted Goldman Sachs to complain about the

same tactics in 2014, Rana Yared's excuse was that Goldman does not suggest that clients join

46

any platform in particular, but "only make them aware of where at any point in time they can access our liquidity." This excuse was repeated by her colleague Bryan Koplin, who claimed that Goldman Sachs was only interested in learning more about the trueEX customer's interest and "educating" those customers on their liquidity options.

145.   Some Dealer Defendants went so far as to deny that any customers had contacted them at all, notwithstanding trueEX's actual knowledge that customers had contacted the Dealer Defendants in question, including in some cases the very same employees who said they had not heard from any customers interested in trueEX.

146.   When Deutsche Bank's tactics in that regard continued, Mr. Hirani ultimately confronted Sagar Gohel during an in-person meeting at Deutsche Bank. Mr. Gohel denied that any trueEX client had *ever* called Deutsche Bank to inquire about using the platform. However, when Hirani offered to prove that Gohel's assertion was false, and offered him a wager that he could prove it, Gohel was clearly rattled and ended the meeting.

147.   The Dealer Defendants' conduct in this regard has continued for an extended period. For example, from late 2014 to as recently as January 2018, trueEX has consistently received feedback from its customers that Goldman Sachs representatives have been attempting to pressure them into using Tradeweb instead of trueEX, or to call them directly over the phone.

148.   Mr. Hirani has brought this conduct to the attention of high level representatives at Goldman Sachs, but has been met only with excuses. As recently as late December 2017, Hirani discussed this matter with Justin Gmelich at Goldman Sachs. Mr. Gmelich downplayed the seriousness of the matter, but did agree to have someone at Goldman look into the situation.

149.   Just a few days after this meeting, however, on December 28, 2017, a trueEX customer, Buy-Side Client 1, sent an inquiry to Goldman Sachs about trading on trueEX. In

response, Goldman refused to price the inquiry and instead asked Buy-Side Client 1 to justify

why they wanted to trade through trueEX.  Goldman Sachs also attempted to push Buy-Side

Client 1 to trade on Tradeweb instead.

150.    In an early January 2018 email exchange between Mr. Hirani and Scott Rofey,

Goldman's Head of Rates, memorializing this incident, Hirani informed Rofey of other similar

incidents reported by other trueEX customers, including Buy-Side Client 3, Buy-Side Client 4,

Buy-Side Client 5, Buy-Side Client 6, Buy-Side Client 7, Buy-Side Client 8, Buy-Side Client 9,

Buy-Side Client 10, Buy-Side Client 11, Buy-Side Client 12, Buy-Side Client 13, Buy-Side

Client 14 and others.  After forwarding this exchange to Justin Gmelich on January 16, 2018, Mr.

Gmelich replied by claiming: "I will look into this.  We are platform agnostic."

151.    Two days later, on January 18, 2018, another trueEX customer, Buy-Side Client

2, informed trueEX of a nearly identical incident when attempting to trade with trueEX through

Goldman Sachs.  When notified of the Buy-Side Client 2 incident, Gmelich once again dismissed

trueEX's concerns and came up with a new excuse: this was just a "missed inquiry" due to

"limited resourcing [sic] and time constraint."

152.    Hirani followed-up with Gmelich in February 2018, noting that trueEX has "been

working with [Goldman Sachs'] swaps group for some time and they have been actively

blocking us in the marketplace by telling clients not to do business with trueEX but rather with

TradeWeb - I've even pointed out some examples to you since December.  The concept of

'Goldman is platform agnostic and willing to trade with clients wherever they want to trade'

does not reflect reality of what's observed in Goldman's interaction with us and clients."

Gmelich responded by repeating that Goldman Sachs is "platform agnostic" (despite the ample

evidence to the contrary) and then passed Hirani off to Amy Hong of Goldman Sachs' FICC Market Structure Strategy Group.

153.     Hirani met with Ms. Hong on April 18, 2018.  Hong doggedly asserted that Goldman's lack of progress was based on resource constraints and that the many examples of Goldman Sachs employees telling trueEX clients to use Tradeweb were limited to a few "uninformed, uneducated salespeople and traders."  Hong also said that there is nothing nefarious or coordinated going on with these activities.  Hirani reminded Hong that it was not an isolated issue among "uninformed, uneducated salespeople and traders" as he had raised it with the senior leaders of Goldman Sachs' rates group over several years, including Scott Rofey (Head of Rates), Bryan Koplin (Head of Interest Rate Products Electronic Sales), Justin Gmelich (Head of FICC), and Rana Yared (Head of PSI).  Hong repeatedly tried to get Hirani to confirm that things between trueEX and Goldman Sachs were "okay."  Hirani communicated that things were not "okay" and that Goldman Sachs was harming trueEX by directing clients to use Tradeweb instead.  Hirani also got Hong to finally agree, reluctantly, that the estimated time for Goldman to complete API connectivity with trueEX was closer to one month and not Goldman's previously supplied estimate of three to six months.

154.     Hong later sent Hirani an email setting forth "a number of steps" that Goldman Sachs had taken to address the "client-related occurrences," including "reminded sales & trading personnel of our firm's position that trades be executed on our clients' preferred venues," "identified and closed entitlement gaps to ensure that relevant sales & trading personnel have access to the trueEX UI and have log-in credentials," and "re-visited API connectivity." Nonetheless, since the April 18, 2018 meeting, Goldman Sachs has not made any progress, such as actually working on connecting to trueEX's API.

155.     The common pressure tactics and excuses confirm that Goldman Sachs and the other Dealer Defendants have acted in a coordinated way in order to actively discourage the buy-side from using trueEX's IRS trading platform, and have done so without disclosing to the buy-side that they have significant and material conflicts of interest relating to their ownership of Tradeweb.

### *The Dealer Defendants Used Similar Delay Tactics and Pretextual Excuses*

156.     The Dealer Defendants used other common delay tactics, excuses, pretexts, and even vocabulary to refuse to conduct meaningful business with trueEX and to neutralize the competitive threat posed by trueEX and other platforms.  By early 2014, Citi had advised trueEX that "the pens were down from Citi's perspective and confirmed that there were no outstanding issues left and we could prepare execution copies [of the Participation Agreement]."  Then, later in 2014, Max Nuti of Citi claimed that in order for Citi to sign the Participation Agreement, "we need to go in front of a committee and get sign off from a number of resources – tech, compliance, middle office, operations, legal etc… it's a lot of lift."

157.     Each of the Dealer Defendants – each with thousands of employees and billions in resources – has claimed, *for extended periods of time*, that their purported "resource constraints" have prevented them from following up with, or engaging with, trueEX and its trading platform. Remarkably, the Dealer Defendants still use that excuse *even today*, while simultaneously declining or ignoring trueEX's offer to provide any required resources.

158.     For example, Goldman Sachs' Fixed Income COO and its Managing Director of Fixed Income Market Structure Strategy each asserted in early 2018—long after trueEX first approached Goldman Sachs—that the firm was still too "resource constrained" to connect to trueEX.  Pierre Vermaak, Head of eTrading Rates and Credit at UBS, used the same excuse and

told trueEX in early 2017 that it would be "a difficult year with IT resourcing." Mahesh Sinkar of Credit Suisse Rates Sales also used similar vocabulary, claiming that "our IT is quite challenged for resources."

159. In another example, a trueEX sales representative asked Rob Grillo, Head of Rates Sales at Bank of America, if trueEX could provide a demonstration of trueEX's IRS platform in August 2015, noting "[b]uy side clients on the platform would like to have the ability to execute both risk and non-risk packages with BAML via trueEX." Mr. Grillo responded that Bank of America "had no client contact re: TrueEX – round risk trades." After the trueEX sales representative listed four buy-side customers, including Buy-Side Client 15 and Buy-Side Client 16, that had specifically expressed interest in trading with Bank of America on trueEX, Grillo retreated to the excuse that Bank of America had "limited resources" to explore joining trueEX.

160. Each of the other Dealer Defendants similarly raised resource constraints to delay or refuse engagement with trueEX. In October 26, 2016, Mike Noto (Barclays' Director of e-Commerce Distribution) stated that Barclays had "too few resources" to meet IT "challenges" to on-board with trueEX. Citi also raised purported resources constraints, with senior trader Nicolas Lenoir telling a trueEX salesperson on August 18, 2014 that Citi would decline a group demonstration of trueEX due to "limited resources to onboard new trading platforms." Kavi Gupta, Head of Rates Trading at Bank of America, similarly asserted purported resource constraints to try to justify not proceeding with trueEX.

161. The Dealer Defendants also pretextually assert that developing software to connect to trueEX's API would take too long and be cost prohibitive. As recently as April 2018, Amy Hong of Goldman Sachs claimed that API connectivity had to wait because Goldman was "resource constrained." But the Dealer Defendants, like any trueEX user, can access trueEX

directly without creating their own software to connect to trueEX.  The Dealer Defendants'
repeated pretextual assertions that it would take several months to develop software to connect to
trueEX's API also is without basis, as users typically develop such software in a matter of weeks.

162.   trueEX has repeatedly volunteered its own employees to develop such software
for the Dealer Defendants, including Bank of America and Goldman Sachs.  Despite trueEX's
offers to provide the needed resources, these dealers still refuse to move forward with trueEX
based on purported time and cost issues associated with connecting to trueEX's API.

163.   Goldman Sachs pretextually claimed that it would take years to develop software
to connect to trueEX's API, only to revise that estimate to six months, then three months, and
most recently to less than one month after trueEX protested during an intense in-person meeting
with Goldman Sachs that Goldman's conduct had unfairly harmed trueEX.

164.   Using the same pretext to justify to a buy-side client why Morgan Stanley was not
on trueEX, Anson Welch, a Morgan Stanley salesperson, outrageously claimed in front of five or
six other people at a trueEX event on May 3, 2018 that it would cost $10 million to connect to
trueEX, dumbfounding those who heard the interaction because the claim was preposterous.
Very recently, other Morgan Stanley employees have latched on to the baseless cost-benefit
excuse, including Chris Good, Matt Granger, Adam Josephart, and Mitch Nadal.

165.   Another common tactic employed by each of the Dealer Defendants has been the
claimed need for a never-ending "legal review" of basic and straightforward on-boarding
documentation, including trueEX's "rulebook," a largely standardized document similar to the
rulebooks of other SEFs the Dealer Defendants use.

166.   Even in a large institution, like some of the Dealer Defendants, it should have
taken no longer than a few weeks to a few months (to be generous) to review and approve the

trueEX onboarding documents *if* the Dealer Defendants were operating in good faith.  Other large financial institutions have onboarded to trueEX in a few weeks.  The fact that the review and approval process purportedly takes *literally years* at each of the sophisticated and well-staffed Dealer Defendants underscores the pretextual nature of their never-ending excuses.

167.    The runaround at Barclays, for example, spanned years and resulted in approval of on-boarding documents only for the clearing side, but *not* the dealer side, effectively denying trueEX any opportunity for meaningful business, as Barclays intended.

168.    High level "gatekeepers" at Barclays were instrumental in the runaround.  In early March 2015, trueEX was attempting to on-board Barclays and Mr. Hirani was put in touch with Michael Yarian, then Barclays' Head of Fixed Income Trading.  After a familiar pattern of delays, Hirani finally met with Yarian on April 8, 2015.  During the meeting, Yarian repeatedly focused on a March article published by Reuters that stated trueEX "offers trading features, such as anonymous trading, that regulators and traders at funds say will encourage smaller banks and other players, such as hedge funds, to enter the market as dealers.  That will help increase competition, reduce prices for customers, and decrease risk in derivatives markets, these people said."  The article also noted that six of the seven "top derivatives dealers," including Barclays, had declined to use trueEX.  Yarian was furious about the article and the identification of Barclays among the dealers that had refused to use trueEX.  Barclays backed away from trueEX following the meeting.

169.    For years, Mr. Hirani tried without success to on-board Deutsche Bank to the trueEX platform.  In 2014, Karen O'Connor, trueEX's Chief Operating Officer, spearheaded this effort and provided Deutsche Bank the relevant on-boarding documents for the clearing side and dealer side.  After months of meetings and communications regarding the required

documentation, Sagar Gohel of Deutsche Bank advised that the operations side of the bank was satisfied, and Amelia Kaufmann of Deutsche Bank's legal department separately advised that the legal side of Deutsche Bank was satisfied.  However, when Ms. O'Connor then sought to move forward in August 2014, she received a phone call from Ms. Kaufman advising that an unexplained "internal issue" had arisen at Deutsche Bank, and that O'Connor should not reach back out to Deutsche Bank—in other words, "don't call us, we'll call you."  O'Connor never heard back from Deutsche Bank again.

170.     trueEX attempted to re-engage with Deutsche Bank and, on July 23, 2015, Mr. Hirani contacted Henry Ritchotte, Chief Operating Officer and member of the management board, seeking "advice on how to on-board DB."  Hirani noted that trueEX was "surprised that DB (after all the documents were negotiated) decided to not proceed."  Ritchotte expressed interest in trueEX and put Hirani in touch with Tom Hartnett, Head of North America Interest Rates.  Hirani spoke with Hartnett by telephone on July 29, 2015, recounting the difficult experience with Deutsche Bank to date and asking if there was a way to fix the on-boarding issues.  Hartnett responded that it's "not going to happen," and when Hirani asked why, Hartnett hung up on him.

171.     A similar story played out at other Dealer Defendants.  The characters changed, but the never-ending delay and protracted review, clarification, and approval of noncontroversial documents was the same.

172.     The Dealer Defendants got creative with their excuses and erected an additional hurdle after extended dialogue by suddenly claiming that "new product committee" approval of trueEX would be necessary.  Each and every Dealer Defendant used some form of the same

"new product" review and approval excuse, even after spending years in the approval process for the trueEX legal documentation.

173.    After purportedly on-boarding and developing a software connection to trueEX's API, Barclays has continued to come up with excuses, through John O'Callahan (Head of Global E-Trading) and others, why it cannot "go live" on trueEX, such as needing months for training and superficial objections to trueEX's user interface.  On May 21, 2018, an employee in Barclays' technology department, Adam Albin, revealed that, even after completing all the legal, technological, integration, and API work, Barclays would not go live any time soon, onboarding had been further delayed internally, and "platform approval [would] not happen prior to August [2018]."

