UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRUEEX LLC,

                              Plaintiff,

v.

BANK OF AMERICA CORPORATION; BANK OF AMERICA,
N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; BARCLAYS BANK PLC; BARCLAYS
CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS
SECURITIES CORP.; CITIGROUP INC.; CITIBANK, N.A.;
CITIGROUP GLOBAL MARKETS INC.; CITIGROUP
GLOBAL MARKETS LIMITED; CREDIT SUISSE GROUP AG;
CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE
INTERNATIONAL; DEUTSCHE BANK AG; DEUTSCHE
BANK SECURITIES, INC.; GOLDMAN SACHS & CO.;
GOLDMAN SACHS BANK USA; GOLDMAN SACHS
FINANCIAL MARKETS, L.P.; GOLDMAN SACHS
INTERNATIONAL; J.P. MORGAN CHASE & CO.; J.P.
MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES
LLC; J.P. MORGAN SECURITIES PLC; MORGAN STANLEY;
MORGAN STANLEY BANK, N.A.; MORGAN STANLEY &
CO. LLC; MORGAN STANLEY CAPITAL SERVICES LLC;
MORGAN STANLEY DERIVATIVE PRODUCTS INC.;
MORGAN STANLEY & CO. INTERNATIONAL PLC;
MORGAN STANLEY BANK INTERNATIONAL LIMITED;
THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL
BANK OF SCOTLAND PLC; RBS SECURITIES INC.; UBS
AG; and UBS SECURITIES LLC;

                              Defendants.

No. 1:18-cv-05361

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR JOINT MOTION TO DISMISS ALL CLAIMS**

July 19, 2018

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 4

     A.    trueEX ........................................................................................................................ 4

     B.    These MDL Proceedings ........................................................................................... 4

     C.    trueEX's Complaint .................................................................................................. 5

ARGUMENT ................................................................................................................................. 7

I.    trueEX Fails to Allege a Plausible Antitrust Conspiracy ...................................................... 7

     A.    trueEX Bears the Burden of Pleading a Plausible Conspiracy. ............................... 7

     B.    trueEX's Complaint Lacks the Key Allegations on Which This Court
           Previously Relied in Partially Sustaining the Earlier Complaints. ........................ 9

     C.    trueEX Has Not Adequately Alleged That Any Individual Dealer
           Participated in a Conspiracy to Boycott Its Platform ............................................ 12

     D.    trueEX Fails to Plead Meaningful Parallel Conduct by the Dealers .................... 15

     E.    trueEX Fails to Plead Viable "Plus Factors." ....................................................... 19

II.    trueEX's Conspiracy Claims Are Time-Barred Before June 14, 2014 ............................ 22

III.    trueEX's State-Law Claims Should Be Dismissed. ........................................................ 24

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*131 Maine St. Assocs.* v. *Manko*, 179 F. Supp. 2d 339 (S.D.N.Y. 2002) ....................................23

*AD/SAT* v. *Associated Press*, 181 F.3d 216 (2d Cir. 1999) ....................................................11, 12

*Agfa Corp.* v. *Goldman Sachs Grp.*, 2016 WL 7009031
    (S.D.N.Y. Nov. 30, 2016) .....................................................................................................9

*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007)................................................................ *passim*

*Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) .............................................8

*Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)................................................................................................21

*Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182 (2004) ......................................................................24

*Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 2014 WL 1396524
    (S.D.N.Y. Apr. 9, 2014).......................................................................................................12

*Envirosource, Inc.* v. *Horsehead Res. Dev. Co.*, 1997 WL 525403
    (S.D.N.Y. Aug. 21, 1997) ....................................................................................................25

*Guard-Life Corp.* v. *S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980)............................25

*Hinds Cty., Miss.* v. *Wachovia Bank N.A.*, 708 F. Supp. 2d 348
    (S.D.N.Y. 2010) ............................................................................................................12, 22

*In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510
    (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016)...........................................9, 21

*In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419
    (S.D.N.Y. 2015).................................................................................................................7, 9

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)...........................................................12

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017)................ *passim*

*In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069
    (S.D.N.Y. May 23, 2018)...........................................................................................12, 15, 16

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186
    (9th Cir. 2015)..............................................................................................................8, 20, 21

*In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................13

*Jepson, Inc.* v. *Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994)........................................................1, 9

*Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179 (1997)................................................................22

*Klein* v. *King*, 1990 WL 61950 (N.D. Cal. Mar. 26, 1990) ................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................13

*Mayor & City Council of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129
    (2d Cir. 2013)................................................................................................ *passim*

*Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 861 F. Supp. 2d 344
    (S.D.N.Y. 2012)................................................................................................7

*Pennsylvania* v. *Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416
    (M.D. Pa. 2013) ................................................................................................18

*Rite Aid Corp.* v. *Am. Express Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) ................................................................23

*Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ................................................8, 17

*trueEX, LLC* v. *MarkitSERV Ltd.*, 266 F. Supp. 3d 705 (S.D.N.Y. 2017) ................................4, 16

*Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55
    (2d Cir. 1988)................................................................................................11

**Statutes**

15 U.S.C. § 15b................................................................................................22

N.Y. GEN. BUS. LAW § 340(5) ................................................................................................22

**Other Authorities**

VI AREEDA & HOVENKAMP, ANTITRUST LAW (3d ed. 2010) ................................................20

The undersigned Dealers[1] respectfully submit this memorandum in support of their joint motion to dismiss the complaint of trueEX LLC ("trueEX") for failure to state a claim.

## PRELIMINARY STATEMENT

With the utmost respect for the Court's suggestion that consideration of the sufficiency of trueEX's claims be deferred until a later stage of these proceedings, the Dealers believe that now is the time to test those claims and that they should be dismissed under this Court's prior ruling in *In re Interest Rate Swaps Antitrust Litigation* ("*IRS I*"), 261 F. Supp. 3d 430 (S.D.N.Y. 2017). "Each complaint must, of course, be assessed on its own allegations . . . ." *Jepson, Inc.* v. *Makita Corp.*, 34 F.3d 1321, 1331 (7th Cir. 1994).  Here, trueEX's complaint includes none of the key allegations related to Javelin and Tera—which had nothing to do with trueEX—that this Court emphasized in holding that the other plaintiffs had alleged a plausible boycott conspiracy.  When its allegations are considered on their own, the trueEX complaint does not plead a plausible conspiracy to boycott its platform.  Early dismissal of this legally defective complaint will make a meaningful practical difference by avoiding the expansion of the scope of and time period covered by these already-complex proceedings.

In holding that the prior complaints alleged a plausible group boycott, this Court relied heavily on allegations that "[t]he Dealers' affiliated FCMs *all* withheld clearing services on the Javelin and Tera platforms," *IRS I*, 261 F. Supp. 3d at 473 (emphasis added); that each of the dealers "refused to supply liquidity to, or to trade on, these platforms," *id*. at 472; that four dealers, on the next business day after Tera's first IRS trade, "made the identical demand of Tera

---

[1] As used herein, the "Dealers" are affiliates of Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS and UBS.  (Compl. ¶ 1 n.1). This memorandum is submitted by the named affiliates of Bank of America, Barclays, Deutsche Bank, Goldman Sachs and Morgan Stanley.  The undersigned Dealers are informed that the other Dealers agree that the complaint should be dismissed in its entirety for the reasons stated in this memorandum, but submitted a separate memorandum to underscore the sparseness of the allegations directed against them.

