UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRUEEX LLC,

                    Plaintiff,

v.

BANK OF AMERICA CORPORATION; BANK OF AMERICA,
N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; BARCLAYS BANK PLC; BARCLAYS
CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS
SECURITIES CORP.; CITIGROUP INC.; CITIBANK, N.A.;
CITIGROUP GLOBAL MARKETS INC.; CITIGROUP
GLOBAL MARKETS LIMITED; CREDIT SUISSE GROUP AG;
CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE
INTERNATIONAL; DEUTSCHE BANK AG; DEUTSCHE
BANK SECURITIES, INC.; GOLDMAN SACHS & CO.;
GOLDMAN SACHS BANK USA; GOLDMAN SACHS
FINANCIAL MARKETS, L.P.; GOLDMAN SACHS
INTERNATIONAL; J.P. MORGAN CHASE & CO.; J.P.
MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES
LLC; J.P. MORGAN SECURITIES PLC; MORGAN STANLEY;
MORGAN STANLEY BANK, N.A.; MORGAN STANLEY &
CO. LLC; MORGAN STANLEY CAPITAL SERVICES LLC;
MORGAN STANLEY DERIVATIVE PRODUCTS INC.;
MORGAN STANLEY & CO. INTERNATIONAL PLC;
MORGAN STANLEY BANK INTERNATIONAL LIMITED;
THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL
BANK OF SCOTLAND PLC; RBS SECURITIES INC.; UBS
AG; and UBS SECURITIES LLC;

                    Defendants.

No. 1:18-cv-05361

---

**MEMORANDUM OF LAW OF BNPP, CITI, CREDIT SUISSE,
JPMORGAN, RBS, AND UBS IN SUPPORT OF
<u>DEFENDANTS' JOINT MOTION TO DISMISS ALL CLAIMS</u>**

# TABLE OF CONTENTS

Introduction .................................................................................................................................... 1

Argument ...................................................................................................................................... 2

I.     The Complaint Fails To Connect The Individual Dealers To A Purported Group
Boycott. ....................................................................................................................... 2

     A.     UBS ................................................................................................................ 4

     B.     Credit Suisse ................................................................................................. 7

     C.     RBS ................................................................................................................ 9

     D.     BNPP ........................................................................................................... 10

     E.     JPMorgan .................................................................................................... 11

     F.     Citi ............................................................................................................... 13

II.     trueEX's State Law Claims Should Be Dismissed. ......................................................... 15

Conclusion ................................................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*AD/SAT, a Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999).................................................................3

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................8, 9

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
   2014 WL 1396524 (S.D.N.Y. 2014)...............................................3

*Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*,
   2013 WL 3337676 (C.D. Cal. 2013)..............................................5

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007).............................................................3

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016)............................................5

*In re Florida Cement & Concrete Antitrust Litig.*,
   746 F. Supp. 2d 1291 (S.D. Fla. 2010) ..........................................6

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   708 F. Supp. 2d 348 (S.D.N.Y. 2010)........................................3, 17

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) (*IRS I*)............................ *passim*

*In re Interest Rate Swaps Antitrust Litig.*,
   2018 WL 2332069 (S.D.N.Y. 2018) (*IRS II*)................................3

*Jasper v. Sony Music Entm't, Inc.*,
   378 F. Supp. 2d 334 (S.D.N.Y. 2005).............................................6

*Lia v. Saporito*,
   909 F. Supp. 2d 149 (E.D.N.Y. 2012) ............................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)......................................................................15

*Muhammad v. Oliver*,
   547 F.3d 874 (7th Cir. 2008) .......................................................13

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
   948 F. Supp. 2d 416 (M.D. Pa. 2013).............................................5

*Poindexter v. EMI Record Grp. Inc.*,
  2012 WL 1027639 (S.D.N.Y. 2012)......................................................................8

*Pu v. Russell Pub. Grp., Ltd.*,
  2016 WL 9021990 (S.D.N.Y. 2016)......................................................................6

*Puente v. Ridge*,
  324 F. App'x 423 (5th Cir. 2009) .......................................................................13

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) ..................................................................9

*trueEX, LLC v. MarkitSERV Ltd.*,
  266 F. Supp. 3d 705 (S.D.N.Y. 2017)...................................................................6

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015)............................................................5, 18

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016)...................................................................3

## INTRODUCTION

The six Dealers that join in this memorandum—BNPP, Citi, Credit Suisse, JPMorgan, RBS, and UBS—respectfully submit that the trueEX complaint should be dismissed in its entirety for the reasons set forth in the memorandum filed on behalf of the other Dealers. These six Dealers (the "Individual Dealers") join in and adopt the arguments made in that memorandum. The Individual Dealers file this separate memorandum to emphasize the independent reasons why trueEX fails to state a claim against any of *them*. Simply put, the trueEX complaint lacks any factual allegations that link the Individual Dealers to the purported boycott conspiracy. Instead, the complaint confirms that none of those Dealers participated in a group boycott: none of them denied clearing services to trueEX; all of them joined the trueEX trading platform; and at least four admittedly make markets on that platform. The Individual Dealers therefore should be dismissed for the same reasons that led this Court to dismiss HSBC from this litigation in *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017) (*IRS I*).