174.    Like Barclays, other Dealer Defendants that purportedly have "on-boarded" actually have sat idle and simply done nothing to explore or promote their connection to trueEX. Bank of America, for example, still refuses to expand its trading on trueEX beyond one client in one currency to price compression trades on trueEX.  After years of negotiation and purportedly onboarding to trueEX, Bank of America will not participate in standard RFQ trading on trueEX. When asked in May 2018 for an update on Bank of America onboarding additional clients, Bank of America responded that they still need to complete "system integration" that is expected "later this year."  In the same email, Bank of America asked trueEX to "not actively market" its limited participation with trueEX.  An industry insider with knowledge of the matter at Bank of America confided in trueEX in 2018 that the Head of Rates Trading, Kavi Gupta, was in fact, in vulgar terms, "[ ]blocking" trueEX from any progress at Bank of America.

175.    Goldman Sachs similarly limits its participation on trueEX to slow manual responses in very limited currencies and, even then, frequently ignores customer requests for

quotes.  Credit Suisse and UBS each continuously has delayed going live on trueEX's API for any product or currency despite ostensibly onboarding with trueEX, asserting a lack of resources.

176.    After delaying onboarding for an extended period, Citi finally onboarded but still refuses to go live in the Euro and Sterling markets, and the head of trading, Matt Jerman, and head of e-trading, Jason Cohen, after repeated requests by trueEX over an extended period, still refuse to even meet with trueEX officials in London.

177.    JP Morgan, while it has onboarded, still does not provide streaming liquidity in Euros or Sterling.

178.    As recently as May 2018, following an extended period of other excuses and delay tactics and nearly a year after signing the PA, Omri Beer of Deutsche Bank similarly cited resource constraints for the lack of progress.  In a subsequent lunch meeting in Manhattan on May 30, 2018, a senior investment banking official at Deutsche Bank stated that the bank's senior rates and management leadership would make trueEX the highest priority if it were to become an investment banking client of Deutsche Bank, revealing that Deutsche Bank's purported lack of resources, the purported lack of buy-side demand for trueEX, and the other numerous delays and excuses previously asserted by Deutsche Bank and the other Dealer Defendants were indeed pretextual.

179.    All of these delays and pretextual excuses for not going live are part of the Dealer Defendants' coordinated effort to block trading on trueEX.  In contrast, each Dealer Defendant completed onboarding onto Tradeweb almost immediately after Tradeweb went live and streams pricing to Tradeweb's inferior and more expensive RFQ platform.

### *The Dealer Defendants Condition and Avoid Dealings with trueEX*

180.    The Dealer Defendants' refusal to trade, provide liquidity to, or in some cases even meet with, trueEX was not based on any shortcomings with trueEX's trading platform, but was instead based on the Dealer Defendants' desire to control the IRS market and to prevent trueEX from gaining a foothold that could lead to all-to-all, anonymous IRS trading.  Thus, in addition to refusing to provide liquidity to trueEX's all-to-all trading protocols, the Dealer Defendants have refused to even provide liquidity to trueEX's dealer-to-client RFQ protocol, while providing RFQ liquidity to other inferior platforms with higher fees such as Tradeweb.

181.    Personnel from the Dealer Defendants delayed or refused, with no good reason, to meet with their counterparts at trueEX.

182.    Some Dealer Defendants agreed to meet only with conditions attached, making similar statements to trueEX in this regard.  For example, Matteo Lorenzoni (Goldman Sachs) and Omri Beer (Deutsche Bank) agreed to meet with trueEX personnel, *but only on the condition that they not discuss trueEX*.

183.    Others, like Citi, conditioned participation on the involvement of the other Dealer Defendants.  For example, in 2014, Max Nuti, the Director of Fixed Income at Citi, told trueEX's CEO during a call that if trueEX could get JP Morgan, Bank of America, Morgan Stanley, Goldman, Barclays, and Deutsche Bank on a call or a meeting to agree to on-board with trueEX, then Citi would on-board with trueEX.

184.    Bank of America sought to condition its participation on control over governance and access rules for trueEX's platform.  At a scheduled meeting with trueEX's CEO at Bank of America's offices in 2014, Kavi Gupta, Bank of America's Head of Rates, questioned trueEX

about governance, control, and access issues, particularly whether it would be possible for trueEX to block Citadel Securities, a non-traditional market maker, from onboarding.

185.    The group boycott of trueEX ran so deep among the Dealer Defendants that it upended normal business and social interactions among peers with decades-long close personal friendships.

186.    Chris Yoshida, Chief Strategy, Sales and Marketing Officer at trueEX, has deep personal relationships with numerous senior executives at the Dealer Defendants, having previously worked at Deutsche Bank, Morgan Stanley, and Goldman Sachs.

187.    After joining trueEX in April 2017, however, Yoshida could not even get a meeting with (or, in some cases, even a return call or e-mail from) old, close friends.

188.    For example, a current senior executive at Goldman Sachs shared offices with Yoshida early in their careers at Goldman and their families enjoyed a close personal friendship. After Yoshida joined trueEX, however, his emails to this executive went unanswered for months and the executive refused to commit to meeting with Yoshida even though the executive's role at Goldman (rates product sales) was directly related to trueEX's product offering.

189.    Such odd interactions have no explanation other than an agreement among senior executives of the Dealer Defendants to avoid meaningful business with trueEX at all costs.

190.    In fact, the Dealer Defendants have coordinated their efforts over an extended period of time.  After extended delays in signing a Participation Agreement or "PA," a basic agreement required to move toward on-boarding trueEX's trading platform, four of the Dealer Defendants (Bank of America, Barclays, Deutsche Bank, and Morgan Stanley) contacted trueEX *within days of each other* in July 2017, all advising that they now were ready to sign the Participation Agreement.  Not coincidentally, these overtures from four separate Dealer

Defendants came very shortly after a ruling favorable for trueEX in a litigation filed by trueEX against MarkitSERV, an IRS trade processing company historically connected to the Dealer Defendants.  However, even after signing the PA, the Dealer Defendants engaged in further delays and obfuscation, as set forth herein, including, among other things as discussed above, Defendants' similar contentions that "new product" approvals now were required before the process could move forward, even *after* the Dealer Defendants signed the PAs.  All of these never-ending, pretextual processes and approvals were created merely to thwart trueEX from ever obtaining the Dealer Defendants' cooperation in on-boarding the trueEX trading platform.

191.    During a May 11, 2018 conversation with a Deutsche Bank senior official in Frankfurt, a trueEX representative recounted the various roadblocks and delays that trueEX encountered with Deutsche Bank and asked that they stop and trueEX be given an opportunity to compete.  The Deutsche Bank official asked the trueEX representative why he thought the trading desk had blocked trueEX, but answered his own question by surmising that it may have been related to Deutsche Bank's investment and support of Tradeweb.  Later in the same conversation, the trueEX representative shared with the Deutsche Bank official that four banks, including Deutsche Bank, suddenly signaled their intent to sign on to trueEX in July 2017 after extended delays.  The Deutsche Bank official wondered aloud if this action was related to any ongoing antitrust litigation.

*The Dealer Defendant FCMs Delayed or Refused to Clear Trades*

192.    As with other anonymous all-to-all trading platforms, the Dealer Defendants used their FCMs to substantially delay and, in some cases, block clearing on trueEX.

193.    As described below, Deutsche Bank, Goldman Sachs, Morgan Stanley, and Bank of America clearing employees each acknowledged that their trading desks influenced the

decisions of their clearing desks, in violation of regulations designed to ensure "an appropriate informational partition" between the units.[32]

194.    In 2014, Mike Dawley of Goldman Sachs revealed that trueEX would need the "franchise" (meaning the trading desk) to "sponsor" it for clearing approval, indicating a link between the dealer side of Goldman Sachs and the clearing side.  In subsequent communications with Goldman Sachs, trueEX asked that the review process be separated so that they close out "the clearing side" and then "focus our attention on the execution side."  Samara Cohen of Goldman Sachs responded that "[w]e don't want to decouple the two."  trueEX later complained to Dawley that "the 2 tracks [are] tied together" and pleaded "can we get the clearing part done sep[arately] please."

195.    During a SIFMA conference in October 2014, a Deutsche Bank clearing employee, Mark Millindorf, told a trueEX officer that he had been instructed by the trading desk not to onboard trueEX.  Millindorf indicated that the instructions from the Deutsche Bank trading desk came from Sagar Gohel, Chuck Fletcher, or Tom Hartnett.  The following year, the trueEX officer reached out to Piers Murray at Deutsche Bank's clearing unit asking for a "fresh look," noting that he was previously "told that DB execution desk had instructed DB Clearing not to sign up to trueEX" despite being "ready to execute."

196.    Similarly, Bob Burke of Bank of America's clearing side told trueEX that he could not do clearing without dealer side support.  And Ciaran O'Flynn, Co-Head of Global Fixed-Income Electronic Trading at Morgan Stanley, told trueEX that because the Morgan Stanley dealer side was not moving forward with trueEX, the clearing side also would not do so.

---

[32] *See supra* n.2.

197.     Moreover, each of the Dealer Defendant FCMs unreasonably delayed the review

process for clearing on trueEX's platform, which is consistent with the Dealer Defendants'

overall pattern and practice of delay and obfuscation vis-à-vis trueEX.  Barclays, for example,

took well over a year to conduct its legal review of trueEX's basic documentation before it

approved clearing.  These drawn-out reviews were unnecessary and plainly pretextual.  The sole

issue for an FCM clearing a trade on trueEX is whether the FCM's customer (not trueEX) has

sufficient credit for the trade.

198.     The Dealer Defendants also violated CFTC regulations "that mandate the

disclosure to its counterparties of any material incentives and any material conflicts of interest

regarding the decision of a counterparty" to execute a trade on a particular trading platform or to

clear a trade through a clearing organization.  The Dealer Defendants, for example, failed to

disclose their material conflicts of interest in pushing trueEX customers from trueEX to

Tradeweb.[33]

### *The Dealer Defendants' Boycott Effectively Shut Out trueEX*

199.     The Dealer Defendants' boycott has effectively shut out trueEX even though

trueEX attracted 100 buy-side customers to on-board onto its platform.  The Dealer Defendants

knew that trueEX could not succeed unless it secured liquidity from the Dealer Defendants who

controlled the vast majority of liquidity in the IRS market.

200.     For an extended period of time up through the present, trueEX has met and

communicated with senior employees at the Dealer Defendants on scores of occasions to discuss

trading on or providing liquidity to the trueEX platform.  As detailed herein, employees at each

of the Dealer Defendants repeatedly cited the same pretexts and excuses for refusing or delaying

---

[33] *See* 17 C.F.R. § 23.605(e).

to conduct business with trueEX, such as a purported lack of customer interest in trueEX even after large trueEX customers, such as Buy-Side Client 3, had called the dealer expressing an interest in trading IRS on the trueEX platform.

201.    Despite a stellar platform and technology, sufficient buy-side demand, extensive sustained effort, and many millions of dollars of investment, the Dealer Defendants' conspiracy has prevented trueEX from realizing any significant volume of "new risk" trades in which counterparties actually assume risk positions in IRS.[34]  With respect to "new risk" trades, only JP Morgan, BNPP, and RBS provide any noticeable pricing on trueEX's non-anonymous RFQ—very limited and immaterial cooperation.  They still do not provide streaming liquidity for Euros or Sterling.  This limited participation is effectively crumbs compared to the business that would exist in the absence of the Dealer Defendants' ongoing conspiracy.

202.    Recognizing the threat that trueEX posed to their profits, the Dealer Defendants coordinated together to refuse to deal meaningfully with trueEX and starve it of liquidity and their coordinated strategy has worked.

203.    The Dealer Defendants' conspiracy has succeeded in keeping trueEX from upsetting the highly-profitable market structure that the Dealer Defendants dominate.  The Dealer Defendants' boycott has prevented trueEX from operating a meaningful RFQ platform, let alone an anonymous all-to-all CLOB.

---

[34] Over 95% of the trades on trueEX are portfolio termination and compaction ("PTC") trades.  These are administrative transactions that merely "terminate" already existing trades or "compress" multiple offsetting trades into one position, a form of trading that previously was done through a cumbersome manual process.  These transactions do not create IRS "new risk" positions and have no bid/ask spread, so trueEX's execution of these trades does not threaten the Dealer Defendants.  trueEX receives minimal fees on these transactions, as compared to "new risk" transactions.  Nevertheless, only a handful of the Dealer Defendants trade even PTC trades on trueEX.

204.    Today, trueEX facilitates few "new risk" trades in the IRS market.  To ensure the

platform does not reach critical trading mass, the Dealer Defendants collectively refuse to trade

plain vanilla swaps—which trade in the highest volumes across the IRS market—with end users

on trueEX.  A study by Clarus Financial Technology ("Clarus") found that in 2015 trueEX's

platforms accounted for *0%* of plain vanilla swaps trading.[35]

205.    Instead, the Dealer Defendants only transact with the buy-side on trueEX's

platform in bespoke, one-off swaps (such as unusual currencies), which trade in significantly

smaller volumes, keeping trueEX out of USD, Euro, and Sterling RFQ, and out of CLOB

entirely.  The Dealer Defendants otherwise only conduct limited "termination" and

"compression" transactions on the platform.  Termination transactions are merely unwinds of

already existing trades, and "compression" trades—which merely consolidate multiple offsetting

trades into one position—are done mainly to reduce regulatory capital and margin requirements

associated with offsetting swap positions.  Because no bid/ask spread is associated with

"compression" trades, trueEX's execution of those trades does not threaten the Dealer

Defendants.  In sum, the Dealer Defendants' conspiracy has successfully neutralized trueEX

from becoming a competitive threat.

**B.     The Dealer Defendants Similarly Boycotted Other All-to-All Trading
        Platforms**

206.    There are striking similarities between the Dealer Defendants' conduct in jointly

boycotting trueEX and their conduct in jointly boycotting other start-up trading platforms, such

as those offered by Javelin Capital Markets LLC ("Javelin") and TeraExchange, LLC ("Tera").

---

[35] Amir Khwaja, *2015 SEF Market Share Statistics*, Clarus Financial Technology (Jan. 26, 2016),
https://www.clarusft.com/2015-sef-market-share-statistics/.

*1.    The Dealer Defendants Boycotted Javelin*

207.    Javelin was founded in 2009 by derivative trading and technology professionals seeking to pursue the obvious market demand for a SEF offering all-to-all electronic trading.  By 2011, Javelin was actively soliciting support for its platform by demonstrating its utility to many buy-side customers and dealers.

208.    As with trueEX, the Dealer Defendants used meetings with Javelin to fish for information about its plans and the names of buy-side customers signed up for Javelin's platform in order to later head off those customers from trading on the platform.  As he did with trueEX, Dexter Senft of Morgan Stanley asked Javelin personnel for a list of buy-side customers that had expressed interest in Javelin, as well as the contact person for each firm as part of a purported "survey" on SEF activity, which Senft then shared with other Dealer Defendants.