(to audit its rulebook) as a condition for clearing trades," *id*. at 475; and that "[t]he Dealers called Tera's platform a 'Trojan Horse' and said they did not wish to let Tera 'off the mat,'" *id*. at 472-73.   None of these allegations appears anywhere in trueEX's complaint, which instead acknowledges that each of the Dealers has engaged in extensive discussions with trueEX and has participated on its platform, with some participating more actively than others.   In fact, *all* of the Dealers that still have swaps-clearing businesses have provided clearing services on trueEX's platform; four of the Dealers concededly have provided live quotes on its platform; and other Dealers have provided some degree of liquidity.   In short, the Dealers' varying participation on trueEX's platform raises the question of exactly what "agreement" trueEX is alleging, and the complaint's recitation of such participation negates the inference of a group-boycott agreement, *i.e*., a mutual agreement not to do business with trueEX.

Nor is trueEX's principal parallel-conduct allegation suggestive of a conspiracy. According to trueEX, four Dealers "within days of each other" last July advised trueEX that they were ready to sign a participation agreement.   Putting aside that this was a positive development for trueEX, the complaint's allegations undercut any inference of collusion by asserting that these alleged communications were prompted by a judicial ruling that eliminated an existential threat to trueEX's platform.   Beyond that, trueEX attempts to plead parallel conduct by alleging that multiple Dealers referenced "resource constraints" as the reason they were moving more slowly than trueEX wanted.   But generic references to "resource constraints" (a common and legitimate cause of delay) are not at all analogous to the "Trojan Horse," "off the mat" and simultaneous audit-demand allegations on which this Court relied in *IRS I*.   trueEX thus pleads "conduct that could just as well be independent action" rather than conduct "that raises a suggestion of a preceding agreement."   *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007).

What remains are allegations that this Court held in *IRS I* do not suffice to plead a conspiracy.  The trueEX complaint relies mostly on labels and conclusions and group-pleading allegations directed at "the Dealer Defendants" as a group, without pleading facts that link *any* of the Dealers to an alleged conspiracy to boycott trueEX's platform, much less a sufficient number of Dealers to make such a conspiracy plausible.   Indeed, the complaint's trueEX-related allegations against a *majority* of the Dealers (BNPP, Citi, Credit Suisse, JPMorgan, RBS and UBS) are sparse to virtually non-existent.  As a result, the case for dismissing those six firms is as strong as, if not stronger than, the Court's basis for dismissing HSBC from the prior complaints.  *See IRS I*, 261 F. Supp. 3d at 483.  As to the other five Dealers, trueEX alleges unilateral, not collusive, conduct, lamenting that those Dealers dragged their feet in connecting to its platform—activities that should have taken weeks or months, in trueEX's view, ended up taking longer—and referenced "resource constraints" as the reason for the slow progress.  This Court already has held, however, that allegations that a dealer gave a new platform the "runaround" are insufficient to state a claim.   *Id*. (allegation that HSBC gave Tera "'the runaround for over a year before refusing to clear for the platform'" is "insufficient").  trueEX does not allege any communications among particular Dealers related to its platform, and its recitation of its back-and-forth with individual Dealers is no substitute for factual allegations suggesting that those Dealers colluded.

Finally, trueEX's attempts to avoid the four-year statute of limitations by alleging fraudulent concealment and to plead claims for unjust enrichment and tortious interference with business relations under New York law are unsuccessful for the same reasons that the similar attempts by Javelin and Tera failed.  *See id*. at 487-90, 499-501.

## BACKGROUND

### A.      trueEX

trueEX was founded in 2010.   (Compl. ¶ 106.)   According to the complaint, "trueEX sought to bring to market an IRS electronic trading platform open to both buy- and sell-side entities."   (*Id*.)   On September 25, 2012, the CFTC designated trueEX as a Designated Contract Market or "DCM," which "permitted trueEX to act as a board of trade (or exchange) for IRS." (*Id*. ¶ 111.)   The CFTC granted trueEX temporary registration as a SEF in September 2013.   (*Id*. ¶ 113.)   trueEX has been active as a SEF for IRS trades since April 2014.   *See trueEX, LLC* v. *MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 713 (S.D.N.Y. 2017).

### B.      These MDL Proceedings

The initial complaint in these actions was filed on November 25, 2015.   The class plaintiffs, Javelin and Tera originally named as defendants the same eleven dealers named as defendants here, as well as a twelfth dealer (HSBC), ICAP and Tradeweb.

This Court granted in part and denied in part defendants' motion to dismiss the prior two consolidated complaints.   The Court dismissed the class plaintiffs' conspiracy claims covering the 2008-2012 period, but denied defendants' motion to dismiss the plaintiffs' claims for the 2013-2016 period.   *IRS I*, 261 F. Supp. 3d at 501.   The Court also dismissed all claims against HSBC, ICAP and Tradeweb.   *Id*.   Although the Court held that the plaintiffs had "plausibly allege[d] a group-boycott conspiracy among Dealer Defendants between 2013 and 2016 aimed at . . . three platforms," *id*. at 477, the Court's opinion said very little about trueEX:  the Court devoted only two paragraphs to the alleged boycott of trueEX, *see id*. at 458, and its discussion of the dealers' alleged parallel conduct focused on Javelin and Tera, *see id*. at 472-76.

The allegations on which the Court placed the most weight in holding that the other plaintiffs had stated a plausible group-boycott claim had nothing to do with trueEX and are

absent from trueEX's complaint.  The Court found "[m]ost telling" the allegation that four

dealers, immediately after Tera's first IRS trade, each separately "told Tera that it would not

clear trades on Tera's platform until it had conducted a review of Tera's rulebook."  *Id*. at 475.

The Court stressed that the allegation "that four Dealers called Tera the next business day, and

made the identical demand of Tera (to audit its rulebook) as a condition for clearing trades, is

improbable enough to support an inference of collaboration."  *Id*. at 475-76.  The Court also

noted that "[t]he Dealers called Tera's platform a 'Trojan Horse' and said they did not wish to let

Tera 'off the mat.'"  *Id*. at 472-73.  According to the Court, "using a common invasion metaphor

to describe Tera (a 'Trojan Horse') and a common wrestling idiom to describe their goal towards

it (not to let it 'off the mat')" is parallel behavior that "supports an inference of coordinated

conduct."  *Id*. at 476.  And the Court relied heavily on the allegation that "[t]he Dealers'

affiliated FCMs all withheld clearing services on the Javelin and Tera platforms."  *Id*. at 475.