In *IRS I*, this Court considered the Dealers' motion to dismiss the claims of Tera, Javelin, and the class plaintiffs. The Dealers argued, among other things, that the plaintiffs had failed to state a plausible group-boycott claim because each Dealer had strong *unilateral* reasons for declining to deal with all-to-all startup platforms. Significantly, this Court agreed that mere allegations of parallel refusals to deal with all-to-all platforms, without more, are "not—at all— suggestive of conspiracy." *IRS I*, 261 F. Supp. 3d at 475. For each Dealer other than HSBC, however, the Court concluded that the plaintiffs had alleged that the Dealers not only refused to do business with all-to-all platforms, but also engaged in "similar stylized stratagems" to prevent their emergence. *Id.* at 476. The Court found "[m]ost telling" the allegation that four different Dealers simultaneously contacted Tera and told it that they "would not clear trades on Tera's platform until [they] had conducted a review of Tera's rulebook." *Id.* at 475. The Court therefore

1

dismissed all claims against HSBC, but sustained the claims against the remaining Dealers in the period in which "similar stylized stratagems" allegedly were employed. *Id*. at 476.

Although trueEX argues that its complaint should be sustained under *IRS I*, that decision in fact requires dismissal of trueEX's claims against the Individual Dealers. In contrast to the prior complaints, the trueEX complaint contains no factual allegations that purport to connect those Dealers to "similar stylized stratagems to blunt the emergence" of all-to-all platforms. For example, trueEX conspicuously omits the "telling" allegation that four Dealers—BNPP, JPMorgan, UBS, and Citi—simultaneously demanded to "audit" the Tera rulebook, an omission doubtless spurred by the mounting evidence that the allegation is untrue. The few remaining allegations against the Individual Dealers are even thinner than the allegations that this Court deemed too sparse and conclusory to state a claim against HSBC. *See* 261 F. Supp. 3d at 483.

Compounding these deficiencies, the trueEX complaint makes abundantly clear that none of the Individual Dealers ever boycotted trueEX. The complaint nowhere alleges that any Individual Dealer ever discouraged trueEX's customers or refused to clear their trades; it concedes that they joined the trueEX trading platform; and it further concedes that most or all of them make markets on the platform. Compl. ¶¶ 4, 175-77, 192-98, 201. These concessions are reinforced by trueEX's judicially-noticeable admissions in its litigation against Markit that these Dealers invested substantial resources in joining its trading platform. The claims against the six Individual Dealers therefore should be dismissed with prejudice.

## ARGUMENT

### I. The Complaint Fails To Connect The Individual Dealers To A Purported Group Boycott.

To survive a motion to dismiss, trueEX must adequately allege that each of the Dealers, "*in their individual capacities*, consciously committed themselves to a common scheme designed

to achieve an unlawful objective." *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999).[1]  Group-pleading allegations directed at "the Dealer Defendants" in the aggregate do not meet that standard because they lack the "specification of any particular activities by any particular defendant" that is necessary to tie individual defendants to an antitrust conspiracy.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).  Such allegations are "insufficient to withstand . . . a motion to dismiss."  *Concord Assocs., L.P. v. Ent. Props. Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. 2014); *see also In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *15 (S.D.N.Y. 2018) (*IRS II*) ("generalized claims of parallel conduct[] must also be set aside" as "impermissible group pleading"); *IRS I*, 261 F. Supp. 3d at 478 (requiring a "factual connection of [each] defendant to the scheme"); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("to state a viable § 1 claim, Plaintiffs must allege a factual connection between each Defendant and the alleged conspiracy").