209.    The Defendants' collective effort to sabotage Javelin was executed through the same tactics used with trueEX, including rationing liquidity away from Javelin, permanently delaying review and approval of noncontroversial Javelin documents, threatening Javelin's customers with a loss of liquidity, and using affiliated FCMs to pressure or cajole customers away from Javelin or to actively refuse needed pre-trade credit checks to Javelin.

210.    Javelin met with senior employees at each of the Dealer Defendants on numerous occasions to discuss trading on or providing liquidity to the Javelin platform, but they would repeatedly cite the same collection of excuses that trueEX and others confronted,  such as claiming a need to conduct a never-ending legal review of the Javelin SEF rulebook.  Regardless of the excuse, the results were the same: none of the Defendants offered to trade on or provide liquidity to Javelin.  Although RBS did briefly provide liquidity to Javelin, it did not do so in a meaningful way.  Instead, RBS primarily streamed prices at unfavorable bid/ask spreads that resulted in no trades with buy-side customers.  The Dealer Defendants coordinated the strategic

participation of one or two dealers in order to keep tabs on the SEFs, including which buy-side customers were trading on the platforms. The Dealer Defendants recognized that one or two dealers trading small amounts on Javelin (or TeraExchange or trueEX) would not be enough to help the platform gain a foothold in the market.  RBS thus ensured that their participation on Javelin would not pose a threat to Defendants' conspiracy.  Eventually, on April 26, 2015, RBS withdrew as a participant on Javelin's platform.

211.    Although JP Morgan proclaimed interest in trading on Javelin, it was merely a ruse in order to collect information on its trading platforms. Simon Maisey, who was actively involved in the conspiracy as a board member of Tradeweb Markets' Board of Directors and then as a Managing Director at Tradeweb itself, was JP Morgan's contact for the "negotiation," entertaining multiple meetings with Javelin personnel and burdening them with numerous pretextual requests for information. When Mr. Maisey was eventually pressed on whether JP Morgan had an interest in trading on the platform, he acknowledged that it did not.

212.    The Dealer Defendant FCMs, including JP Morgan, also refused to provide Javelin credit checks necessary to clear trades, effectively preventing buy-side customers from using Javelin's order book.  Mark Millindorf of Deutsche Bank, who also thwarted trueEX's efforts to establish clearing connections with Deutsche Bank, strung Javelin along for months and blocked progress with excuses such as pending legal review of Javelin's rulebook and "limited resources," despite acknowledging Deutsche Bank could connect to Javelin "at a flip of a switch."  Like trueEX, Deutsche Bank never approved clearing on Javelin, and many of Javelin's buy-side customers who used Deutsche Bank's FCM were precluded from trading on Javelin.  Other Dealer Defendant FCMs, including those at Morgan Stanley, Barclays, and Goldman Sachs, made nearly identical claims as to the need to conduct reviews of Javelin.

213.     The Dealer Defendants also actively pressured their customers not to trade on Javelin, just as they did with trueEX.  For example, Goldman Sachs pressured NISA Investment Advisors LLC ("NISA"), a large buy-side firm, not to use Javelin's platform.  And a Mitsubishi trader informed Javelin that they had been pressed by JP Morgan, their FCM, against using Javelin.

214.     As a result of the Dealer Defendants' boycott, Javelin no longer facilitates any IRS trading.  Despite years of development and millions of dollars in investment capital, Javelin executed less than 180 trades.

### 2.     *The Dealer Defendants Boycotted TeraExchange*

215.     TeraExchange was founded in 2010 by trading and technology professionals who recognized that Dodd-Frank provided a unique opportunity to advance the swaps market beyond the bilaterally negotiated OTC process.  By 2011, TeraExchange was actively soliciting support for its platform by demonstrating its utility to many buy-side customers and dealers, including Dealer Defendants.

216.     The Dealer Defendants pursued a joint "investment" in TeraExchange, with the ultimate goal of taking over the platform and marginalizing or eliminating it.  Personnel from the Dealer Defendants' strategic investment groups offered to take a stake in TeraExchange.

217.     TeraExchange talked with senior employees at each of the Dealer Defendants on numerous occasions to discuss trading or providing liquidity to the TeraExchange platform, but none offered to trade on, or provide liquidity to, TeraExchange.  TeraExchange also talked with non-traditional liquidity providers that were ready, willing, and able to provide the liquidity to the TeraExchange platform that would allow the platform to thrive, many of which committed to using the platform.

66

218.     The Dealer Defendants used their FCMs to block potential trades with non-traditional liquidity providers on TeraExchange by refusing to clear the trades or quoting outrageously high fees that would make the transactions uneconomic, despite clearing similar trades for the same customers on other IRS platforms for reasonable fees.  Similar to trueEX's experience, personnel from the Dealer Defendant FCMs, including Bob Burke of Bank of America, told TeraExchange that they were being internally pressured not to clear trades on TeraExchange.  Also as with trueEX, other Dealer Defendants, including Barclays, Deutsche Bank, and Morgan Stanley, raised the pretextual excuse of a lack of resources, even though clearing trades from TeraExchange required minimal resources.

219.     Because all of the Dealer Defendant FCMs refuse to clear trades executed on TeraExchange, none of those FCMs' customers, including non-traditional liquidity providers, can clear trades executed on TeraExchange.  Throughout this period, the Dealer Defendant FCMs were clearing trades for those same buy-side firms executed on Bloomberg's and Tradeweb's dealer-to-customer RFQ platforms.

220.     The Dealer Defendants also directly pressured customers from trading on TeraExchange.  Multiple Dealer Defendants informed smaller IDBs that expressed interest in using TeraExchange that they saw the TeraExchange platform as a threat that needed to be stopped.  In addition, many buy-side customers became concerned about meeting with TeraExchange for fear of reprisal from their FCMs.  One buy-side customer, for instance, expressed a fear that "JP Morgan knew" it was meeting with TeraExchange.

221.     Like trueEX, the Dealer Defendants' collective boycott of TeraExchange starved it of the liquidity it needed to succeed.  Faced with the Dealer Defendants' boycott, TeraExchange has effectively left the IRS market after completing only one IRS trade.

C.   **The Dealer Defendants Deter Buy-Side Customers From Trading on trueEX and Other All-to-All Trading Platforms**

222.   The Dealer Defendants conspired to block all-to-all trading of IRS by discouraging their customers from using all-to-all trading platforms such as trueEX.  The Dealer Defendants discourage their customers by withholding all clearing services to their customers who attempt to trade on anonymous all-to-all platforms, insisting on post-trade disclosure practices to discourage anonymous all-to-all trading, and even putting their customers in a "penalty box" in an attempt to discourage future transgressions.

223.   These acts, which the Dealer Defendants did in concert, are designed to make all-to-all trading unattractive to customers and, in some cases, to scare them from attempting to disrupt the OTC market.  "[T]his meaningfully disincentivizes [dealer-to-customer SEFs] from making any changes that may receive retaliation from the biggest dealer banks.  As a result, there is little opportunity for 'organic' market evolution to occur in such a deeply anti-competitive marketplace."[36]

1.   *The Dealer Defendants Withhold or Impede Clearing Services to Buy-Side Firms that Attempt to Trade on trueEX and Other All-to-All Platforms*

224.   The Dealer Defendants conspired to dissuade firms from trading on trueEX and other all-to-all SEFs by threatening them with the complete withdrawal of clearing services or across-the-board increases in clearing fees that make IRS trading cost prohibitive.

225.   Because clearing performs an important risk mitigation function for many IRS, denial of clearing services effectively hamstrings the buy-side's ability to trade IRS.  Therefore, the mere possibility that the Dealer Defendants can, through their FCMs, cut off access to

---

[36] KELLEHER, ET AL., *supra* n.20, at 12.

clearing is sufficient to deter many buy-side customers from even attempting to trade on all-to-all platforms.

226.    The Dealer Defendant FCMs are able to coordinate their activities because, among other things, their clearing operations communicate regularly with each other.  For example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at Deutsche Bank, used to work as the Global Head of Rates Clearing at JP Morgan, and regularly communicates with his counterparts at other Dealer Defendants, such as Bob Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services, and Michael Dawley, the head of Goldman Sachs' FCM.

227.    In July 2015, certain of the Dealer Defendant FCMs, including those of Barclays, BNPP, Credit Suisse, and JP Morgan, began jointly penalizing certain buy-side firms that were pushing against the bifurcated market structure by hiking their clearing fees "by as much as ten-fold," while obedient buy-side customers "have been protected."[37]  In a competitive market, the Dealer Defendant FCMs would compete with each other to provide clearing services to their customers.  Instead, the FCMs of Bank of America, Barclays, BNPP, Credit Suisse, JP Morgan, and others collectively threatened to raise or actually raised clearing fees for certain buy-side firms in retaliation for their attempts to trade on all-to-all anonymous SEFs.  Absent collusion, the FCMs would not collectively target the same buy-side firms with higher fees, while keeping fees uniform for other market participants.

228.    The Dealer Defendants' conduct is strikingly consistent.  The head of rates at a high-frequency trading firm "noticed … indirect push-back," including that "one dealer … put

---

[37] Peter Madigan, *FCMs try to "off-board" credit and commodity funds*, Risk (July 30, 2015), http://www.risk.net/risk-magazine/feature/2419614/fcms-try-to-off-board-credit-and-commodity-funds.

the brakes on talks to clear for the firm."[38]  The clearing talks "just stalled" after the dealer

learned that the buy-side firm "wanted to start acting as a market-maker on Sefs."[39]  "A number

of other sources at hedge funds and proprietary trading firms" encountered similar "resistance

from their dealers."[40]  Several buy-side firms have told "similar stories."[41]

229.    The Dealer Defendants' ability to prevent or impede clearing has blocked market

entry for trueEX and other all-to-all anonymous trading platforms.  Without access to clearing,

buy-side firms and second-tier dealers cannot trade on such platforms and are forced to trade on

dealer-friendly SEF RFQ platforms like Tradeweb that retain the inefficient dealer-to-customer

trading structure of the OTC market.

2.      *The Dealer Defendants Insist on "Name Give-Up" to Deter Buy-Side*
        *Participation on All-to-All Platforms*

230.    The Dealer Defendants have agreed to insist on "name give-up" in order to

discourage buy-side participation on all-to-all trading platforms.  Name give-up refers to the

practice of identifying the names of each counterparty to an IRS to the other.  Buy-side firms and

independent SEFs have widely decried this practice because, "[i]n practice, in a SEF

environment, this unnecessary disclosure of swap counterparties only serves to inform the

dealers of the non-dealer firms [or] banks that are attempting to trade on their platforms, and

invit[es] retaliation."  Name give-up thus serves as a policing mechanism because it allows the

Dealer Defendants to determine which trading platforms abide by the Dealer Defendants'

unwritten rules.

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] Rennison, *supra* n.6.

231.    The Dealer Defendants know that name give-up effectively deters end users from utilizing all-to-all trading platforms.  Specifically, name give-up causes uncontrolled "information leakage" in that end users must reveal their trading positions, and thus elements of their trading strategies, to both dealers and other end users, who may be able to exploit that information against them.

232.    Many end users go to great lengths to keep their trading strategies confidential. As Ken Griffin, founder of Citadel, has explained, name give-up allows dealers unfairly to "position their book by taking advantage of their trading counterparties' market insights."[42] Michael O'Brien, Director of Global Trading at Eaton Vance, has stated: "I don't want to show the size of my trades, I don't want people to know how I'm trading.  Information is the most valuable asset we have."[43]  Similarly, another industry leader has stated: "Forcing end-users to disclose themselves if they are in a [order book] is a means to discourage alternative market participants from participating in what were historically interdealer [order books.]"[44]

233.    There is great demand from the buy-side for all-to-all, anonymous trading.[45]  As a result, "[s]ome asset managers have claimed their use of [order books] will increase if they are

---

[42] Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, RISK (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg-and-swap-market-reform.

[43] Levinson, *supra* n.4.

[44] Madigan, *supra* n.21 (O'Brien: "I would like my desk to be executing any trades possible on central limit order books").

[45] *See* Rennison, *supra* n.6 (quoting Sam Priyadarshi, head of fixed income derivatives at Vanguard Asset Management, as stating "[w]e have a deep desire to be able to access these markets"); *id.* (quoting Marc Vesecky, Chief Risk Officer for Tower Research Capital, as stating "Tower is definitely supportive of swap trading moving toward open, efficient electronic trading"); *id.* (quoting the Chief Risk Officer of a large hedge fund as stating: "I might have an interest in being a liquidity provider.  We already have people on our team who can do that and we are interested in showing bids and offers to the market both for our own portfolio and to take advantage of pricing discrepancies").

allowed to trade anonymously."[46]  One industry leader explained that "removing these barriers is important in allowing" a true order book to come to market.[47]  Ken Griffin noted that "anonymous markets foster competition," adding that "[i]t should not matter who provides the best price."[48]  And George Harrington, Global Head of Fixed Income, Currency, and Commodity Execution at Bloomberg LP, stated during a panel discussion at SEFCON on October 26, 2015 that there is "a good deal of demand for anonymous trading" for cleared swaps.

234.    If an order book transaction closes with a dealer on one side, that dealer is immediately able to see if a buy-side participant (a) was allowed access to the order book, and (b) had the audacity to try to capitalize on that access by entering into a transaction over the order book rather than in the dealer-to-customer OTC (or, more recently, dealer-to-customer RFQ) systems.  And because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform, meaning that they are able to quickly identify any buy-side customer trading on such a platform.

235.    Name give-up should not continue to exist in the IRS market.  Name give-up is a historical artifact, and, because IRS trades conducted on SEFs are now centrally cleared, there is no legitimate justification for maintaining the practice on SEFs.  Neutral commentators, regulators, and even Dealer Defendants' employees agree as much.

---

[46] Peter Madigan, *Massad: Sefs fear retaliation if they end name give-up*, RISK (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up; *see also* Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, RISK (Aug. 6, 2015), http://www.risk.net/risk-magazine/feature/2420554/bank-swaps-headlock-slips-as-chicago-prop-firms-join-sefs (quoting the head of fixed income at a principal trading firm as stating: "If volume moves more towards Clobs,[order books], then that's where we'll get more engaged").

[47] Madigan, *supra* n.21.

[48] Devasabai, *supra* n.42.