### C.    trueEX's Complaint

For over two-and-a-half years, trueEX remained on the sidelines, electing not to sue until

June 14, 2018.  trueEX now belatedly alleges that "the Dealer Defendants engaged in a group

boycott aimed at shutting down trueEX."  (Compl. ¶ 27.)  Although trueEX repeats the same

general theme of the earlier-filed complaints, its allegations are materially different.

First, unlike Javelin and Tera, trueEX does not contend that the Dealers refused to deal

with its platform.  Rather, trueEX acknowledges that four Dealers (Citi, BNPP, JPMorgan and

RBS) have provided live quotes to its platform and that other Dealers also have traded on the

platform.  (*See id*. ¶¶ 175-77, 201, 205.)  trueEX also does not, and cannot, allege that the

Dealers refused to provide clearing services on trueEX's platform, instead asserting that each

Dealer "*delayed* the review process for clearing on trueEX's platform."  (*Id*. ¶ 197 (emphasis

added).)  trueEX's website confirms that *nine* of the eleven Dealers (Bank of America, Barclays,

BNPP, Citi, Credit Suisse, Goldman Sachs, JPMorgan, Morgan Stanley and UBS) have provided "clearing services on the trueEX DCM and SEF."  TRUEEX, https://trueex.com/our-community (last visited July 19, 2018).  And the two Dealers that do not provide clearing services on trueEX's platform (Deutsche Bank and RBS) have exited the swaps-clearing business in the United States.[2]  Put simply, every Dealer with an IRS clearing business today has cleared trades on trueEX, the opposite of a group boycott.

Second, the trueEX-related allegations directed at a majority of the Dealers are exceedingly sparse.  As to six of the Dealers (BNPP, Citi, Credit Suisse, JPMorgan, RBS and UBS), trueEX makes no allegation that they did anything at all to obstruct trueEX's platform or that they took any action against customers that sought to trade on it.  As to the remaining five Dealers, trueEX largely alleges that each (i) gave trueEX "the runaround," (ii) cited "resource constraints" as the reason each was not moving as quickly as trueEX wanted, and (iii) sometimes "delayed or refused" to meet trueEX representatives.  (Compl. ¶¶ 137-91.)  The complaint, however, does not allege any communications among particular Dealers about trueEX or otherwise plead facts suggesting that any of the alleged conduct was the product of collusion. Instead, the complaint's allegations of coordination are entirely conclusory and directed at "the Dealer Defendants" as a group.  (*See*, *e.g.*, *id.* ¶¶ 2, 4, 6, 27, 123, 136-37, 139, 155, 179.)

Third, the trueEX complaint omits key allegations on which this Court relied in sustaining the other plaintiffs' boycott claim.  For example, the trueEX complaint does not allege that four dealers, in response to Tera's first IRS trade, demanded an audit of Tera's rulebook as a

---

[2] Joe Parsons, *Deutsche Bank to close US OTC clearing business*, THE TRADE (Feb. 9, 2017 5:51 AM GMT), https://www.thetradenews.com/deutsche-bank-to-close-us-otc-clearing-business/ ("Deutsche Bank will shut its US swap clearing business"); Mike Kentz, *Banks seek OTC clearing lifeline*, REUTERS (May 18, 2015 12:25 PM), https://www.reuters.com/article/news-markets-derivatives/banks-seek-otc-clearing-lifeline-idUSL1N0Y61HQ20150518 (RBS among "first to go").

condition for clearing trades, and trueEX does not contend that the dealers called Tera a "Trojan Horse" or vowed not to let Tera "off the mat." The omission of those allegations was not an accident: trueEX reproduced other allegations from the prior complaints related to Javelin and Tera, but chose not to include the "most telling" allegations. (*See id*. ¶¶ 206-21.)

Fourth, unlike the other plaintiffs' group-boycott claims covering the 2013-2016 period, trueEX focuses on the subsequent 2017-2018 period, contending that the Dealers conspired against trueEX right up until late May 2018. (*See id*. ¶¶ 147-54, 158-64, 173-78, 187-91.) The Court did not have any reason to address the 2017-2018 period in its prior decision, and trueEX offers no explanation as to why the Dealers rationally would have conspired against trueEX after 2016 given the pendency of this litigation.

## ARGUMENT

### I.    trueEX Fails to Allege a Plausible Antitrust Conspiracy.

Even if related complaints that are part of the same MDL proceedings assert overlapping claims, "each complaint and all claims raised therein must rise or fall on their own merits." *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 429 (S.D.N.Y. 2015). Under this Court's prior ruling, trueEX's complaint fails to plead a plausible conspiracy.[3]

### A.    trueEX Bears the Burden of Pleading a Plausible Conspiracy.

To plead a plausible antitrust conspiracy, "a complaint must allege 'enough factual matter (taken as true) to suggest that an [illegal] agreement was made.'" *IRS I*, 261 F. Supp. 3d at 461 (alteration in original and citation omitted). "'The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation.'" *Id*. (citation omitted); *see also*

---

[3] "The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act." *Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012). As a result, trueEX's Donnelly Act claim fails for the same reasons, discussed below, that its Sherman Act claim fails. *See IRS I*, 261 F. Supp. 3d at 498-99 (addressing Donnelly Act claims).

*Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 319 n.2 (2d Cir. 2010) ("The allegation that defendants agreed to [a] price floor is obviously conclusory, and is not accepted as true."). An antitrust plaintiff therefore must plead "evidentiary facts" that sustain a "plausible" inference of an unlawful agreement. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015).

As this Court stated, "there are two ways, at the pleading stage, for a plaintiff 'to allege enough facts to support the inference that a conspiracy actually existed' so as to overcome a motion to dismiss." *IRS I*, 261 F. Supp. 3d at 461 (quoting *Mayor & City Council of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). First, a plaintiff may allege "direct evidence" of conspiracy, *Citigroup*, 709 F.3d at 136—*i.e.*, "'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted,'" *Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (citation omitted). Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Citigroup*, 709 F.3d at 136; *see also IRS I*, 261 F. Supp. 3d at 472 n.22 ("general and conclusory" allegations do not "qualify as direct evidence of an illegal agreement").

Second, a plaintiff may attempt to plead an antitrust conspiracy based on "circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136. Such "circumstantial facts" ordinarily consist of allegations that the defendants engaged in parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Even at the pleadings stage, however, parallel-conduct allegations alone are not enough to survive dismissal because such conduct often results from "'coincidence, independent responses to common

stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Id.*

at 556 n.4 (citation omitted).   Allegations of parallel conduct thus must be reinforced by so-

called "plus factors" raising a plausible inference that the alleged conduct "flowed from a

preceding agreement rather than from [defendants'] own business priorities." *Citigroup*, 709

F.3d at 138.

Here, trueEX makes no attempt to plead "direct evidence" of a conspiracy, and its

attempt to infer a conspiracy from "circumstantial facts" is unsuccessful.