This Court's *IRS I* decision illustrates these principles.  In *IRS I*, the Court held that the plaintiffs' allegations specific to HSBC were "too sparse to sustain" the plaintiffs' claims.  261 F. Supp. 3d at 483.  As the Court observed, the only non-conclusory allegations directed at HSBC consisted of allegations that it "'gave TeraExchange the runaround for over a year before refusing to clear for the platform.'"  *Id.* (quoting JTSAC ¶ 198).  The Court held that these "runaround" allegations were "insufficient to link HSBC to the alleged conspiracy among Dealers."  *Id.*

As to the six Individual Dealers that join in this memorandum, the trueEX complaint alleges even less than the prior complaints alleged against HSBC.  trueEX thus fails to plead facts sufficient to support an inference that any of the Individual Dealers consciously committed themselves to a purported scheme to boycott trueEX.  *See IRS I*, 261 F. Supp. 3d at 478, 483; *In*

---

[1]    Unless otherwise noted, emphasis is added and internal quotations and citations are omitted.

*re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (dismissing claims where plaintiffs failed to "separately state a claim against each and every defendant").

## A.    UBS

As against UBS, the complaint is more notable for what trueEX does not allege than for what it does.  Most glaringly, trueEX omits what in this Court's view distinguished UBS from HSBC:  that UBS, unlike HSBC, was "among the four Dealers who, the day after Tera's first successful IRS trade [allegedly] told Tera 'that they would not clear any trades executed on TeraExchange's platform until they conducted an audit of TeraExchange's rulebook.'"  *IRS I*, 261 F. Supp. 3d at 483 (quoting JTSAC ¶ 205).  This Court characterized that allegation as "telling" and "striking," and it is no exaggeration to say that it was the principal reason that this Court denied UBS's motion to dismiss while granting HSBC's.[2]  The omission of that allegation, and the lack of any counterbalancing *new* allegations, fatally undermines trueEX's complaint against UBS.

Other omissions are similarly revealing.  trueEX does not allege that UBS refused to sign up for trueEX's trading platform, refused to clear trades for trueEX, or discouraged potential customers from using trueEX.  It pleads none of those facts because, as it concedes on its website, UBS supported trueEX from the moment its platform launched.  Indeed, on August 8, 2013, trueEX touted its "liquidity alliance" with UBS and praised UBS for "leading the way" among dealers by "providing markets and routing client flows on the most liquid interest rate swaps" to trueEX's platform.  *See* Ex. 1, https://www.trueex.com/media/51 (trueEX press release).[3]  The

---

[2]    In denying UBS's motion to dismiss, the Court stated:  "[The audit allegation], and the claim that UBS refused to make markets on the new all-to-all platforms, JTSAC ¶ 56, is sufficient to link UBS to the alleged conspiracy." *IRS I*, 261 F. Supp. 3d at 483.  But it was only the audit allegation, not the claim that UBS "refused to make markets on the new all-to-all platforms," that distinguished UBS from HSBC.  *Compare* JTSAC ¶ 56 (UBS), *with id.* ¶ 48 (HSBC).

[3]    All references to "Ex." are to the exhibits accompanying the Declaration of John S. Playforth dated July 19, 2018.

Court may consider admissions that appear on trueEX's website in ruling on this motion. *See, e.g.*, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 295 (S.D.N.Y. 2016) ("[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute"); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (denying motion to strike website materials where the objecting party "[did] not actually dispute the factual material reflected in these websites. He simply would prefer that the Court not consider these materials.").

Unable to allege that UBS sought to harm or sabotage its trading platform, trueEX is reduced to complaining that UBS "delayed going live on trueEX's API" and attributed the purported delay to "a lack of [IT] resources." Compl. ¶¶ 158, 175. But this is nothing more than a repackaged version of the type of "runaround" allegation that the Court found insufficient to state a claim against HSBC in *IRS I*. In fact, the runaround allegations against UBS are *weaker* than those previously made against HSBC because, whereas HSBC allegedly gave Tera the runaround before *declining* to clear Tera's trades or join its trading platform, UBS *does* clear trades for trueEX and *did* on-board onto its platform. *Supra* at 4.

Although trueEX contends that UBS's claim of "resource constraints" was pretextual (Compl. ¶¶ 158, 175), it pleads no *facts* to justify that conclusion. Such "conclusory allegations, without more, do not permit the Court to draw the reasonable inference that [defendants'] justification for [their behavior] is a pretext." *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 427 (M.D. Pa. 2013); *see also Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, 2013 WL 3337676, at *9 (C.D. Cal. 2013) (refusing to credit allegation that a legitimate business explanation was "merely a 'pretext' for [defendant's] true anticompetitive purpose"

because the allegation was a "conclusion couched as a factual allegation"); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1311 (S.D. Fla. 2010) (refusing to credit conclusory "pretext" allegation "[a]bsent any factual allegation to support" that inference).

trueEX goes on to suggest that connecting to trueEX does not require substantial resources (Compl. ¶¶ 156-58, 161, 175), but that suggestion is belied by trueEX's admissions in its litigation against Markit. There, Markit argued that trueEX could easily "finish building out" a direct connection to IRS dealers. *See trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 717 (S.D.N.Y. 2017). trueEX counsel Daniel Brockett of Quinn Emanuel—lead counsel for the class plaintiffs in this litigation—adamantly disagreed, arguing that connecting a *dealer* to trueEX requires "massive investments":

> The reason the banks are not interested in establishing a direct connection to trueEX is because they are locked into MarkitSERV, they've already made these massive investments and they are not going to invest in a startup. Just like many of these banks, your Honor, won't lend to a startup, many of them are not going to invest in a startup. They're concerned about their return and they have policies[.]