236.    For instance, during a panel discussion at SEFCON on October 26, 2015, one participant noted that name give-up on order books is pointless for cleared swaps.  During a prior SEFCON panel, another executive acknowledged that customers are "sitting on the sidelines because they [IRS platforms] still maintain post-trade order give-up."[49]

237.    Former CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared," and that he has "not heard a compelling justification" for the practice of name give-up in today's IRS market.[50]  Mr. Massad also explained that the CFTC had "heard market participants express concern about potential negative consequences of this practice with respect to its effects on liquidity and participation."[51]  Another industry leader noted, "[i]f you are trading in [an order book] where you are pre-trade anonymous then you should also be post-trade anonymous . . . .  [W]hen you cut through the arguments for post-trade disclosure, it's really just a means to discourage people from participating in the [order book]."[52]  And former CFTC Commissioner Mark Wetjen has stated publicly that it is "difficult to rationalize trading

---

[49] Ivy Schmerken, *Swap Markets Debate Anonymous Trading in SEFs*, WALL ST. & TECH. (Jan. 5, 2015), http://www.wallstreetandtech.com/trading-technology/swap-markets-debate-anonymous-trading-in-sefs/d/d-id/1318257.html.

[50] Madigan, *supra* n.46. The CFTC does not police secret, horizontal collusion between direct competitors in the IRS or any other market.  Moreover, the CFTC Chairman has recently stated that the CFTC has no plans to combat name give-up. *See CFTC not planning on anonymity for swaps market*, FIN. TIMES (Oct. 26, 2015), http://www.ft.com/fastft/414101/us-swaps-market.

[51] Remarks of Chairman Timothy Massad Before the ISDA 30th Annual General Meeting (Apr. 23, 2015), http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad-17.

[52] Madigan, *supra* n.21.

protocols that reveal the identities of counterparties on an anonymous, central limit order book."[53]

238.    Although central clearing eliminated all legitimate reasons for requiring name give-up, the Dealer Defendants recognized its importance in maintaining market bifurcation. Specifically, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Barclays and Morgan Stanley, among others, conspired to keep the practice in place by making their Defendant Dealers' provision of liquidity to a trading platform conditional on the use of the practice.  The remainder of the Dealer Defendants thereafter joined the agreement. Pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform that refused to include name give-up as a feature.

239.    The Dealer Defendants also ensure that name give-up persists through a service known as MarkitWire, which is operated by MarkitSERV.  MarkitSERV used to be dominated by the Dealer Defendants as well as other representatives from other banks.  At relevant points in time, Brad Levy (formerly of Goldman Sachs' Principal Strategic Investments group) served as CEO of MarkitSERV, Stephen Wolff (formerly the Head of Interest Rate Trading at Deutsche Bank) served as Head of Group Corporate Strategy at Markit, and Chip Carver (who previously managed fixed income derivatives trading for Goldman Sachs and was responsible for the bank's E-Commerce for global interest rate products) ran MarkitWIRE.

240.    MarkitWire is a trade processing service for IRS and other asset classes offered by MarkitSERV, meaning it delivers trades to clearinghouses once they have been executed by counterparties.  While it is possible to design IRS trading platforms to feature "straight-through processing" — where a trade is immediately sent to a clearinghouse by a SEF once it is executed

---

[53] *See Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial Services Policy Summit*, CFTC (Nov. 14, 2014), http://www.cftc.gov/PressRoom/SpeechesTestimony/opawetjen-10.

— the Dealer Defendants force IDBs to send trades to MarkitWire *before* they are cleared.[54]
MarkitWire then offers the counterparties to an IRS transaction a "last look" at the trade, where
they learn each other's identities and have the option to terminate the transaction.  This process is
inefficient and more cumbersome than electronic all-to-all trading, and it subjects the parties to
unnecessary post-trade name give-up.[55]

241.    The IDBs only use MarkitWire, and disclose the names of the parties to an IRS
transaction post-trade, because the Dealer Defendants collectively insist that they do so.  Buy-
side firms have complained that this practice "is applied to please dealers and that it discourages
non-banks from trading, helping to preserve the traditional market structure in which dealer-to-
client and interdealer markets were separate."[56]

242.    As a result of collective pressure from the Dealer Defendants, numerous SEFs
agreed to impose name give-up on their platforms.  The largest IDB SEFs — BGC, DealerWeb,
GFI, ICAP, IGDL, Tullet Prebon, and Tradition — all maintain name give-up, thereby
effectively preventing buy-side customers from trading on them.[57]  These entities recognize the

---

[54] *See* Peter Madigan, *CFTC to clamp down on delays in swap clearing*, RISK (Aug. 5, 2015),
http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[55] *Id.* (citing a CFTC staffer as stating: "It is not uncommon for it to take more than an hour for
counterparties to agree [to] a trade confirmation on affirmation platforms such as Markitwire").  During a
recent SEFCON panel discussion, one participant stated that the lack of straight-through processing
delays trade processing and clearing by up to six hours.

[56] *Id.*

[57] *See Top of the Swaps*, RISK (Nov. 2014), https://www.citadelsecurities.com/_files/uploads/sites/2/
2014/12/Ken-Griffin-Risk-Magazine-Top-Of-The-Swaps-November-2014.pdf (noting that dealer-run
platforms feature name give-up).

collective power of the Dealer Defendants, and, as an employee of Tradeweb explained, are careful about "not biting the hand that feeds you."[58]

243.    The Dealer Defendants even touted the benefits of order book trading of IRS, while neglecting to note that they had conspired to save those benefits for themselves alone. Ciaran O'Flynn, Managing Director and Global Head of Rates eTrading at Morgan Stanley, commented that "Morgan Stanley is committed to supporting execution of swaps trading on electronic venues like Trad-X.  These venues increase the transparency of the swaps market and facilitate the move towards mandatory clearing."[59]

244.    Name give-up is an effective deterrent to the buy-side's use of all-to-all platforms. For example, when Mitsubishi traded IRS on Trad-X via an aggregator, its identity was disclosed and it immediately received a phone call from Tradition complaining about Mitsubishi's use of the Trad-X platform.  The IDBs and Dealer Defendants thus work together to ensure that buy-side firms are not trading on IDB platforms.  As a direct consequence of maintaining name give-up, "[t]o date, volumes on the few order-book platforms built by SEFs have been underwhelming to the point of invisibility."[60]

245.    CFTC Chairman Timothy Massad has said that numerous "[i]nvestors have complained that they are unable to break into the interdealer markets because they are not anonymous — with names given up after trading."[61]  Indeed, one U.S.-based hedge fund

---

[58] Mike Kentz, *New dawn as non-bank enters interdealer order book*, INT'L FIN. REV. (July 18, 2014), http://www.ifre.com/new-dawn-as-non-bank-enters-interdealer-order-book/21154986.article.

[59] TRADITION, *Trad-X launches USD Interest Rate Swaps*, http://www.trad-x.com/news/2013/tradition-launches-trad-x-usd-platform.aspx (Feb. 15, 2013).

[60] Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INVESTOR. (July 21, 2015), http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-buildsbridges-in-the-new-world-of-swaps.html#.Vk5RPk3ltaQ.

manager stated that "[e]nding name give-up on broker Sefs [would] remove[] the ability for dealers to effect retribution on their clients."[62]

246.    Market data confirms that all platforms on which IRS are traded in any significant volume impose name give-up.  Clarus reports daily trading volume for each SEF, and each SEF is categorized as either a "D2C" (dealer-to-customer) or "D2D" (dealer-to-dealer) SEF.[63]  As shown in the chart below, approximately 98% of what Clarus considers D2C trading volume occurs on either Tradeweb or Bloomberg.  Trading on these two platforms occurs exclusively through a dealer-to-customer RFQ protocol with post-trade name give-up.[64]



[61] *CFTC not planning on anonymity for swaps market*, *supra* n.50.

[62] Rennison, *supra* n.6.

[63] The data below comes from Clarus SEFView, *Data for 02/16/2016 – 02/22/2016*.

[64] This chart, which provides a snapshot from February 2016, shows that the Dealer Defendants maintained the market share of Dealerweb, the interdealer SEF owned and operated by Tradeweb, at a very low level — merely 2%.  This reflects the fact that the Dealer Defendants are — jointly — rewarding the IDBs for keeping the buy-side off their platforms.  At the same time, the Dealer Defendants maintain Dealerweb as a threat to those IDBs.  The IDBs know that, at any time, the Dealer Defendants could, in lockstep, move their liquidity to Dealerweb, as they had done in the mortgage bond market — the event that led to the détente between the Dealer Defendants and ICAP.  Dealerweb poses significant operational costs to Tradeweb, and the minimal trading on the platform means that Tradeweb (and thus the Dealer Defendants) is operating the platform at a significant loss.  They are only willing to suffer these losses because Dealerweb serves an important role in their overall conspiracy.

247.    While Bloomberg nominally offers an order book platform as required by CFTC regulations to operate as a SEF,[65] this platform sees virtually no IRS activity because Bloomberg does not promote it, the Dealer Defendants refuse to trade on it, and buy-side firms fear they will face retaliation from the Dealer Defendants if they use it.  As with Tradeweb's order book, buy-side customers cannot trade on Bloomberg's all-to-all platform without being found out because they have to clear their trades through Dealer Defendant FCMs.

248.    Although Bloomberg has the functionality to allow all-to-all anonymous trading, it did not (and does not) offer an all-to-all anonymous trading platform with any meaningful liquidity and focuses on providing name-disclosed RFQ services because the IRS dealers are willing to stream prices to platforms with those trading protocols.  Bloomberg is content to focus on name-disclosed RFQ services because it makes the vast majority of its profits on license fees for its terminals, a substantial portion of which are licensed to the Dealer Defendants. Thus, Bloomberg has a diminished incentive to offer meaningful all-to-all anonymous trading protocols, because it already profits from other, related businesses and does not want to rock the boat by upsetting the dealers.

249.    Bloomberg also offers a pricing screen by the name of "All-Q," where dealers can post executable prices for end users.  This screen, however, does not allow end users to post prices or trade with each other, and trading via the screen is not anonymous.  As a result, Bloomberg constrains end users to the same OTC-like trading available on Tradeweb.

---

[65] Dodd-Frank requires that all SEFs operate and offer an order book for trading.  The law permits SEFs to also offer a RFQ platform in conjunction with the order book.  Bloomberg and Tradeweb offer both platforms, but, as a result of Defendants' conspiracy, the buy-side effectively only has access to the RFQ platforms.  In addition, both Bloomberg and Tradeweb limit their RFQ platforms to dealer-to-client trading functionality, meaning that end users cannot trade with each other on these platforms.

250.    The dealer-to-dealer side of the market is also dominated by SEFs that have agreed to play by the Dealer Defendants' rules.  *None* of the dealer-to-dealer SEFs allow anonymous trading.[66]



251.    As this data shows, there is virtually no IRS trading that is anonymous.  This alone is powerful evidence of Defendants' collusion because there is no legitimate reason for name give-up to persist in a centrally cleared IRS market.

                    3.    *The Dealer Defendants Place Transgressors in the "Penalty Box"*

252.    At the same time that the Dealer Defendants collectively prevent all-to-all SEFs from succeeding, they themselves use identical platforms.  Tradeweb and a number of IDBs,

---

[66] As shown in the following chart, which provides a snapshot from February 2016, the Dealer Defendants maintained the market share of Dealerweb, the interdealer SEF owned and operated by Tradeweb, at a very low level — merely 2%.  This reflects the fact that the Dealer Defendants are — jointly — rewarding the IDBs for complying with their demands that IDB platforms remain off-limits to the buy-side.  At the same time, the Dealer Defendants maintain Dealerweb as a threat to those IDBs. The IDBs know that, at any time, the Dealer Defendants could, in lockstep, move their liquidity to Dealerweb, as they had done in the mortgage bond market — the event that led to the détente between the Dealer Defendants and ICAP.

including ICAP, operate such SEF trading platforms with order book functionality, but they are open only to dealers.

253.    There is no technical reason why these entities could not allow buy-side customers to trade on their platforms as well, but the Dealer Defendants pressure them not to allow this.  In fact, the Dealer Defendants have "threaten[ed] to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]."[67]  Such a practice is commonly referred to as being placed in "the penalty box."

254.    The Dealer Defendants pull liquidity from platforms that allow anonymous trading.  For example, when an interdealer SEF "run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform."[68]  In particular, GFI "received heated phone calls" from major dealers over the introduction of trade anonymity.[69]  The complaining banks, which had planned to use GFI to trade with other banks, "contended that allowing *nonbanks* to trade anonymously could hurt their ability as swaps providers."[70]  In the face of this pressure, GFI promptly reversed course and implemented name give-up.  GFI's story is a well-known example of what happens to brokers that try to implement anonymous trading.

255.    As a former IDB employee explained, when the IDB attempted to bring buy-side customers onto its trading platform in a different asset class, the Dealer Defendants discovered this through name give-up and responded with collective threats "to simply move their business

---

[67] Madigan, *supra* n.46.

[68] Levinson, *supra* n.4.

[69] Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[70] *Id*. (emphasis added).

to another broker."[71]  He stated that, as a result, the IDB relented, limiting its platform to dealers. The employee added: "We didn't have much choice but to shut it down."[72]

256.    When asked during a recent panel discussion at SEFCON why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of Tradition's SEF, bluntly explained that IDB SEFs were not willing to stand up to dealers and go anonymous because of the risk of a loss of liquidity.

257.    The Dealer Defendants similarly threaten any buy-side customer with being put in the "penalty box" if it attempts to trade on an all-to-all trading platform, whether it is operated by an IDB or an independent SEF.[73]  In such instances, the Dealer Defendants often refuse to trade with the buy-side customer in any venue.  Because the Dealer Defendants are the primary market makers in the IRS market, such a boycott effectively prevents the buy-side customer from trading IRS as long as it is in the penalty box.  In even more egregious circumstances, the Dealer Defendants collectively threaten a transgressing customer with withdrawal of key banking services and refusal to trade other products.  This intimidation is very effective at maintaining the status quo, in which every buy-side trade must be executed on an inefficient retail market, ensuring that the Dealer Defendants take a hefty toll on every transaction.

---

[71] Robert Mackenzie Smith, *Interdealer brokers need to change, say critics*, RISK (Sept. 14, 2015), http://www.risk.net/risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more-change-say-critics.

[72] *Id.*

[73] *See* Rennison, *supra* n.6 (quoting a U.S.-based hedge fund manager: "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms.").

258.    The Dealer Defendants also use the "penalty box" to prevent any non-compliant dealer from breaking ranks, and will refuse to trade with anyone who is suspected of supporting all-to-all trading.

259.    For example, in 2003, Barclays attempted to launch a rudimentary, single-dealer electronic trading platform for IRS called "BARX" by partnering with Bloomberg.[74]  The other Dealer Defendants promptly put Barclays in the "penalty box" and refused to allow Barclays to participate in multi-dealer consortia, such as Tradeweb, for several years.