**B.      trueEX's Complaint Lacks the Key Allegations on Which This Court
          Previously Relied in Partially Sustaining the Earlier Complaints.**

trueEX cannot survive this motion by arguing that this Court has held that *different*

complaints containing *different* allegations and filed by *different* plaintiffs stated a claim for a

2013-2016 group boycott.   It is well-settled that "each complaint and all claims raised therein

must rise or fall on their own merits."   *In re Aluminum*, 95 F. Supp. 3d at 429.[4]   trueEX's

complaint thus should be analyzed based on the allegations that trueEX has made concerning the

supposed boycott of *its* platform, not on the allegations that *other* plaintiffs have made in *other*

complaints concerning the supposed boycott of *other* platforms.   When trueEX's allegations are

considered alone and contrasted with those in the previous complaints, it is clear that trueEX has

failed to plead a plausible conspiracy.

Although trueEX asserts that "the Dealer Defendants engaged in a group boycott aimed

at shutting down trueEX" (Compl. ¶ 27), the complaint's factual allegations, which differ

---

[4] *See also Jepson*, 34 F.3d at 1331 ("Each complaint must, of course, be assessed on its own allegations . . . ."); *Agfa Corp.* v. *Goldman Sachs Grp.*, 2016 WL 7009031, at *3 (S.D.N.Y. Nov. 30, 2016) ("[T]he Court considered each complaint according to its own allegations . . . ."); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *22 (S.D.N.Y. Aug. 29, 2014) ("The Court has reviewed each of the complaints against their respective and individualized allegations."), *aff'd on other grounds*, 833 F.3d 151 (2d Cir. 2016); *Klein* v. *King*, 1990 WL 61950, at *6 (N.D. Cal. Mar. 26, 1990) ("[E]ach complaint must be examined on its own merits.").

markedly from key allegations made by Javelin and Tera, negate that conclusion.   Whereas Javelin and Tera alleged that "[t]he Dealers' affiliated FCMs all withheld clearing services on the Javelin and Tera platforms," *IRS I*, 261 F. Supp. 3d at 473, trueEX does not make that allegation because it cannot:   trueEX's website boasts that nine of the eleven Dealers have provided clearing services on its platform, *see* TRUEEX, https://trueex.com/our-community (last visited July 19, 2018), and the other two no longer participate in the IRS clearing business, *see supra* note 2.   Likewise, whereas Javelin and Tera alleged that the Dealers "each refused to supply liquidity to, or to trade on, [their] platforms," *IRS I*, 261 F. Supp. 3d at 472, trueEX does not make that allegation because it cannot:   trueEX's complaint acknowledges that at least four Dealers (Citi, BNPP, JPMorgan and RBS) have provided live IRS quotes on trueEX's platform and that other Dealers also have traded on the platform.   (Compl. ¶¶ 4, 11, 175-77, 201, 205, 380-81.)

trueEX may be disappointed that Citi and JPMorgan provide live quotes on trueEX's platform in U.S.-dollar IRS but not in certain foreign-currency IRS (*id*. ¶¶ 176-77), that Credit Suisse and UBS have "delayed going live on trueEX's [platform]" (*id*. ¶ 175), that Bank of America "still refuses to expand its trading on trueEX" (*id*. ¶ 174), and that Goldman Sachs "limits its participation on trueEX to slow manual responses in very limited currencies" (*id*. ¶ 175).   But such allegations of varying participation on trueEX's platform do not amount to a "coordinated effort to block trading on trueEX."   (*Id*. ¶ 179.)   Instead, each Dealer's individual decision to support trueEX's platform to varying degrees "is, in and of itself[,] unremarkable," and, "[c]onsidered alone, it is not—at all—suggestive of conspiracy."   *IRS I*, 261 F. Supp. 3d at 475.   trueEX also does not plead any facts suggesting that any Dealer "took any material risk by sitting tight and waiting to see if" trueEX "attracted sufficient support" before committing

significant resources to connect to an unproven, startup platform that was attempting to compete with successful incumbents like Bloomberg and Tradeweb. *Id*. at 475 n.23.

trueEX's grudging admissions that numerous Dealers have supported its platform raise the question of exactly what "agreement" trueEX is alleging. Is trueEX contending that the Dealers agreed that all of them with swaps-clearing businesses would clear trades on trueEX, that four of them would provide live quotes to trueEX's platform, and that others also would participate on its platform in a more limited way? Besides being implausible, such an "agreement" would not amount to a group boycott. *See Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 73 (2d Cir. 1988) ("Generally, a group boycott is 'an agreement by two or more persons not to do business with other individuals, or to do business with them only on specified terms.'") (citation and emphasis omitted); *see also AD/SAT* v. *Associated Press*, 181 F.3d 216, 240 (2d Cir. 1999) ("[T]he allegation of a group boycott by the Newhouse papers is undermined by the fact that other Newhouse papers continued to use AD/SAT."). Disregarding the labels trueEX attaches to its factual allegations, the complaint does not coherently identify the agreement it is alleging, much less plead a plausible agreement to boycott trueEX's platform. Taken as true, the allegations instead reflect eleven different Dealers each independently deciding how much time and money to invest in connecting to a startup platform and each arriving at varying answers to that question.

Finally, trueEX omits the allegations of "strikingly similar" parallel conduct on which this Court most heavily relied in sustaining the other plaintiffs' claims. Noticeably absent from trueEX's complaint are the allegations that four dealers simultaneously demanded an audit of Tera's rulebook immediately after Tera's first IRS trade or that the Dealers called Tera a "Trojan Horse" and said they would not let Tera "off the mat." *IRS I*, 261 F. Supp. 3d at 472-74. trueEX

does not substitute in place of those allegations—which are unrelated to trueEX—comparable "strikingly similar" allegations related to its own platform.

### C.   trueEX Has Not Adequately Alleged That Any Individual Dealer Participated in a Conspiracy to Boycott Its Platform.

trueEX's complaint also does not adequately link a single Dealer to an alleged conspiracy to boycott trueEX's platform, much less a sufficient number of Dealers to make such a conspiracy plausible.

In attempting to plead collusion, trueEX's complaint relies heavily on group-pleading allegations directed at "the Dealer Defendants" as an undifferentiated whole.  (*See, e.g.*, Compl. ¶¶ 2, 4, 6, 27, 123, 136-37, 139, 155, 179.)  Such collective allegations deserve little or no weight because they fail to provide a basis for inferring that each of the Dealers, "in their individual capacities, consciously committed themselves to [a] common scheme designed to achieve an unlawful objective."  *IRS I*, 261 F. Supp. 3d at 478 (quoting *AD/SAT*, 181 F.3d at 234).  Without alleging "any particular activities by any particular defendant" that ties that defendant to an antitrust conspiracy, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007), group-pleading allegations are "insufficient to withstand review on a motion to dismiss," *Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014).  Many of trueEX's allegations "are so sweeping and conclusory as to prevent them from being credited" at all.  *IRS I*, 261 F. Supp. 3d at 478; *see also id*. at 478 n.26 (disregarding "characterizations of defendants' behavior as a 'boycott,' 'conspiracy,' 'cartel' and 'illegal agreement'").[5]

---

[5] *See also In re Interest Rate Swaps Antitrust Litig.* ("*IRS II*"), 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018) (rejecting allegations "as to the motivations or actions of 'the Dealer Defendants' . . . as impermissible group pleading"); *Hinds Cty., Miss.* v. *Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (requiring "a factual connection between each Defendant and the alleged conspiracy").