Ex. 2 at 12. trueEX's CEO likewise testified that "onboarding [onto trueEX] is a lengthy and complex process, *particularly for dealers*." Ex. 3 ¶ 19 n.19. This Court may take judicial notice of trueEX's admissions in the *MarkitSERV* litigation that substantial resources are required to connect dealers to its trading platform.[4]

---

[4]    *See Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 338 (S.D.N.Y. 2005) ("On a motion to dismiss, a court may also consider matters of which judicial notice may be taken . . . including pleadings, testimony, and decisions in prior lawsuits."). trueEX is estopped from denying its statements regarding the burdens of connecting dealers to its platform because Judge Kaplan relied on those statements in granting trueEX a preliminary injunction. *See trueEX*, 266 F. Supp. 3d at 715-17, 727-28; *Pu v. Russell Pub. Grp., Ltd.*, 2016 WL 9021990, at *7 (S.D.N.Y. 2016) ("A District Court, in taking judicial notice of documents filed on other dockets, may then find that a litigant is judicially estopped from taking a position contrary to one already propounded, regardless of where the truth may lie."), *aff'd*, 683 F. App'x 96 (2d Cir. 2017); *Lia v. Saporito*, 909 F. Supp. 2d 149, 178 (E.D.N.Y. 2012) (similar), *aff'd*, 541 Fed. App'x 71 (2d Cir. 2013).

The Court also should note trueEX's deliberate failure to identify UBS as the source of certain statements in its complaint criticizing name give-up as anachronistic and unfriendly to anonymous all-to-all SEFs. At least the other plaintiffs correctly attributed those statements to UBS (*compare* Compl. ¶ 236, *with* JTSAC ¶ 240, *and* SAC ¶ 292; *see also, e.g.*, SAC ¶ 309 (cited in Compl. ¶ 121 n.22)). trueEX carefully excises any reference to UBS as the source of those statements, no doubt because "UBS's opposition to 'name give-up,'" both in industry conferences and before the CFTC, "would certainly supply a basis not to infer its participation" in a conspiracy to boycott anonymous all-to-all SEFs. *IRS I*, 261 F. Supp. 3d at 483. No matter. UBS's public statements are as judicially-noticeable here as they were in *IRS I*, and they negate trueEX's group-pleaded, conclusory allegations that UBS was part of the alleged conspiracy.

## B.     Credit Suisse

trueEX's allegations against Credit Suisse suffer from the same fundamental defects as its allegations against UBS. trueEX nowhere alleges that Credit Suisse declined to join trueEX's trading platform, refused to clear trades on the platform, or discouraged customers from using the platform. *See* Compl. ¶¶ 137-55, 175, 192-98. To the contrary, trueEX acknowledges that Credit Suisse was "the 1st Clearing Firm to onboard with trueEX for Interest Rate Swaps," *see* Ex. 4, https://www.trueex.com/media/52, and "came on board to offer Clearing *and* market-making" to trueEX in August 2013, *see* Ex. 5, https://www.trueex.com/media (Aug. 8, 2013); *see also* Ex. 2 at 11-12 (Credit Suisse makes markets on trueEX).

Pinned down by these admissions on its own website, trueEX resorts to alleging that Credit Suisse "delayed going live on trueEX's API" for an unidentified length of time and stated that "our IT is quite challenged for resources." Compl. ¶¶ 158, 175. These threadbare and conclusory "runaround" allegations fail to connect Credit Suisse to a purported boycott conspiracy for exactly the same reasons that the similar allegations fail to implicate UBS. *See supra* at 5-6. Moreover,

allegations that Credit Suisse temporarily delayed and cited resource constraints are in no way suggestive of a conspiracy. *See IRS I*, 261 F. Supp. 3d at 462 ("An inference of conspiracy will not arise when the conspirators' parallel conduct 'made perfect business sense,' 'there are obvious alternative explanations for the facts alleged,' or the alleged facts 'suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy.'").