260.    BARX eventually ended its IRS business and became devoted mainly to foreign exchange ("FX") trading.  Even then, Barclays was only allowed out of the "penalty box" and into the Dealer Defendants' clubhouse in 2008, when Barclays acquired the assets and personnel of the swaps business of Lehman Brothers, including Dexter Senft, who possessed deep connections with the other Dealer Defendants and went on to bring those relationships and that network to Morgan Stanley in 2010.  This acquisition significantly bolstered Barclays' share of the IRS market, and Mr. Senft used his connections to help Barclays ingratiate itself with the other Dealer Defendants, including by taking a stake in Tradeweb.[75]  Senft similarly used his connections to maintain Morgan Stanley's involvement in the conspiracy after he joined in 2010.

### D.    The Dealer Defendants' Conduct Has Chilled Market Progress

261.    The Dealer Defendants' boycotts have sent a message to the industry that *any* SEF platform attempting to offer the buy-side access to an anonymous all-to-all trading platform

---

[74] *See Bloomberg and Barclays Capital launch interest rate swaps trading*, FINEXTRA (July 21, 2003), https://www.finextra.com/news/fullstory.aspx?newsitemid=9515.

[75] TRADEWEB, *Barclays Capital Takes Equity Stake in Tradeweb* (Sept. 10, 2009), http://www.tradeweb.com/news/news-releases/barclays-capital-takes-equity-stake-in-tradeweb/.

would be collectively boycotted and crushed, and any buy-side partners would be punished through a denial of trading services and an imposition of excessive clearing fees.

262.    As Angela Patel, Trading Operations Manager at Putnam Investments, a buy-side customer, stated during a recent SEFCON panel discussion: "No one wants to do anything because no one wants to be the next person to piss everyone off."

263.    SEFs are afraid even to apply to make IRS "available to trade" (and buy-side firms are afraid to trade IRS on all-to-all trading platforms) because of the risk of collective retaliation by the Dealer Defendants as happened to Javelin.

264.    Stephen Berger, the Director of Government Affairs at Citadel, similarly noted at SEFCON that a "market discipline element . . . is there in the background."  Certain employees of the Dealer Defendants, such as Michael Dawley, Managing Director and Co-Head of Futures and Derivatives Clearing Services at Goldman Sachs, make direct threats to SEFs in order to enforce market discipline.  In 2014, for example, at least one IDB SEF received a threatening phone call from Mr. Dawley after the SEF hired an employee who was perceived as hostile to the Dealer Defendants.

265.    As a result, the Dealer Defendants have effectively deterred any entities from offering anonymous all-to-all trading to the buy-side.

## IV.    DEFENDANTS' OTHER EFFORTS TO BLOCK ALL-TO-ALL TRADING OF INTEREST RATE SWAPS

### A.    The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform

266.    trueEX was not the very first trading platforms for IRS.  By early 2008, Tradeweb was poised to introduce an electronic all-to-all trading platform to the IRS market — a development that the marketplace should have embraced.  Instead, the Dealer Defendants acted in concert to neutralize the threat Tradeweb posed.

1.      *The Dealer Defendants' Strategic Investment Groups Took Control of Tradeweb's Interest Rate Swaps Business*

267.    Tradeweb was founded in 1998 as a private, dealer-backed firm that provided an online marketplace for fixed-income products, such as U.S. Treasuries.  Tradeweb subsequently developed a dealer-to-customer RFQ platform for IRS upon which buy-side customers could (non-anonymously) request non-executable and non-binding quotes from dealers, but not from other end users.  This was, in other words, an OTC platform that facilitated the Dealer Defendants' roles as the sole IRS market makers.  Because Tradeweb's platform relied on the dealers to make markets, its success depended on the dealers providing liquidity to the platform.

268.    In 2004, the dealers sold Tradeweb to what was then Thomson Corp., counting upon Tradeweb's dependence on the dealers' liquidity to keep it under their effective control.  IRS trading volumes thereafter continued to grow.  With the increased demand for IRS and advances in trade documentation, IRS products became increasingly standardized and, as discussed above, IRS quickly evolved to the point where the IRS market was poised and ready for the introduction of all-to-all electronic trading.

269.    Recognizing the threat the market evolution to all-to-all IRS trading posed to the Dealer Defendants' collectively privileged position as the primary market makers, Goldman Sachs' Principal Strategic Investments group devised a "dealer consortium" strategy to work with its biggest competitors, *i.e.*, the other Dealer Defendants, to maintain control of the IRS market.

270.    Having experienced the migration of other financial instruments away from OTC trading — and having seen the loss of bank revenues resulting from that migration — the Goldman Sachs PSI group recognized that, if the IRS market shifted to all-to-all platforms, buy-

side customers would be able to trade directly with one another, thereby diminishing the substantial profits the Dealer Defendants derive from trades in the dealer-to-customer market.

271.    Many of the other Dealer Defendants employ similar "strategic investment" groups to coordinate with their competitors to control market structures.[76]  Bank of America's group, Global Strategic Capital Initiatives, was headed by Mary Harman from 2009 to 2015. Barclays employs a group known as Market Strategic Investments, which is headed by Andrew Challis.[77]  Deutsche Bank utilizes a group called Strategic Investments, which was headed by Stephen Wolff from 2004 to 2014, when he was succeeded by Andrew Murray.  Morgan Stanley's group, also called the Strategic Principal Investments Group, was led by Gary Offner from 2005 to 2016.[78]  As discussed in more detail below, personnel in these divisions regularly communicate with their counterparts at other Dealer Defendants to ensure that the dealers are acting in a coordinated fashion.

272.    The Dealer Defendants are "intensely secretive" about their strategic investment groups.[79]  They did not typically even disclose the groups' existence, and they kept their

---

[76] Philip Georgiadis & Tim Cave, *Strategic investment units driving the evolution of trading*, FIN. NEWS (Mar. 31, 2015), http://m.efinancialnews.com/story/2015-03-31/banks-strategic-investment-units-drive-the-evolution-of-trading ("While most bulge-bracket banks have principal strategic investment units, US investment banking giants dominate the space and Goldman Sachs, in particular, is widely viewed as one of the largest and most organised.").

[77] Luke Clancy, *Tough Times for the Real Masters of the Universe*, RISK (Sept. 26, 2016), http://www.risk.net/risk-magazine/feature/2471879/tough-times-for-the-real-masters-of-the-universe.

[78] *Id.*

[79] *Id.*

operations hidden from public scrutiny.[80]  When one publication attempted to research these

groups in 2015, all banks approached refused to discuss their groups on the record.[81]

273.     The members of these groups understand themselves to constitute a so-called

"dealer community" that controls how markets evolve.  The heads of these groups met with each

other regularly, and secretly, in person and by telephone and through electronic communications,

to discuss how to protect the Dealer Defendants' role as dealers and maintain an artificially

bifurcated IRS market.  They also collaborated closely with the respective heads of their IRS

trading desks.[82]

274.     These groups secretly collaborated to protect what they called the "dealer

community" or the "industry."  For these groups, protecting the "dealer community" means

protecting their privileged status in markets they have historically controlled.  As explained by

an article in the financial press, triggered in part by the scrutiny brought to these groups by the

interest rate swaps class action lawsuit and a prior lawsuit involving CDS, these groups long

collaborated in a manner "enabling them to influence the speed and direction of change in the

markets where they made a fat slice of their revenues."[83]

275.     As stated in another article, the result of this collaboration is that: "When change

happened, it did so with the blessing of the industry."[84]  That same article quotes an unnamed

---

[80] *Id.*

[81] *See* Georgiadis & Cave, *supra* n.76.

[82] *Id.*

[83] Clancy, *supra* n.77.

[84] Duncan Wood, *Swaps market mutation could replace managed change*, Risk (Oct. 3, 2016),
http://www.risk.net/risk-magazine/opinion/2472646/swaps-market-mutation-could-replace-managed-
change.

source from one of the banks as "ruefully" acknowledging how that collaboration restricted market growth and development: "We were too slow to change; too closed.  *There was too much control*."[85]

276.    Tradeweb is a prime example of where the Dealer Defendants exercised too much control to prevent the market from developing.  By late 2007, Tradeweb was planning to introduce electronic all-to-all trading to the IRS market — a development for which there was great demand from the buy-side.  Tradeweb touted itself as a "real-time trading platform" and boasted it was "well positioned to capture new business as the market migrates to more efficient electronic trading platforms."[86]

277.    In response to this perceived threat, the Dealer Defendants resolved to regain control of Tradeweb to prevent it from introducing all-to-all trading.  In late 2007, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Lehman Brothers (later of Barclays and Morgan Stanley), all members of their respective dealers' strategic investment groups, devised and implemented a scheme to eliminate the threat from Tradeweb.

278.    Messrs. Levy, Senft, and Wolff recognized that Tradeweb's liquidity contracts with the Dealer Defendants — which Tradeweb needed in order to drive volume to its RFQ and eventually its all-to-all platform — were expiring.  This provided the Dealer Defendants with leverage.  According to one source, "Thomson realized the banks would take their liquidity and shop it around, which would threaten the value of TradeWeb."[87]

---

[85] *Id.*

[86] *See* TRADEWEB, *Thomson to Acquire TradeWeb* (Apr. 8, 2004), http://www.tradeweb.com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

[87] Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL ST. & TECH. (Oct. 10, 2007), http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.html.

279.    To exploit this leverage, Levy, Senft, and Wolff recruited other Dealer Defendants to join an initiative they named "Project Fusion."  Project Fusion was designed as a way for the Dealer Defendants to take control of Tradeweb's IRS business so as to eliminate Tradeweb as a threat – and to do so secretly.

        2.    *The Dealer Defendants and Tradeweb Hid the True Nature of the Dealer Defendants' Acquisition of Control*

280.    On October 1 and 2, 2007, the Dealer Defendants and Tradeweb privately formed two Delaware LLCs within 24 hours.  They named the first one "Tradeweb Markets LLC."  This was the entity intended to be the public face of the deal and the one in which the Dealer Defendants really would take a minority stake in exchange for paying $180 million to Thomson Corporation, the parent of Tradeweb at the time.  The Dealer Defendants created a second company named "Tradeweb NewMarkets LLC."  This entity was conceived and created with one central purpose: to give the Dealer Defendants control over IRS trading at Tradeweb.  The Dealer Defendants paid Thomson Corporation approximately *$280 million* to purchase an *overwhelming majority stake* (80%) in this entity, and it was this entity that would house Tradeweb's IRS business.

281.    On October 11, 2007, Tradeweb and the Dealer Defendants issued a press release announcing that "the dealers will invest approximately $180 million to purchase a *minority* stake in TradeWeb's established markets."[88]  This press release was plainly meant to convey to the financial press and others that this minority investment included Tradeweb's *interest rate swaps business*.

---

[88] TRADEWEB, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (October 11, 2007) (emphasis added), http://www.tradeweb.com/News/News-Releases/Nine-Global-Dealers-and-Thomson-Financial-Form-Premier-Electronic-Trading-Venture-Using-TradeWeb.

282.     Elsewhere in the release, Lee Olesky, President of Tradeweb, emphasized *IRS trading* as the chief benefit of the Dealer Defendants' supposed minority stake: "At this stage in the evolution of the electronic markets, *especially interest rate swaps,* the partnership of leading dealers with TradeWeb's global distribution and technology, is a powerful combination."[89]

283.     Nowhere did Defendants' press releases mention the existence of the newly-created entity, Tradeweb NewMarkets LLC, that would house Tradeweb's IRS business, or that the Dealer Defendants' were paying approximately $280 million to control 80% of that entity. At most, those crucial facts were addressed, and deliberately obscured, only by one vague sentence, which conveyed no meaningful information at all: "Separately, Thomson and the dealers will fund additional investment in asset class expansion."[90]

284.     The press releases were misleading about the *purpose* of the Dealer Defendants' investment.  As noted, they claimed the Dealer Defendants were investing in Tradeweb's IRS business to provide "a significant opportunity for institutional investors to benefit from the efficiencies of electronic trading."[91]  In fact, the Dealer Defendants' purpose was to keep Tradeweb from offering an all-to-all platform that would be *more efficient* for the buy-side.

285.     As explained more fully below, Goldman Sachs and the other Dealer Defendants originally did not allow Barclays to participate in the Tradeweb consortium because they had placed Barclays in the "penalty box" for attempting to launch a dealer-to-customer IRS electronic trading platform without the other dealers' permission.  When Barclays' "penalty" expired, and the Dealer Defendants allowed it to become an investor in Tradeweb in 2009, the

---

[89] *Id.* (emphasis added).

[90] *Id.*

[91] *Id.*

Dealer Defendants again issued a press release stating that Barclays had joined the other dealers in taking "a *minority* equity stake in its business," again neglecting to mention the Dealer Defendants' overwhelming *majority* stake in Tradeweb NewMarkets LLC.[92]

286.     As part of Project Fusion, certain Dealer Defendants agreed with each other that Tradeweb would not move forward with an all-to-all trading platform and that they would not support other trading platforms that threatened to move the market toward all-to-all trading. They also agreed that each Dealer Defendant would provide liquidity to Tradeweb's platforms to the exclusion of competing platforms.

> 3.     *The Dealer Defendants Installed Themselves on Tradeweb's Boards and Committees and Use Their Positions to Further the Conspiracy*

287.     The Dealer Defendants and others installed their senior personnel, including those principally responsible for the conspiracy alleged herein, on the boards of both Tradeweb Markets and Tradeweb NewMarkets.  The Dealer Defendants' and other dealers' personnel occupied 16 of the 26 seats on the Tradeweb Markets Board of Directors and 16 of the 24 seats on the Tradeweb NewMarkets Board of Directors.  The Dealer Defendants also installed key strategic personnel on the governance committees of both entities during the relevant time period, so they could control Tradeweb's IRS business strategy and use the entities secretly to collude.

288.     The Dealer Defendants installed one of the chief architects of their consortium strategy, Vic Simone, a Managing Director at Goldman Sachs and then-Global Head of its PSI

---

[92] WALL ST. & TECH., *Barclays Capital Takes Minority Equity Stake in Tradeweb,* (September 11, 2009), http://www.wallstreetandtech.com/electronic-trading/barclays-capital-takes-minority-equity-stake-in-tradeweb/d/d-id/1262406d41d.html.

Group, as Chairman of the Board of Directors of Tradeweb Markets.[93]  And they selected Lee Olesky, the former Chief Operating Officer for Fixed Income at Credit Suisse, to serve as CEO of both entities.