This Court's previous dismissal of all claims against HSBC is instructive.  Although the Court sustained the plaintiffs' group-boycott claims for the 2013-2016 period, it required the plaintiffs to plead facts sufficient to link each individual dealer to the alleged conspiracy. Applying that principle, the Court held that the allegations directed at HSBC were "too sparse to sustain" the plaintiffs' claims.  *Id*. at 483.  As the Court explained, "[a] close review of the [complaints] reveals no allegations that HSBC took any action against any trading platform that proposed all-to-all trading or against any customer that sought to so trade."  *Id*.  Instead, "[t]he one specific claim made against HSBC" was that "its FCM 'gave TeraExchange the runaround for over a year before refusing to clear for the platform.'"  *Id*.  The Court held that this "runaround" allegation was "insufficient to link HSBC" to an antitrust conspiracy.  *Id*.  That same principle requires dismissal of the claims against all eleven Dealers here.

To start, as is demonstrated in the other Dealers' separate memorandum, the trueEX-related allegations against a *majority* of the Dealers (BNPP, Citi, Credit Suisse, JPMorgan, RBS and UBS) are "sparse to the point of near non-existence."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).[6]  In the absence of plausible factual allegations that six of the eleven Dealers agreed to boycott trueEX's platform, trueEX's entire conspiracy theory becomes "economically irrational and practically infeasible."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

While the complaint's allegations against the five remaining Dealers—Bank of America, Barclays, Deutsche Bank, Goldman Sachs and Morgan Stanley—are greater in number, they boil down to essentially the same story:  trueEX wanted to do business with those Dealers, but from trueEX's perspective, each dragged its feet and participated on trueEX's platform inconsistently.

---

[6] To avoid duplication, that discussion is not repeated here.

Accepting the allegations as true, trueEX may be disappointed with the timing and extent of these Dealers' participation on its platform, but trueEX does not allege any communications among them about trueEX, let alone communications that suggest collusion.  trueEX also does not allege that any of these Dealers refused to clear trades on trueEX's platform—with the exception of Deutsche Bank (which exited the swaps-clearing business in January 2017), all five of them have provided clearing services for trueEX.  TRUEEX, https://trueex.com/our-community (last visited July 19, 2018).  And trueEX appears to admit that at least some of these Dealers have transacted on trueEX's platform in certain IRS.  (Compl. ¶¶ 175, 205.)

Instead, trueEX alleges that these five Dealers delayed in connecting to trueEX's platform (*id*. ¶¶ 156-91), that Bank of America, Barclays, Deutsche Bank and Goldman Sachs cited "resource constraints" as a reason (*id*. ¶¶ 157-61, 174-75, 178), that Goldman Sachs and Morgan Stanley inquired about "customer demand" for trueEX (*id*. ¶¶ 139-44), that Goldman Sachs and Morgan Stanley (in trueEX's view) overestimated the time and money needed to connect to trueEX (*id*. ¶¶ 161-66), and that trueEX got "[t]he runaround" at Barclays (*id*. ¶¶ 167-68).[7]  At bottom, the complaint contends that these five Dealers, to varying degrees, gave trueEX the "runaround" and unreasonably delayed in connecting to its platform, while acknowledging that these Dealers have in fact transacted on trueEX's platform.  "That lone claim [of a commercial runaround] is insufficient to link [these Dealers] to [an] alleged conspiracy."  *IRS I*, 261 F. Supp. 3d at 483.  Although trueEX seeks to bolster its allegations with descriptions of its individual communications with particular Dealers, the complaint does not allege that the Dealers ever communicated *with each other* about trueEX.  *See Twombly*, 550 U.S. at 556-57

---

[7] trueEX further alleges and that "Goldman Sachs representatives" attempted to persuade certain trueEX customers to "us[e] Tradeweb instead of trueEX" (Compl. ¶ 147; *see also id*. ¶¶ 148-53).  This allegation describes unilateral conduct by Goldman Sachs and does not suggest a preceding agreement.

("bare" or "conclusory" allegation of concerted conduct "will not suffice"). Nor can trueEX plead a plausible inference of an agreement by alleging that some Dealers cited "resource constraints" (Compl. ¶ 157) or a "lack of customer interest" (*id.* ¶ 139)—unremarkable alleged comments—as a reason for the delay in connecting to trueEX's platform.

Lastly, trueEX asserts that the trading desks of Bank of America, Deutsche Bank, Goldman Sachs and Morgan Stanley "influenced the decisions of their clearing desks, in violation of [CFTC] regulations." (Compl. ¶ 193; *see also id.* ¶¶ 8, 194-96.) Allegations that four Dealers violated CFTC regulations, however, are insufficient to plead a plausible antitrust conspiracy. *See Twombly*, 550 U.S. at 566 ("[E]ven if the [defendants] flouted the [Telecommunications Act of 1996] in all the ways the plaintiffs allege, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . .") (citation omitted). In any event, Bank of America, Goldman Sachs and Morgan Stanley ultimately provided clearing services on trueEX's platform, and Deutsche Bank exited the swaps-clearing business.

### D.     trueEX Fails to Plead Meaningful Parallel Conduct by the Dealers.

To plead a plausible conspiracy, allegations of parallel conduct must extend beyond acts that are explainable as "independent responses to common stimuli." *Citigroup*, 709 F.3d at 137. The type of parallel conduct that "might be sufficient under *Twombly*'s standard" would include, for example, "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.'" *Id.* (quoting *Twombly*, 550 U.S. at 556 n.4). By contrast, "generalized claims of parallel conduct" directed at the defendants as a group are insufficient to plead a conspiracy. *IRS II*, 2018 WL 2332069, at *15; *see also id.* at *17 ("The Dealers' parallel actions, motivations, perspectives, and intentions are largely pled generically and in undifferentiated fashion . . . ."). Once the complaint's

conclusory group-pleading allegations are stripped away, trueEX fails to plead meaningful parallel conduct by the Dealers that suggests a preceding agreement.

trueEX bases its claim of parallel conduct largely on the allegation that "four of the Dealer Defendants . . . separately contacted trueEX *within days of each other* in July 2017, all advising that they now were ready to sign [a] Participation Agreement." (Compl. ¶ 9; *see also id*. ¶¶ 3, 190.)   In the next breath, however, trueEX acknowledges that these alleged communications were triggered by a judicial ruling:  "Not coincidentally, these parallel overtures from four separate Dealer Defendants came very shortly after a ruling favorable for trueEX in a litigation . . . against MarkitSERV." (*Id*. ¶¶ 9, 190.)   That ruling eliminated a threat to trueEX's survival by granting a preliminary injunction that prevented MarkitSERV from blocking trueEX's access to the MarkitSERV network.  *trueEX*, 266 F. Supp. 3d at 708-09.  trueEX had told the court that it "'cannot survive as a business without connectivity to MarkitSERV's network' because 'nearly every trade that happens on trueEX's platform includes at least one counterparty that needs MarkitSERV connectivity.'"  *Id*. at 727 (citation omitted).   Not surprisingly, once trueEX overcame this looming threat to its platform's survival, certain Dealers allegedly decided to sign participation agreements with trueEX.