trueEX also cites a 2015 Risk Magazine article for the proposition that "certain of the Dealer Defendant FCMs, including . . . Credit Suisse . . . began jointly penalizing certain buy-side firms that were pushing against the bifurcated market structure by hiking their clearing fees 'by as much as ten-fold,' while obedient buy-side customers 'have been protected.'" Compl. ¶ 227. But that artfully-worded allegation is refuted by the very article cited to support it, which attributes rising clearing costs *solely* to new regulatory capital requirements.[5] To make matters worse, the truncated quotations used in the allegation relate to commodity derivatives and credit default swaps as opposed to IRS. *See* Ex. 6 at 1-2. And the article nowhere suggests that *Credit Suisse* was among the FCMs that supposedly hiked their clearing fees. Instead, the article identifies Credit Suisse as a "notable exception[]" to the general trend among European FCMs. *Id*. at 4-5.

Finally, the complaint's "fee hike" allegation is completely disconnected from trueEX: there are no allegations that Credit Suisse raised clearing fees to *trueEX* customers or otherwise penalized buy-side firms that traded on *trueEX*. The absence of such allegations is unsurprising:

---

[5]     Ex. 6, cited in Compl. ¶ 227 n.37 (Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, Risk (July 30, 2015)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.13 (2007) ("the District Court was entitled to take notice of the full contents of the published articles" quoted in the complaint); *Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. 2012) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control . . . .").

it would make no sense for Credit Suisse to penalize customers that trade on trueEX given that Credit Suisse itself makes markets on trueEX. *Supra* at 7.

### C. RBS

The allegations against RBS are, if possible, even weaker. There are no allegations that RBS refused to clear for trueEX, declined to trade on trueEX, cited pretextual resource constraints, or gave trueEX the runaround.[6] Instead, trueEX makes only two substantive mentions of RBS in its entire complaint: once when alleging that RBS provided liquidity to trueEX, and once when alleging that RBS provided liquidity to Javelin. Compl. ¶¶ 201, 210. These allegations are the polar opposite of well-pled allegations that RBS "boycotted" trueEX.

trueEX counters that although RBS makes markets on trueEX in multiple currencies, this market-making is "limited" and does not extend to continuous "streaming" of live quotes in Sterling or Euros. Compl. ¶ 201. But as this Court concluded in *IRS I*, mere allegations that a dealer declined to do business with a startup platform are "not—at all—suggestive of conspiracy." 261 F. Supp. 3d. at 475. It follows *a fortiori* that RBS's decision to do *some* market-making on trueEX, albeit not as much as trueEX wanted, likewise fails to suggest participation in an antitrust conspiracy. *See id.*; *Twombly*, 550 U.S. at 566 (no basis for concluding that "resistance to the upstarts was anything more than the natural, unilateral reaction" of each defendant); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (no inference of conspiracy where the "conduct claimed to be conspiratorial is nothing more than the continuation of preexisting [business] patterns").

---

[6] The absence of any allegation that RBS denied clearing services to trueEX is consistent with published reports indicating that RBS exited the FCM clearing business in 2014. *See, e.g.*, Ex. 7, cited in Compl. ¶ 102 n.15 (Tod Skarecky, *FCM Rankings—Q3 2016*, Clarus Fin. Tech. (Nov. 16, 2016) (RBS cleared no swaps after 2014)); Mike Kentz, *Banks seek OTC clearing lifeline*, Reuters (May 18, 2015), https://www.reuters.com/article/news-markets-derivatives/banks-seek-otc-clearing-lifeline-idUSL1N0Y61HQ20150518 (RBS "shut down" its clearing business).

trueEX's allegation that RBS provided only "limited" support also conflicts with its statements in the *MarkitSERV* litigation. There, trueEX acknowledged that RBS, JPMorgan, and non-defendant Société Générale are the only firms that undertook the enormous effort required to forge a "direct connection to trueEX," and that those three firms alone account for nearly half of trueEX's trading volume. *See* Ex. 2 at 6 ("44 percent [of trades on trueEX] are related only to the three dealers who have a separate direct connection to trueEX, and those are JPMorgan, RBS, and Société Générale."). Moreover, trueEX's CEO publicly stated that "'J.P. Morgan and RBS were not only amongst the first dealers to onboard to trueEX, but they are *pioneers* in the development of [the] enhanced capabilities on the trueEX platform. . . . With their early support for trueFIX, all market participants will benefit.'" Ex. 8, https://www.trueex.com/media/64 (Dec. 8, 2015 trueEX press release). trueEX cannot fairly describe RBS's support as "limited" when RBS was a "pioneer" on trueEX and ranks among its three largest customers.