289.    Bank of America installed Shea Wallon, a Managing Director in the bank's Global Strategic Capital Initiatives group, on the Boards of both Tradeweb Markets and Tradeweb NewMarkets.  Other Bank of America personnel on the Tradeweb NewMarkets Board included Luke Halestrap, the Head of Emerging Markets Interest Rates.

290.    Barclays personnel on the Tradeweb Markets Board of Directors included Dexter Senft, another chief architect of the conspiracy who subsequently headed Morgan Stanley's Fixed Income e-Commerce division, and Andrew Challis, the Head of eFICC Distribution and Market Strategic Investments.  Barclays personnel on the Tradeweb NewMarkets Board of Directors included Christopher Mosher.

291.    Deutsche Bank filled the boards of Tradeweb Markets and Tradeweb NewMarkets with Michele Faissola, the Head of Global Rates, and Stephen Wolff, the Head of Strategic Investments, Head of Fixed Income e-Commerce, and Head of Interest Rates Trading.

292.    In addition to installing Vic Simone as Chairman, Goldman Sachs placed Brad Levy, another chief architect of the conspiracy alleged herein, as a board member of both Tradeweb Markets and Tradeweb NewMarkets.  Mr. Levy was the Global Head of Goldman Sachs' PSI Group and, at the same time, the Chairman of the Board of Directors of Tradeweb Markets.  Goldman Sachs also installed Colin Corgan, a partner on its Rates Desk, on the boards of both Tradeweb Markets and Tradeweb NewMarkets.

---

[93] *See* TRADEWEB, *Tradeweb Appoints New CEO* (Sept. 9, 2008), http://www.tradeweb.com/News/News-Releases/Tradeweb-Appoints-New-CEO/.

293.    JP Morgan named Simon Maisey to the Tradeweb Markets Board of Directors (and he joined Tradeweb as a Managing Director in 2014), and Christopher Paul Willcox, the Global Head of Rates Trading and the Head of Global Rates Strategic Investments, to the Tradeweb NewMarkets Board of Directors.  In addition, Kemal Askar, JP Morgan's Head of Rates Trading in the United States, served on the boards of both Tradeweb Markets and Tradeweb NewMarkets.

294.    When Dexter Senft joined Morgan Stanley as the Global Head of Fixed Income E-Commerce, Morgan Stanley installed him on the Tradeweb Markets Board of Directors. Morgan Stanley also installed David Moore, the Head of Global Rates, on the Tradeweb NewMarkets Board of Directors.

295.    RBS placed Richard Volpe, the Global Head of Dollar Interest Rates, on the Tradeweb Markets Board of Directors, and Michelle Neal, the Global Head of Electronic Markets and co-head of FICC Prime Services, on the Tradeweb NewMarkets Board of Directors.

296.    Many Tradeweb employees also come from the Dealer Defendants or other major dealers who have access to information about trueEX from their prior work with dealers.  Simon Maisey, for example, joined Tradeweb in 2014 after doing extensive due diligence of trueEX when working with JP Morgan.

297.    As noted, these board members include some of the primary architects of the conspiracy.  They met regularly under the cover of Tradeweb's board and committees to plan how the Dealer Defendants could maintain control of the IRS market and make sure they were not disintermediated by anonymous all-to-all IRS trading platforms such as trueEX.

298.    In addition to routine conference calls, which often took place weekly, the Board met annually in Miami, Florida.  The Dealer Defendants used these meetings to discuss and coordinate their strategy and to further their conspiracy to maintain a bifurcated IRS market.

299.    The Dealer Defendants also control Tradeweb via its governance committees. Some examples of Tradeweb's governance committees are the "participation committees" that determine who can participate on Tradeweb's SEFs.[94]  Acting through these committees, the Dealer Defendants met and agreed to coordinate their conduct to ensure no threat to their collective dominance of the OTC market would succeed.  Tradeweb kept the existence of these committees and the identities of their members largely hidden from the public.

300.    In November 2010, Tradeweb NewMarkets LLC merged into Tradeweb Markets LLC in 2010, leaving Tradeweb Markets LLC as the surviving company.  The Dealer Defendants continued to hold a controlling majority of seats on the Board of Directors of Tradeweb Markets LLC, giving them continuing control over the company.

301.    Through this influence and control, the Dealer Defendants have used Tradeweb to further their conspiracy.  The Dealer Defendants publicly tout Tradeweb as a modern, efficient trading platform that can provide "accurate pricing information" and "greater market transparency."[95]  But these "benefits" are a sham, and serve only to placate the buy-side's increasing demands for all-to-all trading.  The Dealer Defendants have allowed Tradeweb merely

---

[94] *See* TRADEWEB, *DW SEF LLC: SEF Participation Committee Charter*, http://www.tradeweb.com/ uploadedFiles/Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Participation%20Committee%2 0Charter.pdf (last visited June 7, 2018); TRADEWEB, *TW SEF LLC: SEF Participation Committee Charter*, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/TW%20 SEF%20Participation%20Committee%20Charter.pdf (last visited June 7, 2018).

[95] TRADEWEB, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007), http://www.tradeweb.com/MediaCenterTwoColPage.aspx? Pageid=1124&id=1881&LangType=1033&&LangType=1033&ekfxmen_noscript=1&ekfxmensel=ef6f3 2368_6_84.

to put a new sheen on the OTC market structure — the buy-side can trade on Tradeweb *only* via its dealer-to-customer RFQ platform, rather than all-to-all via an RFQ system or an order book, and buy-side customers cannot trade directly with one another.

302.    Tradeweb continues to play a role in the Dealer Defendants' conspiracy by maintaining a two-tiered market structure.  Tradeweb currently operates two different SEFs: Dealerweb, which is "designed exclusively for dealers" and allows anonymous trading, and Tradeweb SEF, which "is designed for non-dealer market participants and always discloses counterparty identities."[96]  As Jon Williams, former Managing Director and Head of U.S. Institutional Market Operations at Tradeweb, acknowledged during a recent panel discussion at SEFCON: "we don't have buy-side participants" on Dealerweb.

303.    In fact, while Tradeweb SEF ostensibly offers an "order book," it is effectively closed off to the buy-side.  The Dealer Defendants do not trade on the platform.  They trade with each other on Dealerweb (or other IDBs) and limit trades with end users to the dealer-to-client RFQ.  The Dealer Defendants also prohibit their clients from using the order book by punishing those who try to do so.  As a result, this platform is inactive and seen by the buy-side as inaccessible.

304.    While Tradeweb could offer an all-to-all RFQ platform, due to the Dealer Defendants' influence and control, Tradeweb has limited its RFQ to facilitate dealer-to-client or dealer-to-dealer trading by allowing only dealers to respond to the quote requests submitted to the platform.

---

[96] KELLEHER, ET AL., *supra* n.20, at 12.

94

**B.      The Dealer Defendants Utilize Other Forums to Collude**

305.     In addition to Tradeweb, the Dealer Defendants have colluded and coordinated their efforts in furtherance of the conspiracy through other forums as well.  One of these is ISDA.  ISDA is nominally an industry trade association, but in reality, it served the interests of the Dealer Defendants.

306.     The Dealer Defendants controlled ISDA's Board of Directors and used those roles to discuss the IRS market and their conspiracy.  The following employees of the Dealer Defendants held positions on the ISDA Board of Directors during the relevant period, and used ISDA to ensure that they all remain on the same page regarding their collective boycott of all-to-all electronic platforms for IRS trading: Stephen O'Connor (Morgan Stanley: Chairman), Ciaran O'Flynn (Morgan Stanley: Director), Keith Bailey (Barclays: Secretary), Diane Genova (JP Morgan: Treasurer), Biswarup Chatterjee (Citigroup: Director), Kieran Higgins (RBS: Director), Christopher Murphy (UBS: Director), Will Roberts (Bank of America: Director), and Eraj Shirvani (Credit Suisse: Director).

307.     In addition, the Dealer Defendants meet and collude under the auspices of meetings of the Board of Directors of the Futures Industry Association ("FIA"), or as part of various FIA "working groups."  The following employees of the Dealer Defendants held positions on the Board of Directors of FIA America (FIA's American division) during the relevant period: M. Clark Hutchison (Deutsche Bank), Emily Portney (JP Morgan), Michael Dawley (head of Goldman Sachs' FCM), Jeffrey Jennings (Credit Suisse), Raymond Kahn (Barclays), Jerome Kemp (Citi), Edward Pia (UBS), and George Simonetti (Merrill Lynch, Pierce, Fenner & Smith).

308.     ISDA and FIA often coordinate to create "working groups" that provide a forum for collusion.  One such working group was devoted to the drafting of the "Cleared Derivatives

Execution Agreement" ("CDEA") — a standard form contract intended to govern the relationship between FCMs and their customers.  The "CDEA Drafting Committee" was chaired by Maria Chiodi, a Director and In-House Counsel at Credit Suisse.

309.    The CDEA Drafting Committee held numerous meetings throughout 2010 and 2011.  One such meeting was held on April 8, 2011 at the offices of Credit Suisse in New York City.  Jamie Cawley, Javelin's former CEO, and Suellen Galish, Javelin's General Counsel, learned of the meeting in advance, and requested an invitation because they were concerned that the CDEA Drafting Committee was being used to prevent or limit trading on all-to-all anonymous trading platforms.

310.    At the meeting, Ms. Galish asked how the CDEA — which appeared to have been drafted solely for OTC transactions, and did not seem to cover IRS trades executed on a SEF — would work for trades executed on a SEF.  Athanassios Diplas, then a Managing Director at Deutsche Bank and Co-Chair of ISDA's Industry Governance Committee, immediately asked for Ms. Galish's name and who she worked for, and refused to answer her question.

311.    After the meeting, the committee informed Mr. Cawley by email that it was inappropriate for any representatives of SEFs to attend future CDEA Drafting Committee meetings.  Thereafter, Javelin was prevented from attending any further Drafting Committee meetings.  Although the drafting of the CDEAs was purportedly an industry wide process, all-to-all SEFs including trueEX were shut out of the process, though Tradeweb and ICAP had a voice given their special relationship with the Dealer Defendants.

312.    The Dealer Defendants also met and conspired through another IDB named "Tradition."  Tradition is the interdealer broker arm of Compagnie Financiere Tradition and one of the world's largest IDBs in OTC financial and commodity related products.  From 2013 to

2015, Tradition personnel hosted monthly meetings in New York with the collective heads of the Dealer Defendants'' IRS trading desks to discuss issues relating to SEFs.  The Dealer Defendants used these meetings to coordinate their positions regarding the IRS market and to ensure none of them broke ranks to support electronic trading platforms that would threaten their control of the market.

### C.     The Dealer Defendants Prevented Interdealer Brokers From Opening All-to-All Trading Platforms to the Entire Market

313.    In addition to taking control of Tradeweb and preventing it from offering more competitive trading, the Dealer Defendants conspired to prevent other market actors from opening all-to-all trading platforms.  In particular, the Dealer Defendants identified IDBs as a potential platform for facilitating all-to-all trading, and moved decisively to quash that threat.

314.    By the late 2000s, a number of IDBs were also well-positioned to allow buy-side customers to trade on all-to-all IRS trading platforms.  Many already operated such platforms in the interdealer market, and opening access to others would not have imposed any additional technological burden.  Since IDBs earned brokerage fees on each trade on their platforms, they had strong financial incentives to open their platforms to buy-side firms in order to expand their customer base.  Great demand existed for this to happen.  The Dealer Defendants, however, conspired to eliminate that threat as well.

315.    The Dealer Defendants agreed to jointly penalize any IDBs that dared to consider opening their platforms to the buy-side.  In furtherance of this agreement, the Dealer Defendants "threaten to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]."[97]  As noted above, the Dealer Defendants refer to this practice as placing the IDB in the "penalty box" or "pulling the line" on the IDB.

---

[97] Madigan, *supra* n.46.

316.    GFI Group ("GFI"), for example, operates leading IDB platforms and attempted to implement anonymous trading on two separate occasions, both of which were immediately shut down by the Dealer Defendants.  In 2009, an interdealer platform "run by GFI Group said it would allow anonymous trading,"[98] a move the Dealer Defendants saw as the first step toward GFI allowing buy-side customers to trade on its platform.  To prevent a shift to anonymity, the Dealer Defendants responded in unison with threats to pull their business off the platform.[99]  GFI promptly reversed course.

317.    In 2014, GFI made a second attempt to bring an anonymous trading platform to market.  Shortly thereafter, GFI "received heated phone calls" from major dealers over the introduction of trade anonymity.[100]  In response to those calls, GFI switched trading to a name-disclosed basis, disappointing buy-side customers that had hoped to trade anonymously on the platform.

318.    Anonymity is critical for the buy-side in these situations because the Dealer Defendants similarly threaten any buy-side customer with the "penalty box" if they discover it has attempted to trade on an all-to-all platform, whether it is operated by an IDB, Tradeweb, Bloomberg, or independent SEFs such as trueEX.[101]  As described further above, the Dealer Defendants conspire to prevent anonymity in trading to catch transgressing end users.  And when

---

[98] Levinson, *supra* n.4.

[99] *See* Kim Hunter, *Growing Pains*, Markit (Winter 2014), http://content.markitcdn.com/corporate/ Company/Files/MagazineEntireIssue?CMSID=1277525de02549adbf7b422b9b34f641 ("The first [IDB] that goes anonymous is sending a signal that the buyside is becoming part of its platform.  You'll get wider spreads or even dealers withdrawing from that platform.").

[100] *See* Burne, *supra* n.69.

[101] *See* Rennison, *supra* n.6 (quoting a U.S.-based hedge fund manager as stating: "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms.").

an end user is caught trading on a prohibited platform, the Dealer Defendants often refuse to trade with the investor in any venue.  Because the Dealer Defendants are the primary market makers in the IRS market, such a boycott effectively prevents the investor from trading IRS for as long as it is in the "penalty box."  In some cases, the Dealer Defendants have even threatened a transgressing investor with withdrawal of key banking services.  Such threats carry great weight and have had the intended deterrent effects.[102]

319.    As a result, IDBs did not open their platforms to the buy-side.  Tullett Prebon, for example, announced that it would open a platform on which buy-side customers can trade with one another (similar to its IDB platform), but limit trading to asset classes in which dealers' roles as market makers are already diminishing.[103]  Mihiri Jayaweera, Tullett Prebon's strategy head, has made clear that "[s]waps will be off limits" for the buy-side, referring to IRS trading as "the territory of our dealer banks."[104]

320.    The Dealer Defendants also worked to neutralize ICAP.  In 2009, ICAP agreed with the Dealer Defendants to prevent the buy-side from accessing its platform as part of an agreed upon détente.  In April 2009, Tradeweb (along with its Dealer Defendant investors)

---

[102] The Dealer Defendants even use the "penalty box" to prevent any *dealer* from taking steps that are not in their collective interests, even if it is in the dealer's individual interest.  For example, in 2003, Barclays attempted to launch a rudimentary, single-dealer electronic trading platform for IRS called "BARX" by partnering with Bloomberg.  Other Dealer Defendants promptly refused to allow Barclays to participate in multi-dealer consortia, such as Tradeweb, for several years.  BARX eventually ended its IRS business and became focused on foreign exchange trading.  Even then, Dealer Defendants only let Barclays out of the "penalty box" when Barclays acquired the assets and personnel of the swaps business of Lehman Brothers, including Dexter Senft, who possessed deep connections with other Dealer Defendants.  Mr. Senft used his connections to help Barclays ingratiate itself with the other Dealer Defendants, including by taking a stake in Tradeweb.  Senft similarly used his connections to maintain Morgan Stanley's involvement in the conspiracy after he joined that firm in 2010.