This claim of parallel conduct is not analogous to the allegation that this Court previously found "most striking," namely, "that four Dealers on the same day—the business day after Tera's first trade—had separately notified Tera that they would not clear trades on its platform until they had conducted a review of its rulebook."  *IRS II*, 2018 WL 2332069, at *15; *see also IRS I*, 261 F. Supp. 3d at 475 ("most telling" allegation is "identical demand of Tera (to audit its rulebook) as a condition for clearing trades").  trueEX does not allege that the four Dealers at issue here contacted it on the same day, relying instead on the vague phrase "within days of each

other." (Compl. ¶¶ 3, 9, 190.)   trueEX also acknowledges that the claimed conspiratorial communications expressed a willingness to sign a participation agreement (*id*. ¶¶ 3, 9, 190)—a positive development for trueEX, not a threat to put a roadblock in trueEX's path.  And, most importantly, trueEX admits (*id*. ¶¶ 9, 190) that the four Dealers' alleged communications were prompted by a publicly announced court ruling that eliminated a threat to trueEX's survival, undermining any suggestion that the communications were the result of a prior agreement or that they would be "improbable" to occur without coordination.  *IRS I*, 261 F. Supp. 3d at 475-76 (response must be "improbable enough to support an inference of collaboration").

trueEX also contends that some but not all Dealers delayed in connecting to its platform and that some but not all Dealers cited "resource constraints" as the reason.  (Compl. ¶¶ 156-98.) Such allegations are a far cry from the example of a parallel-conduct allegation offered in *Twombly* and *Citigroup* "that might be sufficient" to plead a plausible conspiracy:  "complex and historically unprecedented changes in pricing structure made at the very same time . . . and . . . for no other discernible reason."  *Twombly*, 550 U.S. at 556 n.4; *see Citigroup*, 709 F.3d at 137. Nor are trueEX's allegations that certain Dealers cited "resource constraints" or a "lack of customer interest" (generic comments) analogous to the prior allegations that multiple dealers "called Tera's platform a 'Trojan Horse' and said they did not wish to let Tera 'off the mat.'" *IRS I*, 261 F. Supp. 3d at 472-73.  trueEX does not point to comparable "strikingly similar" or "stylized" comments by multiple Dealers here.  *Id*. at 473, 476.  Moreover, the significant variation in the extent and nature of each Dealer's participation on trueEX (Compl. ¶¶ 380-81) is irreconcilable with any inference that "the parallel conduct alleged [here] was the result of an agreement among the defendants."  *Starr*, 592 F.3d at 323.

In arguing that certain Dealers' references to limited resources were "pretextual," trueEX relies entirely on labels and conclusions (Compl. ¶¶ 156, 161, 163-64, 166), noting that each Dealer has "thousands of employees and billions in resources" (*id*. ¶ 157).  Putting aside the misguided notion that large firms can devote limitless resources and personnel to every proposed venture, conclusory allegations that a justification was pretextual are insufficient to raise a plausible inference of conspiracy.[8]  *See*, *e.g.*, *Pennsylvania* v. *Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 427 (M.D. Pa. 2013).  Furthermore, trueEX's own CEO, Sunil Hirani, admitted in trueEX's lawsuit against MarkitSERV that "onboarding is a *lengthy and complex process, particularly for dealers*," that "involves, among other things, negotiating legal agreements and fee schedules, platform security and risk assessments, software development to support a new trading venue, identification and implementation of STP requirements, setup of traders and account data, and end-to-end testing."  Ex. A ¶ 19 n.19 (emphasis added).[9]  And trueEX's counsel in that case stressed the costs to dealers of establishing a direct connection to trueEX:

> The reason the banks are not interested in establishing a direct connection to trueEX is because they are locked into MarkitSERV, they've already made these massive investments and they are not going to invest in a startup.  Just like many of these banks, your Honor, won't lend to a startup, many of them are not going to invest in a startup.  They're concerned about their return and they have policies[.]

(Ex. B at 12.)

---

[8] The claim that certain Dealers' references to resource constraints were pretextual is particularly implausible as to Deutsche Bank, which publicly announced in October 2015 plans to reduce its technology and infrastructure staff, shrink its investment banking division, and reduce the number of investment banking and global markets clients during the relevant period.  *See Deutsche Bank announces details of Strategy 2020* (Oct. 29, 2015), https://www.db.com/newsroom_news/2015/medien/deutsche-bank-announces-details-of-strategy-2020-en-11247.htm.

[9] The exhibits to this memorandum are attached to the accompanying Declaration of Richard C. Pepperman II.

### E.    trueEX Fails to Plead Viable "Plus Factors."

Even if trueEX had alleged meaningful parallel conduct by the Dealers, "alleging parallel conduct alone is insufficient." *Citigroup*, 709 F.3d at 136.  trueEX also must plead "plus factors" that plausibly suggest that any alleged parallel conduct "flowed from a preceding agreement rather than from [the Dealers'] own business priorities." *Id.* at 138.  "The Second Circuit has identified three 'plus factors' . . . that may support a plausible inference of conspiracy:  '(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications.'"  *IRS I*, 261 F. Supp. 3d at 463 (citation omitted).  trueEX does not adequately allege any of those plus factors.[10]

<u>Actions against individual self-interest</u>.  trueEX argues that it "would have been in the individual interest of many Dealer Defendants to support . . . evolution to all-to-all trading." (Compl. ¶ 342.)  But that argument flies in the face of trueEX's allegations that the "evolution to this modern form of trading" threatened the Dealers' profits (*id.* ¶ 26) and that the Dealers "'want desperately to preserve the status quo'" to protect their profits (*id.* ¶ 17).  Accepting those allegations as true for purposes of this motion, the "natural, unilateral reaction" of each Dealer would have been to "resist" a market evolution that threatened its profits.  *Twombly*, 550 U.S. at 566.  As this Court observed, "[e]ach dealer's overall interest therefore lay in aborting . . . new platforms" such as trueEX's.  *IRS I*, 261 F. Supp. 3d at 477.