**D. BNPP**

trueEX's allegations against BNPP fail for the same basic reasons as those against RBS. As with RBS, there are no allegations that BNPP refused to clear for trueEX, declined to trade on trueEX, cited pretextual resource constraints, gave trueEX the runaround, or otherwise boycotted trueEX in any fashion. To the contrary, the complaint acknowledges that BNPP has long done business with trueEX and identifies BNPP as one of trueEX's three leading market-makers. *See* Compl. ¶ 201; *see also* Ex. 9, https://www.trueex.com/our-community (BNPP clears for trueEX). Indeed, in September 2016, trueEX highlighted BNPP as one of three leading dealers that connected to its API trading platform:

> trueEX . . . is adding BNP Paribas to its pool of 21 global derivatives dealers which also includes JPMorgan and RBS that collaborated on the launch of the trueFIX API platform . . . . "By now being able to offer streaming liquidity of yet another global derivatives dealer through our platform, we reinforce our position

> as a leader in innovation by further increasing the range and depth of execution choices we offer buy-side clients," said Sunil Hirani, CEO of trueEX.

Ex. 10, https://www.trueex.com/media/81; *see also* Ex. 5, https://www.trueex.com/media (Sept. 26, 2016) ("Derivatives clients of the French banking giant will be getting access to direct clearing and other post-trade services."). Moreover, there is no allegation—nor could there be—that BNPP ever participated in Project Fusion or sat on the board of Tradeweb, which allegedly "functions as a primary forum for Defendants' collusion." Compl. ¶ 34.

trueEX also omits the "telling" allegation in the prior complaints that BNPP and three other Dealers simultaneously demanded to audit the Tera rulebook. *See IRS I*, 261 F. Supp. 3d. at 483. This omitted "audit" allegation is the only material allegation that arguably distinguished BNPP from the position occupied by HSBC in the prior complaints. *See IRS I*, 261 F. Supp. 3d at 482.[7] In fact, BNPP now occupies an even stronger position than HSBC because trueEX now concedes that BNPP trades on and clears for the trueEX trading platform. *Supra* at 10. BNPP therefore should be dismissed under the same principles that led this Court to dismiss HSBC in *IRS I*.

### E. JPMorgan

trueEX's decision to sue JPMorgan is baffling. There are no allegations that JPMorgan refused to clear for trueEX, declined to trade on trueEX, discouraged customers from using trueEX, cited pretextual resource constraints, or gave trueEX the runaround. Instead, the complaint makes clear that JPMorgan (i) provides clearing services for trueEX, (ii) responds to RFQs on trueEX, and (iii) streams live quotes to trueEX's anonymous all-to-all order book. *See*

---

[7] trueEX makes the same FCM fee-hike allegation against BNPP that it made against Credit Suisse (Compl. ¶ 227), but that defective allegation fails against BNPP for the same reasons that it fails against Credit Suisse. *Supra* at 8-9. That allegation is further eroded as to BNPP by the fact that BNPP admittedly clears for trueEX, makes markets on its trading platform, and is not accused of discouraging or hindering trueEX's customers.

Compl. ¶¶ 4, 177, 192-98, 201, 296; *see also* Ex. 9, https://www.trueex.com/our-community (trueEX website statement that JPMorgan clears for trueEX); Ex. 8, https://www.trueex.com/media/64 ("'J.P. Morgan and RBS were not only amongst the first dealers to onboard to trueEX, but they are pioneers in the development of [the] enhanced capabilities on the trueEX platform.'"); Ex. 11, https://www.trueex.com/media/49 (JPMorgan executed trueEX's "first PTC trades").

trueEX had no choice but to make these damaging admissions because it emphasized in the *MarkitSERV* litigation that only JPMorgan, RBS, and Société Générale made the "massive investments" required to build a direct connection to the trueEX trading platform. *See* Ex. 2 at 12; Ex. 3 ¶ 36. According to trueEX's CEO, designing, building, and securing that connection required 22 months of intensive work and capital investment. *See* Ex. 3 ¶¶ 27-31, 33, 36. trueEX thus singled out JPMorgan as the only "major" IRS dealer in the world that was willing to make this extraordinary investment. *Id.* ¶¶ 35-36.