[103] Duncan Wood, *Brokers woo new clients, try not to upset old ones*, RISK (Sept. 9, 2016), http://www.risk.net/risk-magazine/feature/2469861/brokers-woo-new-clients-try-not-to-upset-old-ones.

[104] *Id.*

launched a trading platform for mortgage bonds called "Dealerweb."[105]  This launch had a devastating impact on ICAP, which had spent seven years building a mortgage-bond trading business that was transacting up to $50 billion in daily volume.  Following the Dealerweb launch, ICAP's mortgage-bond trading platform "lost 85 percent of its business over six weeks" as Dealerweb "basically walked away with the market."[106]

321.    In retaliation for Dealerweb capturing the mortgage bond market, ICAP threatened to launch an all-to-all platform for IRS.  This threat was credible because ICAP was developing an electronic-trading platform for the European IDB IRS market called i-Swap, which ICAP could have launched as an all-to-all fully anonymous IRS trading platform in the United States and that could have included the buy-side.[107]  Alternatively, ICAP could have chosen to allow buy-side customers to trade on its existing IDB platform.  Either option threatened to collapse the bifurcated IRS market the Dealer Defendants wanted to maintain.

322.    In response to these mutual threats, ICAP communicated with representatives of the Dealer Defendants and others in the late spring and early summer of 2009.  As a result of their discussions, ICAP and the Dealer Defendants agreed to a détente whereby the Dealer Defendants would not further expand Dealerweb into the IDB space in exchange for ICAP not establishing an all-to-all anonymous IRS trading platform.

---

[105] *See* Bryce Elder & Neil Hume, *Icap hurt by banks' platform*, FIN. TIMES (Apr. 21, 2009), http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d3-00144feabdc0.html#axzz419KBvtLz.

[106] Matthew Leising & Jody Shenn, *ICAP Loses 85% of Mortgage Bond Trading to Dealerweb*, BLOOMBERG (Apr. 21, 2009).

[107] *See* Michael Mackenzie, *Rate swap traders wait for no man*, FIN. TIMES (Oct. 19, 2010), http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html#axzz3p2lJ0933 (noting that i-Swap's European launch laid "the ground for an eventual assault on the US market").

323.     Tellingly, the Dealer Defendants formally opened Dealerweb for interdealer IRS trading but, as shown below, the Dealer Defendants only supply Dealerweb with a very low amount of trading volume — thereby making good on their end of the bargain while reminding ICAP and other IDBs that Dealerweb is an ever-present threat.  The Dealer Defendants have also supported ICAP by directing their business to its platforms.  In fact, certain Dealer Defendants even entered into written agreements that they would not support electronic IDB platforms other than ICAP, and would inform each other if they were approached by such a platform

324.     The Dealer Defendants also furthered their conspiracy through regular meetings and interactions with ICAP.  For example, a senior ICAP executive regularly met and golfed with the head of Goldman Sachs' IRS business until November 2013, when the senior ICAP executive changed positions at ICAP.  During these meetings, the senior ICAP executive and the head of Goldman Sachs' IRS business coordinated their positions regarding ISDAfix, a key benchmark interest rate for a range of financial derivative instruments, and maintaining the status quo in the IRS market.  During this time, the senior ICAP executive also met monthly with executives from the other Dealer Defendants to coordinate their positions regarding ISDAfix and maintaining the status quo in the IRS market.

## V.     ABSENT A CONSPIRACY, IRS MARKET PARTICIPANTS WOULD PREDOMINANTLY TRADE ON TRUEEX AND OTHER ALL-TO-ALL TRADING PLATFORMS

### A.     Relevant Market

325.     The relevant market is the market for IRS in the United States.  IRS are, and are widely perceived by those in the industry to be, a unique financial product.  The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

326.    Other derivative products are not substitutable for IRS.  The rapid rise in IRS volume following their inception in the mid-1980s demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

## B.    The Dealer Defendants Have Substantial Market Power

327.    Currently, the Dealer Defendants continue to account for most IRS dealing, and they continue to earn extraordinary profits from their dealer-to-dealer OTC-like trading.

328.    Each Dealer Defendant possesses a significant share of the IRS market, and they collectively dominate the market.  Based on available market-share information, the Dealer Defendants collectively control the vast majority of the market.[108]

329.    The Dealer Defendants' market power is well-recognized.  As Paul Rowady of the TABB Group stated: "Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."[109]  Mr. Rowady also stated that "[f]rankly, nothing happens in OTC derivatives without the major dealers blessing the moves, as they are counterparty to every trade."[110]

330.    The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

---

[108] In 2014, Bank of America was reported to control 12.6% of the IRS market, JP Morgan 11.4%, Deutsche Bank 9.5%, Citi 9.2%, and Barclays 8.2%.  In 2012, Goldman Sachs was reported to control 6.9% of the IRS market, BNPP 4.9%, and Morgan Stanley 3.2%.  The remaining Dealer Defendants — Credit Suisse, RBS, and UBS — collectively controlled over 10% of the IRS market in 2012.  *See* GREENWICH ASSOCS., 2013 GLOBAL INTEREST RATE DERIVATIVES: DEALER RANKINGS & MARKET TRENDS REPORT — UNITED STATES 1 (2013).

[109] Michael Mackenzie & Gillian Tett, *Markets: Frozen in time*, FIN. TIMES (June 15, 2010), http://www.ft.com/intl/cms/s/0/bf3fd548-78b6-11df-a312-00144feabdc0.html#axzz3sFYwvyw0.

[110] *Id.*

331.    There are no adequate substitutes for IRS.  While other financial instruments in the market replicate certain aspects of IRS, none afford investors the same benefits with the same flexibility as IRS.

332.    For example, CME offers a swap futures product, but attempting to mimic an IRS trade with such products is often untenable or simply impossible because the available liquidity of swap futures is nowhere near that of IRS.  IRS trading volume dwarfs swap futures: as a typical order of magnitude, the average daily volume of cleared OTC USD IRS is approximately $200 billion notional, whereas that of swap futures is *one two-hundredths* the size at approximately $1 billion.  The difference in open interest is even more disproportionate, on the order of $100 *trillion* in notional IRS interest outstanding versus a mere $25 billion in swap futures.  The relative dearth of swap futures liquidity compared with IRS liquidity is a major barrier for buy-side participants because the price impact of any large trade will be much worse in the swap futures market than it would be in the IRS market, if the trade could be done at all in the swap futures market.  This means that, if an IRS trade could even theoretically be replicated as a swap futures trade, the buy-side investor would have to pay much higher prices for the futures trade because it would be using up much more of the available supply.

333.    Indeed, the Dealer Defendants have purposely contributed to the lack of liquidity in the swap futures market, by not directing liquidity into this market or supporting the swap futures market.

334.    IRS are also not replicated by CME swap futures because the terms available on the resulting swap are much more restrictive than in IRS, limiting their utility for the buy-side. For instance, CME futures are quarterly contracts available in only six tenors (2-, 5-, 7-, 10-, 20-, and 30-year), whereas IRS regularly trade in tenors available in whole-year increments from one

up to 30 years or more.  In addition, IRS can trade in fractions of year, such as a 3.5, 9.75, or 12.37-year.  Similarly, while the start dates for the CME futures contracts are limited to just four dates a year (the third Wednesday of March, June, September, and December), IRS can start on any day the buy-side investor requires.

335.    Because of this flexibility and deep liquidity, IRS can be used precisely and easily to hedge interest-rate fluctuations related to other financial instruments of significant value (by matching the start and end dates, tenor, and notional amount), whereas a CME futures contract cannot.  Municipalities and corporations, accordingly, regularly enter into IRS related to floating-rate bonds they have issued; the IRS allow the entities to convert floating-rate exposure to fixed-rate exposure for the exact duration of the bonds.  A futures contract would not match the start and end dates, thereby creating exposure to fluctuations in interest rates.  Furthermore, a debt issuer would have to enter into numerous futures just to match the notional exposure on one bond issuance.  As a result, municipalities, corporations, and other end users of IRS essentially make no use of futures contracts.  For all of these and still other reasons, CME swap futures are not an adequate substitute for IRS.[111]

### C.    Defendants' Conspiracy Robbed trueEX of Substantial Profits

336.    As a result of the Dealer Defendants' joint boycott of trueEX and other anonymous all-to-all trading platforms, the SEFs that have succeeded are either controlled by the

---

[111] Similarly, a package (or "strip") of Eurodollar futures can be used to replicate certain aspects of an IRS, but building such a package is complicated and time-consuming for the buy-side, and it produces a set of cash flows that may differ from an IRS.  Eurodollar futures are cash-settled futures contracts with a final futures price based on three-month LIBOR at the expiration date.  Building a strip of Eurodollar futures requires the purchase or sale of a series of futures maturing in successively deferred months. Thus, as with CME futures, an investor must make multiple purchases to build the equivalent of one swap — four Eurodollar futures must be purchased for each year of tenor of the IRS.  And while an IRS locks in a single fixed payment rate for the life of the swap, each individual Eurodollar future in a strip comes with a different interest rate, meaning it produces different cash flows than an IRS. For these and other reasons, a strip of Eurodollar futures is also not an adequate IRS substitute for the buy-side.

Dealer Defendants (Tradeweb), have explicitly entered into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial market division (ICAP), or have recognized that the only way to avoid retaliation from the Dealer Defendants is to focus on providing a dealer-to-customer RFQ platform (Bloomberg).[112]

337.    trueEX and other SEFs that attempted to abolish name give-up have seen their customers threatened and their businesses hobbled by coordinated refusals to deal.[113]  As described above, due to the Dealer Defendants' conspiracy *not a single SEF offering all-to-all anonymous trading currently does any meaningful business in the IRS market*.

338.    But for Defendants' anticompetitive acts, the IRS market would have gravitated to trueEX and other all-to-all trading platforms, thereby generating immense profits for those all-to-all SEFs that, like Plaintiff, stood ready, willing, and able to onboard customers and execute transactions.

339.    In sum, if Plaintiff had not been jointly boycotted by the Dealer Defendants there would have been a rapid migration of IRS onto trueEX.

### D.    Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes

340.    Absent a conspiracy to punish them for doing so, buy-side customers would have supported, and flocked to, all-to-all platforms like trueEX that promised to keep their anonymity while also compressing bid/ask spreads due to increased competition and transparency.

---

[112] While Bloomberg offers a nominal "order book," the platform sees little IRS activity because, among other things, the Dealer Defendants refuse to trade on the platform and buy-side firms fear Dealer Defendants' retaliation if they do so.

[113] *See also, e.g.*, Karen Brettell, *Banks' pressure stalls opening of U.S. derivatives trading platform*, REUTERS (Aug. 27, 2014), http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks-idUSKBN0GR1Z320140827.

341.    Absent a conspiracy, it would have been in the individual interest of many different market participants — including IDBs, clearinghouses, and SEFs — to offer an all-to-all trading platform solution to the buy-side.  Instead, because of the Dealer Defendants' conspiracy, trueEX and other SEFs that *have* tried to offer such platforms have been put in an impossible position (trueEX) or put out of the IRS business altogether (Javelin and TeraExchange), while SEFs like Tradeweb that replicate the structure of the OTC market have remained successful.  Without the Dealer Defendants' collusion, offerings such as those by trueEX would have generated large new revenue streams through increased volume and market share.

342.    Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change as well.  Absent a conspiracy, evolution to all-to-all trading would have been inevitable — it is the natural progression when financial products become, as most IRS have long been, highly standardized, high-volume products.  This is particularly true where, as here, trueEX and other solution providers were actively entering the market to make this happen in response to strong demand.  Each Dealer Defendant, absent coordination, should have been looking out for its own self-interest — which would have been furthered by partnering with trueEX or some other all-to-all platform in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IRS market.

343.    Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to customers in the form of fully anonymous order-book trading.  Even leaving aside the potential to be an industry leader and gain first-mover advantage, each Dealer Defendant would have an independent interest in trading

on the new platforms and providing clearing services, all of which could have been a profitable source of income.  Because no individual Dealer Defendant could prevent all-to-all trading platforms from flourishing, the only way to overcome each Dealer Defendant's individual economic self-interest in participation was to coordinate a united front that could prevent the emergence of all-to-all trading platforms.

344.    An electronic all-to-all platform has not emerged.  Not because IRS are not ready for all-to-all trading.  Not because the buy-side does not want all-to-all trading.  Not because trueEX and other solution providers were not ready, willing, and able to offer all-to-all trading. Instead, we have this world because the Dealer Defendants collectively blocked the market's evolution.  Only a conspiracy that assured each Dealer Defendant that all-to-all trading was not going to happen explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

345.    The Dealer Defendants' agreement was a per se illegal agreement among horizontal competitors to collectively boycott trueEX and thwart competition.  The Dealer Defendants' collective refusals to deal with trueEX and other all-to-all trading platforms that would not play ball comprised a group boycott that is per se illegal under the antitrust laws.

**E.    Investigations and Litigation Concerning the Credit Default Swaps Market and ISDAfix Show a Pattern of Collusion Among the Dealer Defendants to Manipulate Various Aspects of the Financial System**

346.    This is not the first time the Dealer Defendants abused their collective influence over the market's infrastructure to obtain extraordinary profits with respect to a derivatives product.  To the contrary, the Dealer Defendants' strategy here parallels their alleged misbehavior in the CDS market and in their manipulation of ISDAfix.