The complaint asserts that this "overall interest" was overcome here because "providing clearing services" was "a profitable source of income" for the Dealers and the trading desks of at least a few Dealers had an incentive to "get in on the ground floor" and "gain first-mover

---

[10]    trueEX's attempt to allege misconduct related to credit default swaps and ISDAfix (Compl. ¶¶ 346-57) should be disregarded.  *See IRS I*, 261 F. Supp. 3d at 477 n.25.

advantage." (Compl. ¶¶ 342-43.) But the complaint does not allege that the Dealers acted inconsistently with those incentives: Nine of eleven Dealers *have* provided IRS clearing services on trueEX's platform (the other two having exited the business), and multiple Dealers *have* sought to "gain first-mover advantage" by being early supporters of trueEX. What trueEX cannot allege is that any of the Dealers that were *not* early supporters of trueEX "took any material risk by sitting tight and waiting to see if the new platform[] attracted sufficient support to survive" in competing with Bloomberg and Tradeweb. *IRS I*, 261 F. Supp. 3d at 475 n.23. trueEX thus fails to identify any conduct contrary to the Dealers' individual interests—*i.e.*, conduct that was "so irrational that no firm would have engaged in it except on the understanding that others were in agreement." VI AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1414 (3d ed. 2010); *see also In re Musical Instruments*, 798 F.3d at 1195 (conduct inconsistent with self-interest occurs "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement").

Inter-firm communications. trueEX asserts that the Dealers "coordinated their conspiracy through numerous forums, including their joint involvement with Tradeweb, ISDA, and the Futures Industry Association." (Compl. ¶ 117.) The complaint further contends, without any supporting facts or details, that the Dealers' "personnel met in informal settings" (*id*. ¶ 118) and that "[t]he heads of the Dealer Defendants' IRS trading desks also maintained an ongoing dialogue" (*id*. ¶ 119). There are no accompanying allegations, however, that these alleged communications concerned trueEX or its platform, that the Dealers' employees lacked legitimate reasons to communicate with each other, or that all eleven Dealers participated in such communications. At most, trueEX alleges that the Dealers had an "opportunity to conspire," but

a "mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993); *see also In re Aluminum*, 2014 WL 4277510, at *33 ("plaintiffs' allegations . . . amount only to a potential[] opportunity to communicate, which is nothing more than a bare assertion incapable of supporting a plus-factor on its own").

Common motive to conspire.  trueEX contends that the Dealers shared a common motive to maintain their "massive profits."  (Compl. ¶ 1; *see also id.* ¶¶ 17, 22, 24, 26, 202.)  To plead a "plus factor," however, trueEX must do more than allege that each Dealer had a similar interest in maintaining its trading profits because a "common motive for increased profits always exists." *In re Musical Instruments*, 798 F.3d at 1194 n.8.  The complaint instead must allege that the Dealers had a common motive to agree to engage in conduct *in which they were unlikely to engage absent a conspiracy.  See Twombly*, 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway").  trueEX fails to allege such a common motive because each individual Dealer had a strong *unilateral* interest in "sitting tight and waiting to see if the new platform[] attracted sufficient support to survive" before devoting scarce resources to connect to the platform.  *IRS I*, 261 F. Supp. 3d at 475 n.23.

Unlike Javelin and Tera, trueEX does not allege that "there was otherwise a risk that enough Dealers would participate to give the new platform . . . sufficient liquidity to be viable." *Id*. at 476.  Because numerous Dealers have participated on its platform, trueEX is forced to take the position that "[a]n IRS trading platform is relevant only when it includes the participation of *nearly all* of the major liquidity providers" and that "[a] trading platform that has the participation of *all* these dealers has a *decisive* advantage" over its competitors.  (Compl. ¶ 4 (emphasis added); *see also id*. ¶ 199 ("trueEX could not succeed unless it secured liquidity from

the Dealer Defendants who controlled the vast majority of liquidity in the IRS market.").)  If, according to trueEX's own allegations, a single Dealer could greatly diminish trueEX's chance of succeeding by unilaterally declining to support trueEX's platform, then the Dealers lacked any particular motive to *conspire* to jointly boycott trueEX.  *See Twombly*, 550 U.S. at 566 (defendants had no reason to agree to "among themselves to do what was only natural anyway," namely, "resist" threatening upstarts).[11]

## II.     trueEX's Conspiracy Claims Are Time-Barred Before June 14, 2014.

trueEX's conspiracy claims are subject to a four-year statute of limitations that runs from the date of injury.  *Hinds Cty.*, 620 F. Supp. 2d at 519; *see* 15 U.S.C. § 15b; N.Y. GEN. BUS. LAW § 340(5).  Because trueEX filed its complaint on June 14, 2018, trueEX's conspiracy claims, to the extent based on injuries allegedly incurred before June 14, 2014, are time-barred.

trueEX's assertion that the statute of limitations is somehow "extended and renewed" due to the Dealers' alleged "continuing violations" and "ongoing conspiracy" is meritless.  (Compl. ¶¶ 358-59.)   "[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Hinds Cty.*, 620 F. Supp. 2d at 519.

---

[11] trueEX also alleges that the Dealers "refused to . . . provide liquidity to trueEX's dealer-to-client RFQ."  (Compl. ¶ 180.)  But trueEX asserts that RFQ trading "is the functional equivalent of transacting on the voice-based OTC market" (*id*. ¶ 33), and it acknowledges that the Dealers provide prices on Bloomberg's RFQ (*id*. ¶ 248).  The Dealers have no more motive to conspire to boycott trueEX's RFQ than they do Bloomberg's RFQ.  Although trueEX halfheartedly claims that the Dealers boycotted its RFQ to prevent trueEX from gaining "traction" (*id*. ¶ 5), it admits (*id*. ¶ 205) that certain Dealers conduct "termination" and "compression" transactions on its platform, thus providing trueEX with substantial revenue.  *See* Amir Khwaja, *2015 SEF Market Share Statistics*, CLARUS FINANCIAL TECHNOLOGY (Jan. 26, 2016), https://www.clarusft.com/2015-sef-market-share-statistics/ (cited at Compl. ¶ 204 n.35) (trueEx did more than $50 billion gross notional in compression trades every month in 2015 and more than $150 billion gross notional in two different months in 2015); *see also* Joe Parsons, *Start-up Sef trueEX takes larger slice of swaps trading pie*, THE TRADE (Aug. 8, 2017 11:10 AM GMT), https://www.thetradenews.com/start-up-sef-trueex-takes-larger-slice-of-swaps-trading-pie/ ("In March [2017] alone, trueEX reported $3.3 trillion in notional volume of interest rate derivatives, the most out of any Sef platform including rivals Bloomberg and Tradeweb . . . .").

Instead, "[t]he continuing violation exception only allows a plaintiff to recover damages caused by overt acts committed inside the limitations period." *Rite Aid Corp.* v. *Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 268 (E.D.N.Y. 2010).

This Court's prior ruling forecloses trueEX's claim that the statute of limitations should be equitably tolled due to fraudulent concealment. As to the first element of fraudulent concealment—concealment of the cause of action—this Court has rejected the contention that an alleged conspiracy to prevent exchange trading of IRS was "self-concealing." (Compl. ¶ 364.) As the Court explained, on the plaintiffs' theory (*see, e.g., id.* ¶ 98), the alleged conspiracy "occurred in plain sight and in contrast to the market's expectations. This, if anything would have invited, rather than lulled, skeptical attention." *IRS I*, 261 F. Supp. 3d at 488. This Court also held that generic allegations of "secret meetings and discussions" (Compl. ¶¶ 361-62) are too "general and conclusory" to plead concealment. *IRS I*, 261 F. Supp. 3d at 489.