What, then, did JPMorgan supposedly do to "boycott" trueEX? Only this: although JPMorgan provided RFQ liquidity to trueEX in IRS of all major currencies and streamed anonymous order book liquidity to trueEX in U.S. dollar IRS, the liquidity it provided allegedly was "limited" and did not extend to "streaming liquidity in Euros or Sterling." Compl. ¶ 201. But the suggestion that JPMorgan provided only "limited" liquidity is a pure conclusion devoid of factual allegations, *see id.*, and contradicts trueEX's admission in the *MarkitSERV* litigation that JPMorgan, RBS, and Société Générale together account for 44 percent of trueEX's trades. Ex. 2 at 6. Moreover, although trueEX complains that JPMorgan streams continuous quotes to trueEX only in dollars and not in Euros or Sterling, it does not allege—and cannot allege—that JPMorgan has *ever* streamed liquidity to *any* IRS platform in Euros or Sterling, including market leaders Bloomberg, Tradeweb, ICAP, and Tradition. Finally, trueEX's allegations of "limited" support

are mere allegations of inaction, *i.e.*, allegations that JPMorgan did not do as much to support trueEX as trueEX wanted. As this Court recognized in *IRS I*, allegations of parallel inaction are "not—at all—suggestive of conspiracy." *See* 261 F. Supp. 3d at 475.

Unable to allege that JPMorgan obstructed *trueEX*, the complaint vaguely asserts that JPMorgan obstructed *Javelin*. *See* Compl. ¶¶ 212-13. Specifically, the complaint alleges that at one point JPMorgan's clearing business declined to provide "credit checks" for Javelin and discouraged a JPMorgan clearing customer from using Javelin. *See id.* Those allegations cannot possibly support an inference that JPMorgan boycotted *trueEX* because there are *no* allegations that JPMorgan obstructed clearing on the trueEX platform. To the contrary, the complaint and the trueEX website confirm that JPMorgan clears trueEX trades without any difficulty. *Supra* at 11-12. If trueEX had a basis for alleging that JPMorgan ever denied it clearing services, discouraged its customers, or obstructed its platform, it would be shouting those allegations from the rooftops. This Court should draw a negative inference from the total absence of such allegations. *See, e.g.*, *Muhammad v. Oliver*, 547 F.3d 874, 880 (7th Cir. 2008) ("The longer and more detailed a complaint is, the more compelling the inference that any omission from it was deliberate and should bind the plaintiff."); *Puente v. Ridge*, 324 F. App'x 423, 428 (5th Cir. 2009) (dismissing claim where plaintiff "did not allege the facts that, if true, were well within her knowledge").[8]

### F.    Citi

The allegations against Citi are similarly defective. There is no allegation that Citi refused to clear for trueEX, discouraged customers from trading on trueEX, or declined to trade on trueEX.

---

[8]    JPMorgan, along with BNPP and Credit Suisse, is among the targets of trueEX's artfully-worded FCM fee-hike allegation (Compl. ¶ 227), but that allegation fails for all of the reasons set forth above. *Supra* at 8-9. Even if that allegation were well-pled, it still would be irrelevant here because there are no allegations that JPMorgan (or BNPP or Credit Suisse) hiked clearing fees to *trueEX* customers, discouraged *trueEX* customers, or obstructed *trueEX* in any way.

To the contrary, trueEX acknowledges that Citi provides clearing services for trueEX, on-boarded to its platform, and provides it with U.S. dollar IRS liquidity. Compl. ¶ 176; Ex. 9, https://www.trueex.com/our-community. Although trueEX complains that Citi has not supplied liquidity in Euros and Sterling (Compl. ¶ 176), trueEX's disappointment in not having it all, all at once, is not a basis to sustain an antitrust action. *See IRS I*, 261 F. Supp. 3d at 475 (allegations of parallel inaction are "not—at all—suggestive of conspiracy"). Moreover, trueEX does not allege that Citi obstructed Tera or Javelin, and conspicuously omits the Tera "audit" allegation against Citi and other Dealers that the Court found "telling" in *IRS I*. *See* 261 F. Supp. 3d at 483.

trueEX does assert that Citi gave it the "runaround" in 2014 (Compl. ¶¶ 156, 160, 183), but those runaround allegations fail for the same reasons that they fail against UBS and Credit Suisse, and that they previously failed against HSBC. *Supra* at 5. Indeed, Citi's case for dismissal is stronger than HSBC's was because, despite the supposed runaround, it is undisputed that Citi now clears for and trades on trueEX, whereas HSBC allegedly never did. *See IRS I*, 261 F. Supp. 3d at 483. The runaround allegations are also flawed in their own right. trueEX paints the misleading picture that, in "early 2014," Citi was prepared to sign a participation agreement with trueEX, but then "later in 2014," Citi switched gears and stated that it needed additional approvals. Compl. ¶ 156. But trueEX notably does not—because it cannot—allege that the participation agreement Citi supposedly had been prepared to sign in early 2014 was for its IRS business. Moreover, trueEX fails to plead any facts suggesting that the Citi approval process described in paragraph 156 was inaccurate or pretextual. To the contrary, trueEX has admitted that a dealer's decision to participate on a SEF entails a "lengthy and complex process" that includes, "among

other things, negotiating legal agreements and fee schedules" and conducting "platform security and risk assessments." Ex. 3 ¶ 19 n.19.[9]