1.      *The Dealer Defendants' Misconduct in the Credit Default Swaps Market*

347.    The Dealer Defendants' misconduct in the CDS market has been the subject of two separate investigations by the United States Department of Justice ("DOJ") and the European Commission ("EC").  The DOJ and EC investigations were spurred by complaints by market participants that the Dealer Defendants and others, who were the major CDS dealers, were abusing their control of the market to limit price transparency and competition.[114]  In one widely reported email, for example, Samuel Cole, then-Chief Operating Officer of buy-side firm BlueMountain, lamented that banks, including many of the Dealer Defendants, were engaging in "liberal use of dissembling and obfuscation" in order to retain their "oligopolistic dominance" of most major market structures in the credit markets.[115]

348.    The concerns expressed by the DOJ and EC are similar to present-day complaints about anticompetitive behavior in the IRS market.  For example, the EC stated that "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[116] The EC believed that "the investment banks also sought to shut out exchanges . . . by coordinating the choice of their preferred clearing house."[117]

349.    The striking similarities also carry over to the means by which exchange-like trading was blocked — *i.e.*, collective control over the system's infrastructure, by way of group

---

[114] *See* Liz Rappaport, Carrick Mollenkamp & Serena Ng, *U.S. Tightens Its Derivatives Vise*, WALL ST. J. (July 15, 2009), http://www.wsj.com/articles/SB124756743503138067.

[115] Serena Ng, *Friction on Swaps Response*, WALL ST. J. (June 3, 2009), https://www.wsj.com/articles/SB124390301244674747.

[116] EUROPEAN COMMISSION, *Antitrust: Commission sends statement of objections to 13 investment banks, ISDA and Markit in credit default swaps investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[117] *Id.*

boycotts.  For instance, CME backed a joint venture (with Citadel) known as CMDX, which was going to enable market participations to execute CDS trades through an order book.

350.    In June 2008, CMDX was presented to the market.  Members of the sell-side were offered equity in the venture, creating significant upside for those who would move first to support the migration to an exchange.

351.    CMDX was operationally ready by the fall of 2008[118] and was initially backed by several dealers.[119]  CMDX ran into a brick wall, however, once the CDS dealers, including the Dealer Defendants, were able to circle the wagons.  Further, as here, the dealers enjoyed the benefit of being on the boards of entities that controlled the system's infrastructure — in CDS, the relevant entities were Markit Group Ltd. ("Markit") and ISDA, whose boards were dominated by representatives of the dealer community.

352.    The government investigations indicated that the dealers used their control over Markit and ISDA to prevent CMDX from launching with exchange-like features — instead insisting that a dealer stand on one side of every transaction, just like they did in the IRS market.[120]

353.    A series of private class actions were also filed against ISDA, Markit, and twelve CDS dealers alleging that they had conspired to boycott the exchange trading of CDS.  The cases were consolidated into a single action.  The defendants eventually agreed to pay over $1.86

---

[118] *See* Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008), http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

[119] *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, DOW JONES NEWSWIRE (Dec. 23, 2008), http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

[120] *See* EUROPEAN COMMISSION, *supra* n.116.

billion to settle the claims and also agreed to injunctive relief that would help clear the way for exchange trading of CDS.[121]

354.    It is telling that today IRS SEF operators and customers lodge similar criticisms against the Dealer Defendants as those that prompted the DOJ and EC to investigate the CDS market, and spurred a series of class actions against the CDS defendants.  While the markets at issue are different, today's complaints by SEF operators — that the Dealer Defendants work together as a cartel to squash outright or take control over any actual or potential competitors — are reminiscent of the complaints that prompted the CDS investigations in 2008 and 2009 and litigation in 2013.

355.    As in the CDS market in 2008 and 2009, current IRS market participants lament how "the big banks control over half the liquidity in the market, giving them the power to decide which platforms survive, and which die."[122]  Similar to how the major CDS dealers allegedly used their control over the CDS market to block new entrants and artificially inflate bid/ask spreads, current participants in the IRS market find themselves in an anticompetitive stranglehold, where promising new market developments are either entirely blocked, or taken over and neutralized, by the Dealer Defendants.

2.    *The Dealer Defendants' Manipulation of ISDAfix*

356.    The Dealer Defendants have also allegedly manipulated ISDAfix, a key benchmark interest rate for a range of financial derivatives.  Beginning in November 2012, the CFTC sent subpoenas to the world's largest banks — including all or nearly all of the Dealer

---

[121] *See* Katy Burne, *Big Banks Agree to Settle Swaps Lawsuit*, WALL ST. J. (Sept. 12, 2015), http://www.wsj.com/articles/banks-wall-street-groups-agree-to-settle-credit-swaps-antitrust-case-1441988741.

[122] Levinson, *supra* n.4.

Defendants — and ICAP to determine whether the banks and ICAP were colluding to rig ISDAfix.[123]  In September 2014, the CFTC reportedly told the U.S. Department of Justice that its investigation had found "evidence of criminal behavior" involving manipulation of ISDAfix.[124]

357.    A series of private class actions were subsequently filed against fourteen banks that dominate the market for interest-rate derivatives and set ISDAfix, including the Dealer Defendants, as well as ICAP.  Similar to the allegations of the Complaint, the allegations of the ISDAfix class actions detailed how large banks shared information and worked together to manipulate the market for interest-rate derivatives for their own financial gain.  Though all defendant banks continue to deny liability, seven of them, including Dealer Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, JP Morgan, and RBS have agreed both to pay a total of $324 million to settle class action litigation, and to cooperate with counsel for the Plaintiff in further investigation of the manipulation of ISDAfix.[125]

## VI.    THE STATUTE OF LIMITATIONS IS EXTENDED AND RENEWED DUE TO THE DEFENDANTS' CONTINUING VIOLATION AND ONGOING CONSPIRACY AND, IN THE ALTERNATIVE, IS EQUITABLY TOLLED DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

358.    As detailed herein, the Dealer Defendants have engaged in continuing violations over an extended period in furtherance of an ongoing conspiracy.

359.    The Dealer Defendants' tactics, which evolved over time, have included new and

---

[123] Matthew Leising, *CFTC Said to Subpoena ICAP Brokers, Dealers on Swap Prices*, BLOOMBERG (April 8, 2013), http://www.bloomberg.com/news/articles/2013-04-08/cftc-said-to-probe-icap-treasure-island-brokers-on-swap-prices.

[124] Matthew Leising and Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging*, BLOOMBERG (Sept. 9, 2014), http://www.bloomberg.com/news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn.

[125] Bob Van Voris, *Seven Banks to Pay $324 Million to Resolve ISDAfix Claims*, BLOOMBERG (Sept. 9, 2014), http://www.bloomberg.com/news/articles/2016-05-03/seven-banks-to-pay-324-million-to-resolve-isdafix-claims.

independent acts over an extended period and continue to the present day, inflicting new and accumulating injury to trueEX.

360.    Furthermore, trueEX did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to boycott all-to-all IRS platforms until the filing of the *Public School Teachers' Pension and Retirement Fund of Chicago*, No. 15-cv-9319 (S.D.N.Y.) complaint (the "Class Complaint") on November 25, 2015.  Until the filing of the Class Complaint, trueEX reasonably believed that the Dealer Defendants were interacting in good faith with trueEX salespeople and executives.  In fact, the Dealer Defendants' coordinated conduct, which employed a lengthy cycle of feigned interest in trueEX followed by pretextual delays and excuses for the lack of progress, was specifically designed to placate trueEX while concealing the scheme.

361.    By its very nature, Defendants' conspiracy to boycott all-to-all trading of IRS and refuse to deal with any entity that could facilitate such trading was self-concealing.  Defendants executed their conspiracy, in large part, through secret meetings and discussions.  These meetings were often, although not exclusively, carefully held under the cover of meetings connected with ostensibly independent market actors, like Tradeweb or ISDA.  Defendants used their positions in other industry consortia to meet regularly.  These meetings provided a seemingly legitimate front for Defendants' conduct even though their discussions often had no valid connection to the legitimate work of the boards, committees, and other entities.

362.    Defendants also met secretly at the homes of their senior executives and at restaurants in New York City.  The details of these meetings were secret, as were the identities of the individuals attending the meetings.  Defendants' internal communications and communications among each other were not public information, rendering impossible any

ascertainment of the misconduct of individual Defendants or the fact of the conspiracy as a whole.  Defendants also regularly met in person, and communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging.  Plaintiff had no way to access such communications.

363.    The Dealer Defendants' boycott of all-to-all trading platforms was, by necessity, secretive — the boycotts would have been rendered ineffective, and likely broken down, if their existence was made public.

364.    As a result of the self-concealing nature of the Defendants' collusive scheme, no reasonable person would have discovered Defendants' conspiracy to block the emergence of all-to-all trading of IRS before 2015 and later.

365.    In addition, Defendants repeatedly made false and misleading statements about the reasons for their collusive actions, in a purposeful effort to cause the public to believe that there were legitimate reasons for the lack of market evolution, and they represented that their actions were beneficial to the market.  Because of Defendants' affirmative efforts to mislead, Plaintiff's continuing ignorance as to Defendants' conspiracy was not a result of a lack of due diligence.

366.    Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the IRS market.  Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a great fear of retaliation.  Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

367.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

368.    As alleged above, Defendants entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-customer IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly boycott trueEX and other entities that would introduce competition on IRS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, per se violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

369.    Defendants' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

370.    Defendants' conduct in boycotting Plaintiff cannot be plausibly justified as being intended to enhance overall market efficiency.  Among other things, Defendants' conduct leads to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all trading platform like trueEX.

371.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, trueEX has been injured and financially damaged in its business and property, including by having lost capital, profits and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, and threatened with

elimination, in amounts that are presently undetermined.  Plaintiff's damages are directly

attributable to Defendants' illegal boycott of Plaintiff's business and their allocation of the IRS

market among themselves.  Plaintiff's injuries are of the type the antitrust laws were designed to

prevent, and flow from that which makes Defendants' conduct unlawful.

**SECOND CAUSE OF ACTION**
**(Violation of the Donnelly Act)**

372.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

373.    Defendants' combination, conspiracy and arrangements alleged above, violate the

Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

374.    As alleged above, Defendants entered into and engaged in a horizontal contract,

combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-customer IRS market

and dealer-to-dealer IRS market between themselves, and (2) jointly boycott trueEX and other

entities that would introduce competition on IRS bid/ask spreads in the market for IRS in the

United States.

375.    Defendants' conduct in boycotting Plaintiff cannot be plausibly justified as being

intended to enhance overall market efficiency.  Among other things, Defendants' conduct leads

to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-

all trading platform like trueEX.

376.    As a direct and proximate result of Defendants' scheme and concrete acts

undertaken in furtherance thereof, trueEX has been injured and financially damaged in its

business and property, including by having lost capital, profits and goodwill, by incurring

substantial and unnecessary expenses, and by being seriously weakened, and threatened with

elimination, in amounts that are presently undetermined.  Plaintiff's damages are directly

attributable to Defendants' illegal boycott of Plaintiff's business and their allocation of the IRS market among themselves.  Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

377.    There is a close nexus between the Defendants' conspiracy and injury to competition in New York, including the location of Plaintiff and most of the Defendants in New York, and the regular trading of IRS by the Dealer Defendants' personnel located in New York.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment Under New York Law)

378.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

379.    Because of the acts of Defendants as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff.

380.    trueEX had direct dealings and actual relationships with each of the Defendants. While those dealings and relationships differed in scope and progression by Defendant to some extent, each was direct and actual and not attenuated.  And, as far as trueEX was concerned, the dealings were substantive and incident to a meaningful business relationship (and not, as later proved to be the case, pretextual and part of a group boycott).

381.    For example, and as detailed herein, some Defendants had actually onboarded to trueEX but were not actively trading (or were doing so in a very limited fashion), others had signed a participation agreement with trueEX but had not actually onboarded, still others were purportedly conducting diligence on trueEX or awaiting approvals to sign agreements and onboard with trueEX.

382.    Defendants deprived trueEX of revenue, market share, and value through conduct Defendants knew to be wrongful, including, among other things, intentionally delaying progress

toward a meaningful business relationship with trueEX, refusing to price inquiries from buy-side clients that wanted to trade through trueEX, directing buy-side clients to trade on Defendant-controlled Tradeweb instead, declining to provide automated pricing for any products or currencies, or permitting only incredibly restricted pricing for limited products in specific currencies.

383.    These acts by the Defendants directly diverted revenue, market share, and value from trueEX to Defendant-controlled Tradeweb and elsewhere.  These acts also furthered a scheme whereby Defendants were enriched at trueEX's expense with substantial sums of money and other benefits, including reduced competition, that were unattainable absent Defendants' anticompetitive behavior directed toward trueEX.

384.    Plaintiff seeks restitution of the monies of which it was unfairly and improperly deprived, as described herein.

**FOURTH CAUSE OF ACTION**
**(Tortious Interference with Business Relations Under New York Law)**

385.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

386.    trueEX had business relationships with numerous buy-side customers, including Buy-Side Client 1 through 16, who wished to trade IRS through trueEX's IRS platform, as detailed herein.

387.    Defendants knew of trueEX's business relationships with these buy-side customers given that trueEX provided customer lists to Defendants at Defendants' request, and several buy-side customers contacted Defendants directly to confirm their business relationship with trueEX.

388.     Defendants acted with the sole purpose of harming trueEX when dissuading, pressuring, or intimidating customers from trading through trueEX and directing them to trade through Defendant-controlled Tradeweb instead.  Alternatively, Defendants used dishonest, unfair, and improper means by purporting to conduct diligence on trueEX and its level of buy-side demand, when in reality Defendants were fishing for information about trueEX's business and prospects to try to thwart trueEX's progress.

389.     As alleged herein, Defendants injured prospective business relations that trueEX had with its buy-side customers who wished to trade IRS through trueEX by preventing those customers from doing so, thereby depriving trueEX of the revenue, market share, and value that would have come from those buy-side customer relationships.

390.     Plaintiff seeks restitution of the monies of which it was unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

391.     WHEREFORE, Plaintiff, respectfully requests that the Court:

a.     Find Defendants jointly and severally liable for the damages incurred by Plaintiff;

b.     Award Plaintiff treble damages;

c.     Award reasonable attorneys' fees and costs;

d.     Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

e.     Decree that Defendants have unlawfully conspired to boycott trueEX in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

f.  Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff;

g.  Decree that Defendants have tortuously interfered with Plaintiff's prospective business relations with its customers;

h.  Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the IRS market, a market valuable to not only Plaintiff but also to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

i.  Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: June 14, 2018

Respectfully submitted,

*/s/ William A. Maher*

David H. Wollmuth
William A. Maher
Thomas P. Ogden
Jeffrey Coviello
James J. Brennan
Nicholas G.O. Veliky
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
wmaher@wmd-law.com
togden@wmd-law.com
jcoviello@wmd-law.com
jbrennan@wmd-law.com
nveliky@wmd-law.com

*Attorney for Plaintiff trueEX LLC*