"For similar reasons," trueEX "fail[s] to plead ignorance of [its] . . . claims—the second element of fraudulent concealment." *Id.* As this Court observed, the claim here "is that the failure of the IRS market to move towards all-to-all anonymous exchange trading in this period was unnatural and contrary to expectations." *Id.* "At a minimum," therefore, trueEX was "on inquiry notice" *Id.* And that is "'[a]ll that is necessary to cause the tolling period to cease.'" *131 Maine St. Assocs.* v. *Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002) (citation omitted).

Lastly, as to the third element—due diligence—trueEX baldly asserts that it "could not have discovered through the exercise of reasonable diligence that they were injured by Defendants' conspiracy . . . until the filing [of the initial complaint] on November 25, 2015." (Compl. ¶ 360.) This generalized assertion is insufficient to plead "diligence" with the requisite

particularity.  Indeed, trueEX fails to plead that it took *any* steps before June 2014 to investigate its potential claims.

### III.    trueEX's State-Law Claims Should Be Dismissed.

Under this Court's earlier decision, trueEX also fails to state a claim for either unjust enrichment or tortious interference with business relations under New York law.

Unjust enrichment.  trueEX's unjust-enrichment claim is entirely dependent on its fatally flawed antitrust claims.  (*Id.* ¶¶ 378-84.)  "[W]ithout a viable underlying claim of illegality, an unjust enrichment claim 'must be dismissed.'"  *IRS I*, 261 F. Supp. 3d at 500 (citation omitted).  Moreover, "[t]he 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Id.* at 500 (citation omitted).  Although the complaint states that "trueEX had direct dealings and actual relationships with each of the Defendants" (Compl. ¶ 380), trueEX does not allege that the Dealers were enriched at trueEX's expense.  As this Court held in dismissing the same claim by Javelin and Tera, "the usage revenue of which [trueEX was] allegedly deprived is different from the money the Dealers ostensibly gained (via wide trading spreads)."  *IRS I*, 261 F. Supp. 3d at 501.

Tortious interference with business relations.  "'This tort is a difficult one to sustain, with requirements more demanding than those for interference with [the] performance of an existing contract.'"  *Id.* at 499 (alteration in original and citation omitted).  In addition, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 192 (2004).  trueEX does not adequately plead any of the four elements of this claim.  *See IRS I*, 261 F. Supp. 3d at 499 (listing four elements).

First, trueEX "does not allege any particular customer relationship[s] . . . with which the Dealer Defendants' actions interfered," *IRS I*, 261 F. Supp. 3d at 499, instead vaguely asserting

that "trueEX had business relationships with numerous buy-side customers, including Buy-Side Client 1 through 16" (Compl. ¶ 386).  That allegation is insufficient.  *See Envirosource, Inc.* v. *Horsehead Res. Dev. Co.*, 1997 WL 525403, at *2 (S.D.N.Y. Aug. 21, 1997) ("[V]ague allegation that Envirosource interfered with 'at least 5 prospective customers' is inadequate as a matter of law.").  Second, trueEX fails to allege that most of the Dealers engaged in any act of interference.  (*See* Compl. ¶¶ 137-54.)  Third, trueEX does not adequately allege that any Dealer acted with the "sole purpose" of harming trueEX or otherwise used "improper means" directed at buy-side customers in purportedly attempting to persuade them to trade on Tradeweb.  *See Guard-Life Corp.* v. *S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980) ("'[W]rongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone . . . .").  Fourth, trueEX does not adequately plead that its business relationship with any particular customer was harmed as a result of a Dealer's actions.  In fact, trueEX does not identify a single customer that was prevented from trading on its platform or that elected to trade on a different platform because of something a Dealer said or did.  (*See* Compl. ¶ 389.)

## CONCLUSION

For the foregoing reasons, trueEX's complaint should be dismissed with prejudice for failure to state a claim upon which relief can be granted.[12]

---

[12] The Commodities Exchange Act and the Dodd-Frank Act also impliedly repeal trueEX's Sherman Act claim.  Because this Court rejected that argument in *IRS I*, *see* 261 F. Supp. 3d at 495-98, the Dealers raise it here only for preservation purposes.

Dated:  New York, New York
          July 19, 2018

Respectfully submitted,

s/  Lawrence E. Buterman                          s/  Adam S. Hakki
James E. Brandt                                   Adam S. Hakki
Christopher J. Clark                              Richard F. Schwed
Lawrence E. Buterman                              SHEARMAN & STERLING LLP
LATHAM & WATKINS LLP                              599 Lexington Avenue
885 Third Avenue                                  New York, NY 10022
New York, NY 10022                                Telephone:  (212) 848-4000
Telephone:  (212) 906-1200                        Facsimile:  (646) 848-4000
Facsimile:  (212) 751-4864                        ahakki@shearman.com
james.brandt@lw.com                               rschwed@shearman.com
chris.clark@lw.com
lawrence.buterman@lw.com                          *Attorneys for Defendants Bank of America*
                                                  *Corporation; Bank of America, N.A.; and*
                                                  *Merrill Lynch, Pierce, Fenner & Smith*
Margaret M. Zwisler                               *Incorporated*
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
margaret.zwisler@lw.com

*Attorneys for Defendants Barclays Bank PLC*
*and Barclays Capital Inc.*

s/  Tracy V. Schaffer                             s/  Robert Y. Sperling
Tracy V. Schaffer                                 Robert Y. Sperling
Eric P. Stephens                                  Joseph L. Motto
JONES DAY                                         WINSTON & STRAWN LLP
250 Vesey Street                                  35 West Wacker Drive
New York, NY 10281                                Chicago, IL 60601
Telephone:  (212) 326-3939                        Telephone:  (312) 558-7941
Facsimile:  (212) 755-7306                        Facsimile:  (312) 558-5700
tschaffer@jonesday.com                            rsperling@winston.com
epstephens@jonesday.com                           jmotto@winston.com

Paula W. Render
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
prender@jonesday.com

*Attorneys for Defendants Deutsche Bank AG
and Deutsche Bank Securities Inc.*


s/  Daniel Slifkin
Daniel Slifkin
Michael A. Paskin
Damaris Hernández
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
dslifkin@cravath.com
mpaskin@cravath.com
dhernandez@cravath.com

*Attorney for Defendants Morgan Stanley;
Morgan Stanley Bank, N.A.; Morgan Stanley &
Co. LLC; Morgan Stanley Capital Services
LLC; Morgan Stanley Derivative Products
Inc.; Morgan Stanley & Co. International plc;
and Morgan Stanley Bank International
Limited*

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100
epapez@winston.com

Staci Yablon
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 294-4703
Facsimile: (212) 294-4700
syablon@winston.com

Richard C. Pepperman II
Corey Omer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
omerc@sullcrom.com

*Attorneys for Defendants Goldman Sachs &
Co. LLC; Goldman Sachs Bank USA; Goldman
Sachs Financial Markets, LP; and Goldman
Sachs International*