*          *          *

Although trueEX has asserted that *IRS I* forecloses dismissal of its complaint, the truth is exactly the opposite. trueEX has omitted key allegations that purportedly linked the six Individual Dealers to a group boycott, and it has added damaging concessions that those Dealers do business with it. Moreover, trueEX never provides a clear articulation of the collusive "agreement" to which the Individual Dealers supposedly were a party. Is trueEX seriously suggesting that those Dealers conspired to suppress the trueEX trading platform by (i) clearing trades executed on the platform, (ii) investing substantial resources in connecting to the platform as dealers, and (iii) making markets on the platform at least in U.S. dollar-denominated IRS? trueEX ducks that question by studiously avoiding any coherent articulation of the collusive "agreement" to which the Individual Dealers purportedly committed themselves. Its complaint should be dismissed for that reason as well. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986) (courts should not "infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct").

## II.     trueEX's State Law Claims Should Be Dismissed.

trueEX's failure to connect the six Individual Dealers to a group boycott also requires dismissal of its state law claims. *See IRS I*, 261 F. Supp. 3d at 501.

**CONCLUSION**

trueEX's claims against the Individual Dealers should be dismissed with prejudice.

---

[9]     Similarly, the allegation that a Citi employee said in 2014 that Citi would onboard with trueEX if other liquidity providers did so (Compl. ¶ 183) raises no conspiratorial inference because Citi *did* onboard with trueEX (*id.* ¶ 176). Moreover, according to trueEX, to be "relevant" as a trading platform, trueEX needed the participation of "nearly all of the major liquidity providers." *Id.* ¶ 4.

15

July 19, 2019                                    Respectfully submitted,


                                                 s/  Robert D. Wick
                                                 Robert D. Wick
                                                 Andrew D. Lazerow
                                                 John S. Playforth
                                                 Kuntal V. Cholera
                                                 COVINGTON & BURLING LLP
                                                 One CityCenter
                                                 850 Tenth Street, NW
                                                 Washington, DC 20001
                                                 Telephone:  (202) 662-6000
                                                 Facsimile:  (202) 662-6291
                                                 rwick@cov.com
                                                 alazerow@cov.com
                                                 jplayforth@cov.com
                                                 kcholera@cov.com

                                                 *Attorneys for JPMorgan Chase & Co.;*
                                                 *JPMorgan Chase Bank, N.A.; J.P. Morgan*
                                                 *Securities LLC; and J.P. Morgan Securities plc*

s/  Kenneth A. Gallo (on consent)[10]
Brad S. Karp
Julia Tarver-Mason Wood
William A. Clareman
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
bkarp@paulweiss.com
jwood@paulweiss.com
wclareman@paulweiss.com

Kenneth A. Gallo
Roberto J. Gonzalez
Ravi Romel Sharma
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
kgallo@paulweiss.com
rgonzalez@paulweiss.com
rsharma@paulweiss.com

*Attorneys for Defendants Citigroup Inc.;
Citibank, N.A.; Citigroup Global Markets Inc.;
and Citigroup Global Markets Limited*

---

[10]  Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

s/ Marshall H. Fishman (on consent)

Marshall H. Fishman
Meghan K. Spillane
Christine V. Sama
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8851
Facsimile: (646) 558-4063
mfishman@goodwinlaw.com
csama@goodwinlaw.com

*Attorneys for Defendants BNP Paribas, S.A.
and BNP Paribas Securities Corp.*

s/ David G. Januszewski (on consent)

David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse AG;
Credit Suisse Group AG; Credit Suisse
Securities (USA) LLC; and Credit Suisse
International*

s/ Arthur J. Burke (on consent)

Arthur J. Burke
James I. McClammy
Rebecca L. Martin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
arthur.burke@davispolk.com
james.mcclammy@davispolk.com
rebecca.martin@davispolk.com

*Attorneys for Defendants The Royal Bank of Scotland Group plc; Royal Bank of Scotland plc; and RBS Securities Inc.*

s/ David C. Bohan (on consent)

David C. Bohan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061
david.bohan@kattenlaw.com

Daniel G. Swanson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520
dswanson@gibsondunn.com

*Attorneys for Defendants UBS AG and UBS Securities LLC*